IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

JBI ELECTRICAL SYSTEMS, INC,

      Plaintiff,

vs.                                                                    No. CIV 19-0614 JB/SCY

KW AQE, LLC and JMD
CONSTRUCTION SERVICES, LLC,

      Defendants.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on: (i) the Defendant JMD Construction Services, LLC's Motion to Dismiss or Transfer, filed July 26, 2019 (Doc. 6)("MTD"); (ii) the Defendant KW AQE, LLC's Motion for Summary Judgment, filed August 25, 2020 (Doc. 53)("KW AQE MSJ"); (iii) the Defendant JMD Construction Services, LLC's Motion for Summary Judgment, filed September 9, 2020 (Doc. 61)("JMD MSJ"); (iv) the Plaintiff JBI Electrical Systems' Motion for Judgment on the Pleadings, filed September 17, 2020 (Doc. 65)("JBI MJP"); and (v) the Plaintiff's Cross-Motion for Partial Summary Judgment, filed January 11, 2021 (Doc. 80)("JBI MSJ"). The Court held a hearing on the MTD on March 9, 2020. See Clerk's Minutes at 1, filed March 9, 2020 (Doc. 26). The Court entered an Order denying the MTD on March 16, 2020, but indicated that it would "issue a Memorandum Opinion at a later date more fully detailing the rationale for its decision." Order at 1 n.1, filed March 16, 2020 (Doc. 27). The Court held a hearing on the remaining motions -- the KW AQE MSJ, the JMD MSJ, the JBI MJP, and the JBI MSJ -- on January 13, 2021. See Clerk's Minutes at 1, filed January 13, 2021 (Doc. 86). The primary issues are: (i) whether the Court should dismiss Counts I through III of the Amended Complaint, filed August 16, 2019 (Doc. 15), under rule 12(b)(6) of the Federal Rules

of Civil Procedure, because Plaintiff JBI Electrical Systems, Inc. ("JBI Electrical") is barred statutorily from bringing those claims; (ii) whether the Court should dismiss this case under rule 12(b)(3) of the Federal Rules of Civil Procedure or should transfer this case to the Eastern District of Arkansas because of a forum selection clause in the Subcontract between JBI Electrical and JMD Construction; (iii) whether JBI Electrical did not comply substantially with the Construction Industries Licensing Act, N.M.S.A. § 60-13-1 (the "CILA"), and, therefore, is barred statutorily from bringing (a) its Foreclosure on Claim of Lien, Count III of the Amended Complaint, or (b) its Unjust Enrichment Claim; Count IV of the Amended Complaint; (iv) whether JBI Electrical must disgorge funds that it received under the Subcontract; (v) whether JBI Electrical can maintain an unjust enrichment claim against KW AQE, although it is not in contractual privity with KW AQE; (vi) whether KW AQE can bring directly claims against JBI Electrical for breach of the CILA; and (vii) whether JMD Construction can (a) assign validly its claims against JBI Electrical for breach of contract to KW AQE, and (b) agree to indemnify KW AQE from any claims against it by JBI Electrical, in exchange for KW AQE agreeing not to pursue claims against JMD Construction.  The Court concludes that: (i) as the Court stated in its Order, the Court declines to dismiss JBI Electrical's claims, because the Court must view the facts in the light most favorable to JBI Electrical, and JBI Electrical alleges that it is a properly licensed general contractor in the State of New Mexico; (ii) the Court declines to dismiss this case under rule 12(b)(3) of the Federal Rules of Civil Procedure or transfer this case to the Eastern District of Arkansas, because N.M.S.A. § 57-28A-1 prohibits transfers of cases involving construction contracts relating to New Mexico real property, such as the Subcontract at issue here; (iii) because JBI Electrical complied substantially with N.M.S.A. § 60-13-1, neither JBI Electrical's Amended Claim of Lien nor its Unjust Enrichment claim are barred statutorily; (iv) JBI Electrical need not disgorge the funds that

it received under the Subcontract, because it complied substantially with N.M.S.A. § 60-13-1; (v) JBI Electrical cannot maintain an unjust enrichment claim against KW AQE, because it is not in contractual privity with KW AQE, and JBI Electrical has contractual remedies against JMD Construction that JBI Electrical is pursuing in the present action; (vi) KW AQE could not bring independently direct contractual claims against JBI Electrical, because JBI Electrical and KW AQE are not in contractual privity, KW AQE may do so in this case given its assignment agreement with JMD Construction; and (vii) JMD Construction's assignment contract with KW AQE is valid, because (a) assignments of contractual rights and obligations are presumptively valid, (b) the Supreme Court of New Mexico has allowed parties to assign rights to bring tort law claims, and (c) nothing in the assignment agreement between JMD Construction and KW AQE is contrary to public policy;  thus, KW AQE may pursue claims against JBI Electrical on JMD Construction's behalf.  The Court, therefore: (i) denies the MTD; (ii) grants in part and denies in part the KW AQE MSJ; (iii) grants in part and denies in part the JMD MSJ; (iv) denies the MJP; (v) grants in part and denies in part the JBI MSJ; (vi) dismisses Count IV of the Amended Complaint; (vii) dismisses KW AQE from this action as a Defendant; and (viii) dismisses Count I, Counterclaim for Violation of the CILA, of the Defendant KW AQE, LLC's Response to Plaintiff's First Amended Complaint and Counterclaim for Violation of Construction Industries Licensing Act and Negligent Construction, filed April 1, 2020 (Doc. 34).

## **FACTUAL BACKGROUND**

The Court relies upon three distinct factual sections when deciding the motions before the Court.  The first factual section contains the facts upon which the Court relies for the purposes of the MTD, which the Court takes from the Amended Complaint.  See Fed. R. Civ. P. 12(b)(6).  The second factual section summarizes the undisputed material facts upon which the Court relies for purposes of the MSJs.  See Fed. R. Civ. P. 56.  With the parties' consent, when evaluating the

MSJs, the Court considers all undisputed material facts.  See Fed. R. Civ. P. 56(a).  The third factual section relays the facts upon which the Court relies for purposes of the MJP.  See Fed. R. Civ. P. 12(c).  With respect to the MJP, the Court considers the allegations of the nonmoving parties' -- KW AQE, LLC, ("KW AQE") and JMD Construction Services, LLC ("JMD Construction") -- to be true, and all of the movant JBI Electrical's,  contrary assertions to be disputed or false.  See Nat'l Metro. Bank v. United States, 323 U.S. 454, 456-57 (1945).

### 1.    **Facts for the MTD's Purposes.**

JBI Electrical "is a Texas corporation with its primary place of business in Fort Worth, Texas," and  "is a properly-licensed general contractor in the State of New Mexico."  See Plaintiff JBI Electrical Systems, Inc.'s First Amended Complaint  for Breach of Contract, Breach of the Implied Warranty of Good Faith and Fair Dealing, Foreclosure on the Claim of Lien, and Unjust Enrichment ¶ 1, at 1, filed August 16, 2019 (Doc. 15)("Am. Compl.").  KW AQE  "is an Arizona limited liability company, with its principal place of business in Tucson, Arizona."  Am. Compl. ¶ 2, at 1.  JMD Construction "is an Arkansas limited liability company, with its principal place of business in Little Rock, Arkansas."  Am. Compl. ¶ 3, at 2.  The property at issue, "the FedEx Freight Center, is located at the NWC of I-40 and Atrisco Vista Boulevard NW, Albuquerque, Bernalillo County, New Mexico . . . ."  Am. Compl. ¶ 4, at 2.

JMD Construction, a general contractor, entered into a Subcontract with JBI Electrical related to the FedEx Freight Center.  See Am. Compl. ¶ 8, at 2.  KW AQE owned the FedEx Freight Center.  See Am. Compl. ¶ 8, at 2.  JMD Construction and JBI Electrical made the agreement on April 25, 2018, for a price of $2,275,000.00.  See Am. Compl. ¶¶ 8-9, at 2.  In the Subcontract, JBI Electrical agreed to provide "all labor and materials necessary to perform a complete turnkey electrical contract."  Am. Compl. ¶ 10, at 3.

JBI Electrical began work, and "KW AQE, LLC, through Defendant JMD, as contractor,

directed JBI to perform additional work that was not required by the Project plans and specifications." Am. Compl. ¶ 11-12, at 3. Although JBI Electrical requested payment for the additional work, JBI Electrical never received payment. See Am. Compl. ¶ 13, at 3. JBI Electrical's additional labor and materials amounted to $248,414.63. See Am. Compl. ¶ 14, at 3.

JBI Electrical recorded a Claim of Lien on June 3, 2019. See Am. Compl. ¶ 15, at 3. On July 1, 2019, JBI Electrical recorded an Amended Claim of Lien. See Am. Compl. ¶ 15, at 3. The "Defendants have refused to pay any portion of the outstanding balance of $248,414.63, plus interest and attorneys' fees, and the balance remains unpaid to date." Am. Compl. ¶ 16, at 3.

       **2.**      **Facts for Purposes of the Motions for Summary Judgment.**

KW AQE is the owner and developer of property located at 1 Shamrock Way NE, Albuquerque, New Mexico (the "Property"). See KW AQE, LLC's Memorandum Brief in Support of Summary Judgment ¶ 1, at 1, filed August 25, 2020 (Doc. 54)("KW AQE MSJ Memo")(asserting this fact); Plaintiff/Counter-Defendant JBI's Response to Defendant/Counter-Plaintiff KW AQE, LLC's Motion for Summary Judgment ¶ 1, at 2, filed September 25, 2020 (Doc. 69)("JBI Response")(admitting this fact); Declaration of Kevin Kiernan ¶ 3, at 1 (dated Aug. 24, 2020), filed August 25, 2020 (Doc. 57)("Kiernan Decl."). KW AQE developed the Property pursuant to a lease agreement with FedEx Freight, Inc. ("FedEx"). See KW AQE MSJ Memo. ¶ 2, at 1 (asserting this fact); JBI Response ¶ 1, at 2 (admitting this fact); Kiernan Decl. ¶ 4, at 1. FedEx intended to use the property as a FedEx Freight Center. See KW AQE MSJ Memo. ¶ 2, at 1 (asserting this fact); JBI Response ¶ 1, at 2 (admitting this fact); Kiernan Decl. ¶ 4, at 1.

On November 27, 2017, KW AQE entered into a construction contract with JMD Construction, a general contractor; JMD Construction agreed to construct the FedEx Freight Center at the Property. See KW AQE MSJ Memo. ¶ 3, at 1 (asserting this fact); JBI Response ¶ 2, at 2 (admitting this fact, but noting that "neither KW AQE nor JMD have provided the prime

contract between the parties"); Kiernan Decl. ¶ 5, at 1.   JMD Construction received a

Subcontractor proposal from JBI on April 17, 2018, related to the FedEx Freight Center

construction.   See KW AQE MSJ Memo. ¶ 4, at 1 (asserting this fact); JBI Response ¶ 4, at 2

(admitting this fact); Declaration of Jacy M. Daugherty ¶ 4, at 1 (taken August 6, 2020), filed

August 25, 2020 (Doc. 56)("Daugherty Decl.").   JBI Electrical's proposal states that it has a

"license in commercial and industrial electrical construction" in New Mexico.   See KW AQE MSJ

Memo. ¶ 5, at 1-2 (asserting this fact); JBI Response ¶ 4, at 2 (admitting this fact); Daugherty Decl.

¶ 5, at 1.   The Subcontract between JMD and JBI required, in relevant part, that JBI:

> furnish its diligent efforts to perform the Subcontract Work in an expeditious
> manner and to cooperate with Constructor so that Constructor may fulfill its
> obligations to Owner.   Subcontractor shall furnish all of the labor, materials,
> equipment, and services, including but not limited to competent supervision, shop
> drawings, samples, tools, and scaffolding as are necessary for the proper
> performance of the Subcontract Work, all of which shall be provided in full accord
> with and reasonably inferable from the Subcontract Documents.   Subcontractor
> shall provide Constructor a list of its proposed Subcontractors and suppliers, and
> be responsible for taking field dimensions, providing tests, obtaining required
> permits related to the Subcontract Work and affidavits, ordering of materials, and
> all other actions as required to meet the Progress Schedule.

Standard Agreement Between Constructor and Subcontractor § 3.2, at 3, filed August 16, 2019

(Doc. 15-1)("Subcontract").   See KW AQE MSJ Memo. ¶ 23, at 3 (asserting this fact); JMD MSJ

Memo. at 1 (adopting this fact); JBI Response ¶ 19, at 5 (admitting this fact).

JBI Electrical received its initial license from the New Mexico Construction Industries

Division (the "CID") on November 14, 1995.   See JBI Response ¶ 8, at 3 (asserting this fact); KW

AQE, LLC's Reply Brief in Support of Motion for Summary Judgment at 1, filed October 7, 2020

(Doc. 71)("KW Reply")(admitting this fact);[1] Affidavit of Bruce Benes ¶ 4, at 2 (taken Sept. 24,

---

[1]The KW Reply does not dispute directly this fact; the Court, therefore, finds this fact admitted.   See D.N.M. LR-Civ 56.1(b) ("All material facts set forth in the Response will be deemed undisputed unless specifically controverted.").

2020), filed September 25, 2020 (Doc. 69-2)("Benes Aff."). JBI Electrical's license "inadvertently lapsed due to a clerical error" on November 30, 2015. JBI Response ¶ 8, at 3 (asserting this fact); Benes Aff. ¶ 4, at 2 (same). See KW Reply at 1 (admitting this fact).[2] Although its license had lapsed, JBI Electrical remained bonded and insured with the CID pursuant to the requirements of the CILA. See JBI Response ¶ 8, at 3 (asserting this fact); KW Reply at 1 (admitting this fact);[3] Benes Aff. ¶ 8, at 2. At the time the license lapsed, JBI Electrical had hired CT Corporation to manage its corporate registrations and licenses in fourteen states. See JBI Response ¶ 8, at 3 (asserting this fact); KW Reply at 1 (admitting this fact);[4] Benes Aff. ¶ 6, at 2. JBI Electrical was unaware that CT Corporation did not file the proper paperwork to renew the license. See JBI Response ¶ 8, at 3 (asserting this fact); KW Reply at 1 (admitting this fact);[5] Benes Aff. ¶ 6, at 2.

When JBI Electrical realized that its license had lapsed, it notified JMD Construction. See JBI Response ¶ 10, at 4 (asserting this fact); KW Reply at 1 (admitting this fact);[6] Affidavit of Bill

---

[2]The KW Reply does not dispute directly this fact; the Court, therefore, finds this fact admitted. See D.N.M. LR-Civ 56.1(b) ("All material facts set forth in the Response will be deemed undisputed unless specifically controverted.").

[3]The KW Reply does not dispute directly this fact; the Court, therefore, finds this fact admitted. See D.N.M. LR-Civ 56.1(b) ("All material facts set forth in the Response will be deemed undisputed unless specifically controverted.").

[4]The KW Reply does not dispute directly this fact; the Court, therefore, finds this fact admitted. See D.N.M. LR-Civ 56.1(b) ("All material facts set forth in the Response will be deemed undisputed unless specifically controverted.").

[5]The KW Reply does not dispute directly this fact; the Court, therefore, finds this fact admitted. See D.N.M. LR-Civ 56.1(b) ("All material facts set forth in the Response will be deemed undisputed unless specifically controverted.").

[6]The KW Reply does not dispute directly this fact; the Court, therefore, finds this fact admitted. See D.N.M. LR-Civ 56.1(b) ("All material facts set forth in the Response will be deemed undisputed unless specifically controverted.").

Smiley ¶ 7, at 2 (dated September 24, 2020), filed September 25, 2020 (Doc. 69-1)("Smiley Aff."). JMD Construction and JBI Electrical agreed to subcontract the work requiring licensure to Universal Technical Services ("Universal Technical"). See JBI Response ¶ 10, at 4 (asserting this fact); KW Reply at 1 (admitting this fact);[7] Smiley Aff. ¶ 8, at 2-3. Specifically, Universal Technical was to provide permitting, oversight, engineering and as needed electrical and control services. See KW AQE MSJ Memo. ¶ 24, at 3 (asserting this fact); JMD MSJ Memo. at 1 (adopting this fact); JBI Response ¶ 20, at 5 (admitting this fact); Independent Contractor Agreement at 27 (dated May 4, 2018), filed August 25, 2020 (Doc. 54). Meanwhile, Mr. William Smiley, Jr. -- JBI Electrical's qualifying party for most of its state licenses -- took the electrical contractor's certification exam and passed that exam in or around July, 2018. See JBI Response ¶ 10, at 4 (asserting this fact); KW Reply at 1 (admitting this fact);[8] Smiley Aff. ¶ 4, at 2. Around the same time, JBI Electrical submitted necessary paperwork to the CID to obtain a license renewal. See JBI Response ¶ 10, at 4 (asserting this fact); KW Reply at 1 (admitting this fact);[9] Benes Aff. ¶ 9, at 3. Universal Technical arranged for the permitting for the electrical work subcontracted to JBI Electrical. See KW AQE MSJ Memo. ¶ 25, at 3 (asserting this fact); JMD MSJ Memo. at 1 (adopting this fact); JBI Response ¶ 21, at 5 (admitting this fact, and explaining

---

[7]The KW Reply does not dispute directly this fact; the Court, therefore, finds this fact admitted. See D.N.M. LR-Civ 56.1(b) ("All material facts set forth in the Response will be deemed undisputed unless specifically controverted.").

[8] The KW Reply does not dispute directly this fact; the Court, therefore, finds this fact admitted. See D.N.M. LR-Civ 56.1(b) ("All material facts set forth in the Response will be deemed undisputed unless specifically controverted.").

[9] The KW Reply does not dispute directly this fact; the Court, therefore, finds this fact admitted. See D.N.M. LR-Civ 56.1(b) ("All material facts set forth in the Response will be deemed undisputed unless specifically controverted.").

that Universal Technical "provided all of the electrical permitting for the project, pursuant to its Subcontract with JBI, and those permits were provided directly to JMD prior to the performance of any electrical work on the project"); Daugherty Decl. ¶ 11, at 2; Smiley Aff. ¶ 9, at 3.  On February 8, 2019, Universal Technical received a partial final electrical inspection.  See KW AQE MSJ Memo. ¶ 26, at 3-4 (asserting this fact); JMD MSJ Memo. at 1 (adopting this fact); JBI Response ¶ 1, at 2 (admitting this fact); Daugherty Decl. ¶ 9, at 2.  The inspector granted JBI Electrical a conditional thirty-day permit, provided that "GFCI protection[10] was installed on all outlets within six feet of any sink, installation of the bollards[11] at the warehouse terminal to protect the panel boards and that the parking lot lighting was completed."  Daugherty Decl. ¶ 9, at 2.  See KW AQE MSJ Memo. ¶ 26, at 3-4 (asserting this fact); JMD MSJ Memo. at 1 (adopting

---

[10]A ground fault circuit interrupter ("GFCI")

can help prevent electrocution. If a person's body starts to receive a shock, the GFCI senses this and cuts off the power before he/she can get injured.  GFCIs are generally installed where electrical circuits may accidentally come into contact with water.  They are most often found in kitchens, bath and laundry rooms, or even out-of-doors or in the garage where electric power tools might be used.

Ground Fault Circuit Interrupters, Safe Electricity, https://safeelectricity.org/ground-fault-circuit-interrupters-gfcis/ (last visited Feb. 13, 2021).

[11]A bollard

is a short post used to create a protective or architectural perimeter.  When installed primarily as a visual guide, they guide traffic and mark boundaries.  As architectural elements they come in a wide variety of shapes and styles to accentuate or visually stand out in their settings.  Bollards can also be constructed to physically block vehicle incursion, protecting people and property.  These security posts may have decorative elements or be chosen to complement the landscape, but their primary consideration is resistance to impact forces.  Bollards can be made from almost any material, depending on their needed function, but the most common materials are metal, stone, cement, or plastic.

A Complete Guide to Bollards, Reliance Foundry, https://www.reliance-foundry.com/bollard/bollard-definition#gref (last visited Feb. 13, 2021).

this fact); JBI Response ¶ 1, at 2 (admitting this fact).  The work that the inspector identified was completed, and, on March 5, 2019, Universal Technical passed its final electrical inspection.  <u>See</u> KW AQE MSJ Memo. ¶ 27, at 4 (asserting this fact); JMD MSJ Memo. at 1 (adopting this fact); JBI Response ¶ 1, at 2 (admitting this fact); Daugherty Decl. ¶ 10, at 2.

KW AQE received a temporary certificate of occupancy for the project from the County of Bernalillo on February 12, 2019.  <u>See</u> Kiernan Decl. ¶ 10, at 2; KW AQE MSJ Memo. ¶ 9, at 2 (asserting this fact);); JMD MSJ Memo. at 1 (adopting this fact); JBI Response ¶ 1, at 2 (admitting this fact).  FedEx began using the Property and paying rent on the same day.  <u>See</u> Kiernan Decl. ¶ 13, at 2; KW AQE MSJ Memo. ¶ 10, at 2 (asserting this fact); JMD MSJ Memo. at 1 (adopting this fact); JBI Response ¶ 1, at 2 (admitting this fact).  On March 11, 2019, the County of Bernalillo provided KW AQE with the final certificate of occupancy.  <u>See</u> Kiernan Decl. ¶ 12, at 2; KW AQE MSJ Memo. ¶ 11, at 2 (asserting this fact); JMD MSJ Memo. at 1 (adopting this fact); JBI Response ¶ 1, at 2 (admitting this fact).  As a result of "technical clerical issues," CID did not issue the renewed license to JBI Electrical until March 23, 3019.  JBI Response ¶ 10, at 4 (asserting this fact); Benes Aff. ¶ 9, at 3 (same).  <u>See</u> KW Reply at 1 (admitting this fact).[12]  Smiley is the qualifying party for JBI Electrical's current New Mexico license.  <u>See</u> KW AQE MSJ Memo. ¶ 15, at 2 (asserting this fact); JMD MSJ Memo. at 1 (adopting this fact); JBI Response ¶ 11, at 4 (admitting this fact); Smiley Aff. ¶ 4, at 2; Affidavit of Katherine J. Torres at 1 (dated Oct. 30, 2019), filed August 25, 2020 (Doc. 55)("Torres Aff.")(no paragraph numbering).

On July 1, 2019, JBI Electrical recorded its Amended Claim of Lien for $248,414.63 on

---

[12]The KW Reply does not dispute directly this fact; the Court, therefore, finds this fact admitted.  <u>See</u> D.N.M. LR-Civ 56.1(b) ("All material facts set forth in the Response will be deemed undisputed unless specifically controverted.").

the Property as Document No. 2019054997 in the records of the Bernalillo County Clerk.  See KW

AQE MSJ Memo. ¶ 18, at 3 (asserting this fact); JMD MSJ Memo. at 1 (adopting this fact); JBI

Response ¶ 14, at 5 (admitting this fact); Amended Claim of Lien at 1 (dated June 28, 2019), filed

August 16, 2019 (Doc. 15-2)(stating that "JBI Electrical Systems . . . hereby amends its original

Claim of Lien  . . . to reflect the sum of . . . ($248,414.63), plus interest and attorneys' fees . . .").

JBI received $2,047,500.00, leaving a remaining balance of $476,255.94 on its Amended Claim

of Lien.  See KW AQE MSJ Memo. ¶ 18, at 3 (asserting this fact); JMD MSJ Memo. at 1 (adopting

this fact); JBI Response ¶ 14, at 5 (admitting this fact); Amended Claim of Lien at 1-3.

    **3.**   **Facts for the MJP's Purposes.**

    JBI Electrical is a Texas corporation with its primary place of business in Fort Worth,

Texas.  See Plaintiff JBI Electrical Systems, Inc.'s First Amended Complaint for Breach of

Contract, Breach of the Implied Warranty of Good Faith and Fair Dealing, Foreclosure on the

Claim of Lien, and Unjust Enrichment ¶ 1, filed August 16, 2019 (Doc. 15)("Am. Compl.").  JMD

Construction is an Arkansas limited liability company ("LLC"), with its principle place of business

in Little Rock, Arkansas.  See Am. Compl. ¶ 3.  The FedEx Freight Center is located at the

northwest corner of I-40 and Atrisco Vista Boulevard NW, in Albuquerque, New Mexico.  See

Am. Compl. ¶ 4.  KW AQE owns the Property, which has an address of 1 Shamrock Way NW,

Albuquerque, New Mexico.  See KW AQE Answer ¶ 1.

    On November 27, 2017, KW AQE entered into a contract with JMD Construction to

improve the Property.  See KW AQE Answer ¶ 2, at 5. On April 25, 2018, JMD Construction

entered into a Subcontract with JBI Electrical for work on the Property.  See Am. Compl. ¶ 8;

Agreement Between Contractor and Subcontractor at 1 (dated April 25, 2018), filed August 16,

2019 (Doc. 15-1)("Subcontract").   The Subcontract stated a price of $2,275,000.00 for JBI

Electrical's services.  See Am. Compl. ¶ 9; Subcontract at 13; KW AQE Answer ¶ 3, at 6.  JBI Electrical agrees to provide "all labor and materials necessary to perform a complete turnkey electrical contract."  Am. Compl. ¶ 3.  When JBI Electrical "bid on and entered into the contract with JMD Construction Services, LLC, JBI was not licensed by the Regulation and Licensing Department, Construction Industries Division to perform the work."  KW AQE Answer ¶ 7, at 6. JBI Electrical performed work on the FedEx Freight Center from May 31, 2018, through March 31, 2019.  See KW AQE Answer ¶ 8, at 6.  During this time, JBI Electrical did not purchase and install properly an electrical generator and transfer switch supplying electricity to the Project; KW AQE purchased and installed a generate at a cost over $300,000.00  See KW AQE Answer ¶ 23, at 8.  Other issues with JBI Electrical's work include "failure to install electrical work shown on the drawings, failure to support conduit as required, failure to comply with building code and fire marshal requirements . . . ."  KW AQE Answer ¶ 25, at 8.  As a result, KW AQE "was required to retain other electrical contractors and others to complete and correct the work performed by JBI at KW AQE, LLC's expense."  KW AQE Answer ¶ 26, at 8.  JBI Electrical obtained a license on March 23, 2019.  See KW AQE Answer ¶ 13, at 7.

On June 3, 2019, JBI Electrical recorded a Claim of Lien on the Property for $476,255.94. See Am. Compl. ¶ 15; KW AQE Answer ¶ 9, at 6.  On July 1, 2019, JBI Electrical recorded an Amended Claim of Lien on the Property.  See Am. Compl. ¶ 15; Amended Claim of Lien at 1-2 (dated June 28, 2019), filed August 15, 2019 (Doc. 15-2)("Amended Claim of Lien").  KW AQE paid for the work that JBI Electrical performed.  See KW AQE Answer ¶ 17, at 7.

## PROCEDURAL BACKGROUND

On July 3, 2019, JBI Electrical Systems filed a complaint against KW AQE and JMD Construction (the "Defendants").  See Plaintiff JBI Electrical Systems, Inc.'s Complaint for Breach of Contract, Breach of the Implied Warranty of Good Faith and Fair Dealing, Foreclosure on the

Claim of Lien, and Unjust Enrichment, filed July 3, 2019 (Doc. 1)("Complaint").  See also Am.

Compl.  The Defendants filed subsequently the MTD, which the Court denied in a March, 2020

Order.  See MTD at 1, Order at 3-4.  KW AQE filed an Answer with Counterclaims against  JBI

Electrical.  See KW AQE Answer at 5-9.  The Defendants each filed an MSJ.  See KW AQE MSJ;

JMD Construction MSJ.  JBI then filed an MJP.  See MJP.  Thereafter, JBI Electrical filed a partial

MSJ.  See JBI MSJ at 1.

       1.       **The Complaint.**

      In its Complaint,  JBI Electrical seeks damages, because JBI Electrical alleges that it "has

not been paid for the changes and additional work required by KW AQE, LLC in the amount of

$248,414.63, plus interest and attorneys' fees."  Complaint ¶ 14, at 3.  In Count I, Breach of

Contract, JBI Electrical alleges that JMD Construction has breached the Subcontract by failing to

pay for work that JBI Electrical has performed, and thereby "has damaged JBI in an amount to be

proved at trial."  Complaint ¶¶ 17-20, at 3-4.  In Count II, Breach of the Implied Warranty of Good

Faith and Fair Dealing, JBI Electrical alleges that JMD Construction breached the "duty of good

faith and fair dealing when it refused to honor the terms of the Subcontract by refusing to pay JBI

the funds due and owing to JBI for labor and materials provided to the project," and contends that

it has "been damaged directly as a direct result of JMD's breach in an amount to be proven at trial."

Complaint ¶¶ 21-25, at 4.  JBI Electrical alleges in Count III, Foreclosure on the Claim of Lien,

that it is entitled to foreclosure on its lien for "all unpaid labor and/or materials provided pursuant

to the Subcontract."  Complaint ¶¶ 26-32, at 4-5.  In Count IV, Unjust Enrichment, JBI Electrical

contends that KW AQE has benefited from JBI Electrical's wok, but has refused to pay JBI

Electrical and, therefore, "has been unjustly enriched in an amount to be determined at trial, plus

interest and attorneys' fees pursuant to the lien."  Complaint ¶¶ 33-36, at 5.

2.      **The Motion to Dismiss or Transfer**.

The Defendants filed jointly the Motion to Dismiss or Transfer.  See Motion to Dismiss or Transfer, filed July 26, 2019 (Doc. 6)("MTD").  See also Brief in Support of Defendants' Motion to Dismiss Amended Complaint or Transfer, filed July 26, 2019 (Doc. 7)("MTD Brief").  The Defendants note that JBI Electrical does not allege that it had a license, and that it "does not, in fact, have a New Mexico Contractor's license."  MTD ¶¶ 2-3, at 1; MTD Brief at 2 (noting that the "consequence of not having a license is a statutory bar on bringing an action for collection compensation for work performed which requires a license").  Next, the Defendants argue that JBI Electrical and JMD's Subcontract "contains a forum selection clause in which the parties agreed to binding dispute resolution via litigation in the State of Arkansas."  MTD ¶ 4, at 1.  See MTD Memo. at 4 (contending that the forum selection clause is enforceable because the language is mandatory).  The Defendants insist that the Court should dismiss Counts I and II, because, "as an unlicensed contractor at the time of the work, Plaintiff is statutorily barred from bringing or maintaining its claims."  MTD ¶¶ 6-12, at 2-3.  See MTD Brief at 3.  With respect to Count III, the Defendants contend that JBI Electrical likewise is barred statutorily from claiming its lien.  See MTD ¶¶ 13-16, at 3; MTD Brief at 3-4.   The Defendants then argue that venue is improper, because of the Subcontract's forum selection clause, and the Court should therefore dismiss the case under rule 12(b)(3).  See MTD ¶ 17-24, at 3-4.  The Defendants continue that, if the Court does not dismiss this case under rules 12(b)(3) or 12(b)(6), the Court should transfer the case to the United States District Court for the Eastern District of Arkansas.  See MTD ¶ 23, at 4.

3.      **The Amended Complaint**.

JBI Electrical amended the Complaint on August 16, 2019.  See Am. Compl. ¶ 1, at 1.  In addition to the information in the Complaint, JBI Electrical states that "JBI is a properly licensed general contractor in the State of New Mexico, and is in all ways qualified to bring and maintain

this action."  Am. Compl. ¶ 1, at 1.  There are no other changes that are not in the initial Complaint.
See Am. Compl. ¶¶ 1-36, at 1-5.

      **4.**      <u>**The Amended Motion to Dismiss or Transfer**</u>**.**

      The Defendants gave notice that they withdrew "their Motion to Dismiss or Transfer . . . as
to Plaintiffs original complaint, as Defendants have filed a subsequent Motion to Dismiss or
Transfer . . . seeking the same relief as to the First Amended Complaint."  Notice of Withdrawal
of Motion to Dismiss or Transfer, filed December 20, 2019 (Doc. 24).  The Defendants added in
the amended Motion to Dismiss or Transfer that JBI Electrical "fails to allege that it had a New
Mexico contractor's license at the time its cause(s) of action arose," and that JBI Electrical "did
not, in fact have a New Mexico contractor's license at the operative time."  Amended Motion to
Dismiss or Transfer ¶¶ 2-3, at 1, filed August 30, 2019 (Doc. 16)("Am. MTD").  The Defendants
also contend that, because JBI Electrical was "an unlicensed contractor at the time of the work,
Plaintiff is statutorily barred from bringing or maintaining its claims."  Am. MTD ¶ 11, at 2.  Last,
the Defendants assert that, because JBI Electrical "an unlicensed contractor at the time of the work,
Plaintiff is statutorily barred from filing or claiming its asserted lien."  Am. MTD ¶ 15, at 2.  The
Amended MTD otherwise remains unchanged from the original MTD.  <u>Compare</u> MTD ¶¶ 2, 3,
11, 15, at 1-4, <u>with</u> Am. MTD ¶¶ 2, 3, 11, 15, at 1-4.

      **5.**      <u>**The MTD Response**</u>**.**

      JBI Electrical responded to the MTD on September 13, 2019.  <u>See</u> Response in Opposition
to Motion to Dismiss or Motion to Transfer Venue, filed September 13, 2019 (Doc. 19)("MTD
Response").  JBI Electrical notes that "in Paragraph One of its Amended Complaint (Doc. 15),
Plaintiff alleges, without qualification, that it is a properly licensed general contractor in the State
of New Mexico and <u>is in all ways qualified to bring and maintain this action</u>."  MTD Response at
2 (emphasis in original).  Next, JBI Electrical explains that, even if it "was unlicensed at the

operative time, which Plaintiff disputes, New Mexico law allows for an unlicensed contractor to recover payment even if it was unlicensed when the cause of action accrued if it was in <u>substantial compliance</u> with CILA at the time the work was performed."  MTD Response at 2 (emphasis in original).  JBI Electrical asserts that, under the substantial compliance doctrine, "even if Plaintiff was unlicensed at the time its causes of action arose as Defendants allege, it could still be '<b><u>qualified to bring and maintain [its] action</u></b>' as it asserted in its Amended Complaint."  MTD Response at 4 (no citation for quotation)(emphasis in original).  With respect to the forum selection clause, JBI Electrical argues that N.M.S.A. § 57-28A-1 renders it void.  <u>See</u> MTD Response at 4-5.  Accordingly, the Plaintiffs ask the Court to deny the MTD.  <u>See</u> MTD Response at 5.

      6.    <b><u>The March 3, 2020, Hearing</u></b>.

The Court held a hearing on the MTD on March 3, 2020.  <u>See</u> Clerk's Minutes at 1.  The Court first informed the Defendants that it thought "the Tenth Circuit had categorized this as nonmandatory venue clause."    Transcript of Hearing at 4:19-21 (taken March 3, 2020)(Court)("March 3 Tr.").  The Defendants responded that, with respect to JBI Electrical's argument that "New Mexico has statutory provision that bars makes void arbitration  provision that is require venue in another state. . . . , three of the courts of appeal have ruled that the Federal Arbitration Act[13] supersedes and preempts those status."  March 3 Tr. at 5:17-22 (Calvert).  The Defendants asserted that the Court has "three choices: You can dismiss the litigation.  You can stay the litigation pending arbitration or you can transfer to the appropriate district court in the venue, but this Court can't order arbitration under the Federal Arbitration Act to arbitrate in another venue."  March 3 Tr. at 6:4-24 (Calvert)(citing <u>LodgeWorks, L.P. v. C.F. Jordan Const., LLC</u>, 506 F. App'x 747 (10th Cir. 2012); <u>Roe v. Gray</u>, 165 F. Supp. 2d 1164 (D. Colo. 2001)).  The

---

[13]9 U.S.C. §§ 1-307.

Defendants continued that the Court does not and should not "have to reach that transfer decision because the venue would be a question for the arbitrator unless you believe . . . that the New Mexico statute voids the arbitration provision completely in which case there is no agreement to Arbitrate . . . ." March 3 Tr. at 7:5-12 (Calvert).  The Court asked the Defendants to clarify what they want.  See  March 3 Tr. at 7:16-18 (Court).  The Defendants stated:

> We are in the first instance asking that the Court dismiss this  matter for JBI's failure to plead that it is a licensed contractor.  Second, Your Honor, we're asking the Court if the Court is unwilling to rule on the motion to dismiss on licensing grounds that the Court find that there is an arbitration provision between the parties that it would be up to the arbitrator to decide the venue for that arbitration and that this matter be either dismissed, stayed, or transferred for that arbitration.

March 3. Tr. at 8:13-23 (Calvert)(citing Spaw-Glass Const. Servs., Inc. v. Vista De Santa Fe, Inc., 1992-NMSC-067, 114 N.M. 557, 844 P.2d 807).

JBI Electrical spoke next, and told the Court that it did not wish to arbitrate this case.  See March Tr. at 10:17-24 (Court, Stevens-Block).  JBI Electrical explained that New Mexico's legislature has determined that "there is a public policy that is strong enough to void all venue selection clauses in a contract if it requires litigation or arbitration in any other state."  March 3 Tr. at 11:14-17 (Stevens-Block).  JBI Electrical continued that the CID "has a huge interest in making sure that the construction that takes place in New Mexico is done correctly and that any litigation arising from that is heard in the state."  March 3 Tr. at 11:18-21 (Stevens-Block).  JBI Electrical contended that, therefore, "the statute completely voids the provision as written that requires the arbitration or litigation in the other state."  March 3 Tr. at 12:12-14 (Stevens-Block).  JBI Electrical clarified that "if you believe that the statute voids that provision of the contract, we're left with no forum selection or litigation preference clause in the contract."  March 3 Tr. at 13:13-15 (Stevens-Block).  JBI Electrical continued that, alternatively, if the Court "did interpret the statute to say the forum selection clause is struck but the arbitration clause remains in force, this statute would

require that the case be arbitrated in New Mexico and not in Arkansas." March 3 Tr. at 13:15-17

(Stevens-Block).  JBI Electrical admitted that it had no case law to support this position, only a

literal reading of the statute.  See March 3 Tr. at 14:21-15:11 (Court, Stevens-Block).  The

Defendants then stated that they had made a mistake, and the Subcontract at issue does not contain

an arbitration clause.  See March 3 Tr. at 20:15-18 (Court, Calvert).

> As a result, the Defendants conceded their Motion to Transfer:

> MR. CALVERT:        I had believed based on the motion to transfer and dismiss
>                     that there was; that it was are the contract selection was
>                     arbitration in Arkansas.  It is not.  My apologies  Your
>                     Honor, the contract fairly clearly says litigation in Arkansas.
>                     Ms. Stevens-Block properly notes the statute doesn't
>                     void . . . arbitration provisions where it's another district.  It
>                     does claim to apply as matter of public policy to litigation
>                     where the forum would be another state.

> THE COURT:          So on the motion to transfer it sounds like that's a denial.

> MR. CALVERT:        I believe that is correct, Your Honor.

> THE COURT:          So we're not going anywhere and there is no arbitration
>                     clause, so we deny the motion to transfer we don't send it to
>                     arbitration unless y'all reach some agreement, and we move
>                     to the motion to dismiss.

> MR. CALVERT:        Yes, Your Honor.

March 3 Tr. at 20:21-21:19 (Court, Calvert).

The parties next discussed the MTD.  See March 3 Tr. at 21:20-21 (Court).  The Defendants

contended that JBI Electrical is barred statutorily from bringing this action, because "they were

not licensed at the time they entered into the contract, at the time they performed any of the work

related to the contract, or at the time they initially filed the complaint in this matter."  March 3 Tr.

at 22:18-23 (Calvert).  See id at 23:23-24:2 (Calvert)("Between the filing of the motion to dismiss

and the amended complaint, I do believe they got licensed again in New Mexico.").  The

Defendants argued that the operative date for licensure is when JBI Electrical entered the

Subcontract, not when it filed the Complaint.  <u>See</u> March 3 Tr. at 24:14-19 (Court, Calvert).  JBI

Electrical responded that it "was actually licensed as of March 2019, which was while the project

was still ongoing.  It was licensed before the lien was filed; it was also licensed in the State of New

Mexico before the lawsuit was filed."  March 3 Tr. at 26:16-20 (Stevens-Block).  JBI Electrical

concluded that, because this is an MTD, the Court must view facts in the light most favorable to

JBI Electrical.  <u>See</u> March 3 Tr. at 33:14-18 (Stevens-Block).  JBI Electrical also argued that the

operative date for licensure is the date that the Complaint was filed.  <u>See</u> March 3 Tr. at 33:14-18

(Stevens-Block).  The parties agreed that the law is unclear upon which party the substantial

compliance burden rests.  <u>See</u> March 3 Tr. at 36:8-13 (Calvert).

   7.   **The Order.**

      The Court denied the MTD, because "the contract's forum selection clause does not require

the Court to transfer the case; and (ii) the Complaint states a viable claim for relief."  Order at 1,

filed March 16, 2020 (Doc. 27).  At the hearing,

> [a]t the close of oral argument on the matter, the Court indicated its inclination to
> deny the motion.  <u>See</u> Tr. at 40:23-25 (Court).  The Court noted that it is consistent
> with <u>Bell Atlantic Corp. v. Twombly</u>, 500 U.S. 544 (2007), for a plaintiff to avoid
> pleading facts that would establish a defendants' affirmative defense.  <u>See</u> Tr. at
> 38:3-38:20 (Court).  The Court stated that, given the way JBI Electrical Systems
> has drafted the Complaint, the Defendants' defense is best resolved at the summary
> judgment stage.

Order at 2-3.  For these reasons, the Court denied the MTD.  <u>See</u> Order at 3.

   8.   **JMD's Answer.**

      JMD Construction filed an Answer to the Amended Complaint.  <u>See</u> Answer at 1, filed

March 25, 2020 (Doc. 32)("JMD Answer").  JMD Construction raises the following affirmative

defenses: (i) failure to state a claim on which relief may be granted; (ii) waiver; (iii) estoppel;

(iv) unclean hands; (v) first in breach; and (vi) set-off.  <u>See</u> Answer ¶¶ 37-42, at 3-4.  JMD

Construction asks the Court to "dismiss JBI Electrical System, Inc.'s complaint with prejudice,

award JMD Construction Services, LLC their attorneys' fees and costs, and for all other just and proper relief."  Answer at 4.

9.     **KW AQE's Answer and Counterclaim.**

KW AQE responds to JBI Electrical's Amended Complaint.  <u>See</u> Defendant KW AQE, LLC's Response to Plaintiff's First Amended Complaint and Counterclaim for Violation of Construction Industries Licensing Act and Negligent Construction, filed April 1, 2020 (Doc. 34)("KW AQE Answer").  KW AQE raises the following affirmative defenses: (i) failure "to sufficiently constitute a cause of action against KW AQE or fails to state facts upon which a claim can be based"; (ii) JBI Electrical's "failure to be properly licensed operated as estoppel and waiver of any rights to file the action"; (iii) JBI Electrical "was not an express or intended beneficiary of any agreement between KW AQE and any party"; (iv) JBI Electrical "lacks standing or capacity to bring this action because it is not properly licensed nor authorized to do business in this state"; and (v) "to the extent Plaintiff can and has sought relieve under its contract with JMD it cannot pursue relief under an unjust enrichment theory."  KW AQE Answer at 4-5.  KW AQE alleges that it has paid for the work JBI Electrical performed and that it is "entitled to recover from JBI the amounts received by JBI to which it was not entitled as an unlicensed contractor."  KW AQE Answer ¶¶ 17-18, at 7.  KW AQE also alleges a counterclaim for negligence against JBI Electrical. <u>See</u> KW AQE Answer ¶¶ 19-26, at 7-8.  Specifically, KW AQE argues that "JBI negligently constructed the electrical system for the FedEx facility through failure to install electrical work shown on the drawings, failure to support conduit as required, failure to comply with building code and fire marshal requirements, among other negligent acts."  KW AQE Answer ¶ 25, at 8.  KW AQE alleges that "as a direct and proximate result of JBI's breaches of its duties owed to KW AQE, LLC, KW AQE, LLC was required to retain other electrical contractors and others to

complete and correct the work performed by JBI at KW AQE, LLC's expense." KW AQE Answer ¶ 26, at 8. KW AQE, therefore, asks the Court to enter judgment against JBI Electrical "in the amount of $2,047,500.00 for amounts received by JBI as an unlicensed contractor, plus KW AQE, LLC's costs and damages incurred in completion and correction of the work performed by JBI, plus its attorney fees and costs." KW AQE Answer at 9.

10.    **JBI Electrical's Answer.**

JBI Electrical replies to KW AQE's Answer. See Plaintiff JBI Electrical Systems, Inc.'s Answer and Affirmative Defenses to Defendant KW AQE, LLC's Counterclaim, filed April 22, 2020 (Doc. 35)("JBI Answer"). JBI Electrical asserts the following affirmative defenses: (i) failure to state a claim upon which relief can be granted; (ii) comparative negligence; (iii) independent intervening cause; (iv) "services provided by JBI met the requisite standard of care"; (v) failure to mitigate; (vi) the "claim for punitive damages and/or exemplary damages is unconstitutional"; (vii) estoppel, laches, waiver, and unclean hands; (viii) that KW AQE "lacks capacity or standing to bring its suit"; and (ix) the right to assert additional affirmative defenses pending discovery. JBI Answer ¶¶ 1-9, at 5. JBI Electrical asks the Court to dismiss KW AQE's counterclaim with prejudice. See JBI Answer at 6.

11.    **The KW AQE MSJ.**

KW AQE filed a memorandum in support of its MSJ on August 25, 2020. See KW AQE MSJ Memo. at 1. First, KW AQE argues that JBI cannot succeed on its Amended Claim of Lien. See KW AQE MSJ Memo. at 5. In support of this contention, KW AQE describes the CILA's purpose: "to promote the general welfare of the people of New Mexico by providing for the protection of life and property by adopting and enforcing codes and standards for construction, alteration, installation, connection, demolition and repair work." N.M.S.A. § 60-13-1.1. See KW AQE MSJ Memo. at 5. KW AQE notes that the CILA requires that all contractors, including

Subcontractors, possess necessary licenses.  See KW AQE MSJ Memo. at 5.  Moreover, "a

'contractor operating without a license as required by the Construction Industries Licensing Act

shall have no right to file or claim any mechanic's lien as now provided by law.'"  KW AQE MSJ

Memo. at 5 (quoting N.M.S.A. § 60-13-30(B)).  KW AQE explains that, when the present cause

of action arose, JBI Electrical did not have a license as the CILA requires.  See KW AQE MSJ

Memo. at 6.  KW AQE notes that, further, JBI Electrical did not have a license: (i) when JBI

submitted a bid to perform the electrical work at issue; (ii) when JBI contracted to perform the

work; or (iii) at any point during performance of work, "with the exception of performing

corrective work for one week in March, 2019."  KW AQE MSJ Memo. at 6.  KW AQE argues that

New Mexico courts apply "a bright line test . . . that if a contractor is not licensed at the time the

contract is formed, then even if it acquired a license later it still may not recover."  KW AQE MSJ

Memo. at 6.  KW AQE concludes that, because "JBI was not licensed at the time of bidding,

contracting, or performing the work, JBI is prevented from recording a claim of lien against the

property and KW AQE is entitled to summary judgment as to JBI's Claim of Lien and claim for

foreclosure."  KW AQE MSJ Memo. at 7.

    Second, KW AQE insists that JBI Electrical cannot prevail on its unjust enrichment claim.

See KW AQE MSJ Memo. at 7.  KW AQE explains that, as with its claim of lien, JBI cannot

allege successfully unjust enrichment, because it was unlicensed.  See KW AQE MSJ Memo. at

6.  KW AQE also argues that, under New Mexico law, unjust enrichment remedies are "'strongly

disfavor[ed] . . . where remedies exist under contract law.'"  KW AQE MSJ Memo. at 7 (quoting

Abraham v. WPX Energy Prod., LLC, 20  F. Supp. 3d  1276,  1284-85  (D.N.M.

2014)(Browning, J.)).  KW AQE avers that an unjust enrichment may proceed only where a

contract is "'concededly unenforceable.'"  KW AQE MSJ Memo. at 8 (quoting Armijo v. FedEx

Ground Pckg. Sys., Inc., 285 F. Supp. 3d 1209, 1217-18 (D.N.M. 2018)(Brack, J.)).  Accordingly,

KW AQE argues that because JBI is pursuing presently breach-of-contract claims, JBI "cannot

pursue KW AQE as a third party for unjust enrichment."  KW AQE MSJ Memo. at 8.

Third, KW AQE argues that JBI Electrical must refund all funds it received as an

unlicensed contractor.  See KW AQE MSJ Memo. at 8.  Specifically, KW AQE insists that

"unlicensed contractors may not retain payments as a matter of public policy, even if the consumer

had knowledge that the contractor was unlicensed." KW AQE MSJ Memo. at 8.  KW AQE notes

that, here, KW AQE did not know that JBI Electrical was unlicensed.  See KW AQE MSJ Memo.

at 9.  Moreover, KW AQE explains that KW AQE "is the victim of precisely the type of problem

intended to be remedied by CILA."  KW AQE MSJ Memo. at 9.

Last, KW AQE contends that JBI Electrical did not comply substantially with the CILA.

See KW AQE MSJ Memo. at 9.  KW AQE notes that JBI Electrical has raised substantial

compliance with the CILA as an affirmative defense.  See KW AQE MSJ Memo. at 9.  KW AQE

describes the test for substantial compliance in New Mexico:

> The three elements that are to be considered are: "(1) the fact that plaintiff
> (contractor) held a valid license at the time of contracting, (2) that plaintiff readily
> secured a renewal of that license and (3) that the responsibility and competence of
> plaintiff's managing officer were officially confirmed throughout the period of
> performance of the contract."

KW AQE MSJ Memo. at 9-10 (quoting Peck v. Ives, 1972-NMSC-053, ¶ 20, 499 P.2d 684, 687).

KW AQE acknowledges that "it is not necessary that all three elements exist in order for a

contractor to substantially comply with CILA."  KW AQE MSJ Memo. at 10.  KW AQE notes

that JBI's license lapsed for three years and four months.  See KW AQE MSJ Memo. at 11-12.

KW AQE continues that "JBI had full knowledge that it was not licensed and attempted to cover

up that violation by representing that it was licensed and by having the permit pulled by another

contractor."  KW AQE MSJ Memo. at 12.  KW AQE maintains that JBI's Subcontract to

UNIVERSAL TECHNICAL does not satisfy the CILA's licensing requirements.  See KW AQE MSJ Memo. at 12.  KW AQE also emphasizes the length of time that it took for JBI to obtain a new license.  See KW AQE MSJ Memo. at 13.  KW AQE explains that before "that, JBI avoided any official review and approval of its responsibility and competence by passing all official responsibility" to UNIVERSAL TECHNICAL.  KW AQE MSJ Memo. at 13.  Accordingly, KW AQE concludes that the Court should grant summary judgment for KW AQE and award judgment "against JBI in the amount of $2,357,876.00 reflecting the amounts paid under the Subcontract to JBI and its suppliers."  KW AQE MSJ Memo. at 14.

### 12.    The JMD Response to the KW AQE MSJ.

JMD Construction asks the Court to "enter an order granting summary judgment in favor of KW AQE, LLC with respect to all claims addressed in its motion for summary judgment."  See Response to KW AQE, LLC's Motion for Summary Judgment, filed September 9, 2020 (Doc. 60).

### 13.    The JMD MSJ.

In its MSJ, JMD Construction asks that the Court enter an order:

A.        Granting summary judgment in favor of KW AQE, LLC with respect to all claims addressed in its motion for summary judgment and

B.      Granting summary judgment in favor of JMD Construction Services, LLC to dismiss Plaintiff's claims for breach of contract and breach of the covenant of good faith and fair dealing

JMD MSJ at 2-3.  JMD Construction incorporates KW AQE's summary judgment arguments into its MSJ.  See Brief in Support of JMD Construction Services, LLC's Motion for Summary Judgment at 1, filed September 9, 2020 (Doc. 62)("JMD MSJ Memo.").  JMD Construction argues:

> It is clear and undisputable that Plaintiff did not have a license when the contract was formed or during the overwhelming majority of the performance of the contract.  As a consequence of this failure by Plaintiff, it is statutorily barred from brin[g]ing its action or maintaining its action against JMD to collect any

compensation which may have been due under the contract.  As a result, JMD is entitled as a matter of law to a summary judgment order dismissing Plaintiff's claims with prejudice.

JMD MSJ Memo. at 3.

**14.    The JBI MJP.**

On September 17, 2020, JBI Electrical filed an MJP pursuant to rule 12(c) of the Federal Rules of Civil Procedure.  See MJP at 1.  JBI notes that "the same standards that govern a motion to dismiss under rule 12(b)(6) also govern a motion for judgment on the pleadings under rule 12(c)."  MJP ¶ 1, at 1 (citing Atl. Richfield Co. v. Farm Credit Bank, 225 F.3d 1139, 1160 (10th Cir. 2000)).  JBI Electrical explains that its claims are: (i) breach of contract, and breach of the implied warranty of good faith and fair dealing, against JMD Construction; and (ii) foreclosure on the claim of lien, and unjust enrichment, against KW AQE.  See MJP ¶ 2, at 2.  JBI Electrical indicates that KW AQE has filed counterclaims against JBI Electrical; specifically, KW AQE alleges violations of the CILA, and that, under the CILA, KW AQE "claims it is entitled to a refund from JBI for payments made by JMD to JBI for the electrical work performed on the project."  MJP ¶ 3, at 2.  JBI Electrical argues that KW AQE's CILA claim is unavailing, because the CILA does not "grant[] a private right of action to an owner of a construction project to enforce" the CILA "against a Subcontractor with whom it has no direct contractual relationship, in order to obtain a refund of contractual payments made to a general contractor."  MJP ¶ 4, at 2.  Accordingly, JBI Electrical avers that the Court should dismiss KW AQE's CILA claim with prejudice.  See MJP ¶ 5, at 2.

JBI Electrical also has filed a memorandum in support of the MJP.  See Plaintiff/Counter-Defendant JBI's Memorandum in Support of Motion for Judgment on the Pleadings, filed September 17, 2020 (Doc. 66)("MJP Memo").  JBI Electrical insists that, if it violated the CILA, KW AQE should "bring an action to vacate the mechanic's lien pursuant to" N.M.S.A. § 60-13-

30(B).  MJP Memo. at 1-2.  JBI Electrical continues that JMD Construction, rather than JBI

Electrical, is the proper party to KW AQE's CILA claim.  See MJP Memo. at 2.  JBI Electrical

notes that JMD Construction "contracted directly with KW AQE to act as the general contractor

and ensure that all work was performed in accordance with industry standard and in compliance

with New Mexico Law."  MJP Memo. at 2.  JBI Electrical continues that, if JMD Construction

"hired an unlicensed contractor to perform work on the project, which JBI Electrical denies, and

KW AQE paid JMD for that work, JMD -- not JBI -- is directly responsible to KW AQE for

reimbursement of those payments."  MJP Memo. at 2.  JBI Electrical argues that allowing KW

AQE to recover directly from JBI Electrical would undermine the CILA's purpose by allowing "a

general contractor to profit from its carelessness."  MJP Memo. at 3.

> JBI Electrical quotes from the CILA:

> > "No contractor shall act as agent or bring or maintain any action in any court
> > of the state for the collection of compensation for the performance of any act for
> > which a license is required by the Construction Industries Licensing Act without
> > alleging and proving that such contractor was a duly licensed contractor at the time
> > the alleged cause of action arose."

MJP Memo. at 4-5 (quoting N.M.S.A. § 60-13-30(A)).  JBI Electrical avers that N.M.S.A. § 60-

13-30(A) "preclude[s] a general contractor in direct privity with an owner from being compensated

for the unlicensed work performed by its Subcontractor."  MJP Memo. at 5.  JBI Electrical also

maintains that general contractors must refund payments for any unlicensed work.  See MJP

Memo. at 5.  JBI Electrical argues that, in New Mexico, general contractors are "completely

prohibit[ed] . . . from being compensated in any manner for licensed work commingled with

unlicensed work."  MJP Memo. at 5.  Moreover, JBI Electrical insists that KW AQE must seek

compensation from JMD Construction, not JBI Electrical.  See MJP Memo. at 5-6.  JBI Electrical

notes that it has not found a single case addressing an owner's private right of action against a

Subcontractor for reimbursement under the CILA.  See MJP Memo. at 6.  JBI Electrical explains

that "a party cannot seek a refund from an entity that it did not pay." MJP Memo. at 6. Consequently, JBI Electrical concludes that KW AQE's only direct remedy against JBI Electrical is "an action to vacate the mechanic's lien." MJP Memo. at 7-8.

15.    **The KW AQE Response to JBI's MJP.**

On September 24, 2020, KW AQE responded to JBI Electrical's MJP. See KW AQE, LLC's Response to JBI's Motion for Judgment on the Pleadings at 1, filed September 24, 2020 (Doc. 68)("KW MJP Response"). KW AQE notes that, because of rule 12(c)'s standards, the Court must "start from the assumption that, as pled by KW AQE, JBI was required to possess an electrical license and was not actually licensed while performing work on the project." KW MJP Response at 1. KW AQE argues that the CILA does not differentiate between contractors and Subcontractors for the purposes of relief. See KW MJP Response at 2. KW AQE explains that the CILA "defines all contractors, regardless of tier and whether they have contract with the owner or not as a 'contractor' for purposes of the statute." KW MJP Response at 2 (quoting N.M.S.A. § 60-13-3(B)). KW AQE also contends that JBI Electrical mischaracterizes Mascarenas v. Jaramillo, 1991-NMSC-014, 806 P.2d 59, and Romero v. Parker, 2009-NMCA-047, 207 P.3d 350. See KW MJP Response at 2-3. KW AQE notes that, although it "disputes JBI's interpretation of the law in New Mexico . . . it obtained an assignment from JMD . . . of the right to pursue amounts paid by" JMD Construction to JBI Electrical. KW MJP Response at 3-4.

KW AQE then insists that, under the CILA, JBI Electrical should disgorge its funds. See KW MJP Response at 4. KW AQE agrees with JBI Electrical that "there is no provision in the CILA that contemplates an action against a Subcontractor for disgorgement of funds received by it as an unlicensed contractor." KW MJP Response at 4. KW AQE argues, however, that courts have recognized this cause of action. See KW MJP Response at 4. KW AQE continues that if "an unlicensed contractor can avoid the consequences of the CILA by simply obtaining its payments

as a Subcontractor, rather than a contractor, the purpose of the CILA is subverted." KW MJP

Response at 5. Specifically, KW AQE explains that employing JBI's interpretation would subvert

the CILA's purpose by allowing "unlicensed contractors to flourish." KW MJP Response at 5.

KW AQE concludes that the Court should deny JBI Electrical's MJP, because: (i) JBI Electrical

"can point to no statute or caselaw that would deny the present counterclaim against JBI for

disgorgement"; and (ii) "disgorgement by JBI is entirely consistent with the purpose of the CILA

and the law of" New Mexico. KW MJP Response at 5.

      16.    **JBI Electrical's Response to KW AQE's MSJ.**

      On September 25, 2020, JBI Electrical responded to the KW AQE MSJ. See

Plaintiff/Counter-Defendant JBI's Response to Defendant/Counter-Plaintiff KW AQE, LLC's

Motion for Summary Judgment, filed September 25, 2020 (Doc. 69)("JBI Response to KW AQE

MSJ"). JBI argues that KW AQE lacks a counterclaim under the CILA. See JBI Response to KW

AQE MSJ at 1. JBI Electrical notes that genuine issues of material fact exist whether JBI Electrical

"was a properly licensed general contractor in the State of New Mexico at all relevant times and/or

qualified to bring and maintain this action against KW AQE for foreclosure on the claim of lien

and unjust enrichment." JBI Response to KW AQE MSJ at 1.

      JBI Electrical asserts that, because it is a licensed contractor in New Mexico, it is qualified

to maintain this action. See JBI Response to KW AQE MSJ at 7. JBI Electrical insists that it "has

been a duly licensed contractor in compliance with CILA, at all times pertinent to this litigation."

JBI Response to KW AQE MSJ at 7. JBI Electrical admits that its New Mexico license lapsed

"due to a clerical error . . . ." JBI Response to KW AQE MSJ at 8. JBI Electrical argues that the

licensing lapse, however, was "inadvertent and unrelated to JBI's qualifications as a contractor."

JBI Response to KW AQE MSJ at 8. JBI Electrical avers that "it is ludicrous to assume JBI would

intentionally jeopardize its status as a New Mexico contractor . . . by intentionally violating the

requirements of CILA simply to avoid paying a nominal fee for renewal."  JBI Response to KW

AQE MSJ at 8.  JBI Electrical also explains that it had not performed work in New Mexico for

several years when it contracted with JMD Construction regarding the FedEx Freight Center

construction.  See JBI Response to KW AQE MSJ at 8.  JBI Electrical insists that it did not realize

that its license had lapsed until JBI Electrical attempted to obtain permits for the FedEx Freight

Project.  See JBI Response to KW AQE MSJ at 8.  Thereafter, JBI Electrical avers that it notified

immediately JMD Construction about the licensing issue.  See JBI Response to KW AQE MSJ at

8.  JBI continues that, because JMD Construction "could not delay JBI's mobilization on the

project due to schedule constraints," JMD Construction and JBI Electrical agreed to have "JBI

Subcontract the scope of work requiring licensure to" UNIVERSAL TECHNICAL.  JBI Response

to KW AQE MSJ at 8.

      17.    **JBI'S Response to JMD's MSJ.**

     JBI Electrical also responds to JMD's MSJ.  See JBI's Response to Defendant JMD's

Motion for Summary Judgment at 1, filed September 25, 2020 (Doc. 70)("JBI Response to JMD

MSJ").  JBI Electrical notes that it "adopts and incorporates by reference all arguments and

authority relied upon" in the JBI Response.  See JBI Response to JMD MSJ at 3.  JBI Electrical

then argues that JMD Construction relies "on language quoted from a case decided in 1953" to

"falsely assert[] that JBI is statutorily barred from suing it for breach of contract."  JBI Response

to JMD MSJ at 3.  JBI Electrical explains that the Supreme Court of New Mexico ruled

subsequently in Koehler v. Donnelly, 1992-NMSC-058, ¶¶ 11-12, 114 N.M. 363, 364, 838 P.2d

980, 981 (1992), that "a contractor who did not hold a valid license at the time of contracting or

any time during the performance nonetheless substantially complied with CILA and was not barred

from recovery."  JBI Response to JMD MSJ at 3-4.  Discussing a Court of Appeals of New Mexico

opinion which bars recovery for an unlicensed contractor, JBI explains that the Court is "'not bound by the Court of Appeals' decision in the same way that it would be bound by a Supreme Court decision.'"  JBI Response to JMD MSJ at 5 (quoting <u>Bailey v. Markham</u>, 2020 U.S. Dist. LEXIS 48576, at *100-03 (D.N.M. March 20, 2020)(Browning, J.)).  JBI Electrical concludes that "the Supreme Court of New Mexico has spoken and determined that contractors who do not hold a valid license at the time of contracting or any time during the performance could nonetheless recover where they had substantially complied with CILA."  JBI Response to JMD MSJ at 5.  Consequently, JBI requests that the Court deny the JMD MSJ.  <u>See</u> JBI Response to JMD MSJ at 6.

**18.    <u>The KW Reply</u>.**

KW AQE replies to the JBI Response to KW AQE's MSJ.  <u>See</u> KW AQE, LLC's Reply Brief in Support of Motion for Summary Judgment, filed October 7, 2020 (Doc. 71)("KW Reply").  KW AQE notes that JBI Electrical "only actually contests five statements of fact" from the KW AQE MSJ, and addresses each factual dispute in turn.  KW Reply at 1-2.  KW AQE avers that "the only dispute is as to whether or not JMD was aware of JBI's status as an unlicensed contractor."  KW Reply at 4.  KW AQE continues that JBI Electrical's actions after entering a contract with JMD Construction are irrelevant, and do not defeat KW AQE's MSJ.  <u>See</u> KW Reply at 4.  KW AQE explains that "the courts have held that an owner's knowledge of the contractor's status as an unlicensed contractor is not a bar to disgorgement."   KW Reply at 4.

KW AQE avers that JBI Electrical did not comply substantially with the CILA.  <u>See</u> KW Reply at 4.  KW AQE maintains that the Court should apply the test from <u>Peck v. Ives</u>.  <u>See</u> KW Reply at 4.  KW AQE explains that, although "JBI offers various statements about how its unlicensed status came about and the lack of notice from CT Corp.," this "does not change the fact

that JBI was not licensed at the time" of contracting.  KW Reply at 5.  KW AQE continues that,

"despite . . . being aware of the need for a license since May, 2018, JBI did not actually obtain a

license until March 23, 2019."  KW Reply at 5.  KW AQE maintains that "no case in California,

where the substantial compliance doctrine was adopted from, or in New Mexico has ever held that

a delay anywhere near the delay in the present case satisfies the second element of the test."  KW

Reply at 5.  KW AQE explains that "'belated compliance with the statute does not in itself

constitute compliance if the initial acquisition of the required license postdates the completion of

performance under the contract.'"  KW Reply at 6 (quoting Lapitac, Inc. v. Superior Court, 64 Cal.

2d 278, 49 Cal. Rptr. 676, 411 P.2d 564).  KW AQE also notes that Smiley was not confirmed "as

being competent and responsible . . . until after almost all of the work was complete."  KW Reply

at 6.  KW AQE explains that JBI Electrical's ability to obtain a bond is not sufficient to satisfy

New Mexico's substantial compliance test.  See KW Reply at 7.  KW AQE avers that JBI Electrical

did not comply substantially with the CILA, because JBI Electrical was not "officially confirmed

by CID during the period of time JBI was performing work on the contract."  KW Reply at 7.

Consequently, KW AQE contends that JBI "may not maintain its current claims and must actually

refund to KW AQE all amounts that it received as an unlicensed contractor."  KW Reply at 7.

     **19.    The JMD Reply.**

     JMD Construction replies to JBI Electrical's arguments against the Defendants' MSJs.  See

Reply to JBI's Response to JMD Construction Services, LLC's Motion for Summary Judgment,

filed October 9, 2020 (Doc. 72)("JMD Reply").  In the Reply, JMD Construction "firmly states that

JBI's alleged informing JMD of its lack of license does not provide a defense to JMD's summary

judgment motion." JMD Reply at 1 (citing Mascarenas v. Jaramillo, 111 N.M. 410, 414, 1991-

NMSC-014, 16, 806 P.2d 59, 63 (1991)).  JMD Construction argues that JBI Electrical cannot assert

that it did not know that its license lapsed, because its agent, CT Corporation "knew of the requirement to renew and failed to do so." JMD Reply at 2. JMD Construction then maintains that, like the plaintiff in Roth v. Thompson, JBI Electrical waited too long to obtain a new license to satisfy substantial compliance. See JMD Reply at 2-3 (citing 113 N.M. 331, 825 P.2d 1241 (1992)). JMD Construction concludes, therefore, that because JBI Electrical "through its agent, knew of the lapse in its license, failed to obtain a new license for nearly a year after claiming to know . . . and didn't obtain a new license until after the work was done, there cannot be substantial compliance with CILA." JMD Reply at 4.

        20.    **The Cross-Motion for Summary Judgment.**

        JBI Electrical files a partial MSJ. See JBI MSJ at 1. JBI contends that, because it is "a contractor in substantial compliance with CILA, JBI is qualified to bring this action." JBI MSJ ¶ 5, at 2. Regarding KW AQE, JBI Electrical argues that it is entitled to summary judgment, because it has no direct contractual relationship with KW AQE. See JBI MSJ ¶ 6, at 2. With respect to JMD Construction, JBI Electrical alleges that, because JMD is "a general contractor in violation of CILA, JMD has no rights to pursue an action against JBI." JBI MSJ ¶ 7, at 2. Accordingly, JBI Electrical asks the Court

        to enter summary judgment against KW AQE as follows:

        a.    Declaring JBI a qualified party to this action as duly licensed contractor in substantial compliance with CILA licensing requirements;

        b.    Declaring assignment of JMD's claims under CILA as legally insufficient; and

        c.    Granting summary judgment in favor of JBI and against KW AQE for any claims brought against JBI under CILA.

JBI MSJ at 2.

        JBI Electrical also files a Memorandum in support of its MSJ. See Memorandum Brief in

Support of Plaintiff's Cross-Motion for Partial Summary Judgment at 1, filed January 11, 2021 (Doc. 81)("JBI MSJ Memo"). JBI Electrical begins by arguing that N.M.S.A § 60-13-30 does not apply to ban JBI Electrical from collecting construction debts. See JBI MSJ Memo. at 5. JBI Electrical admits that the CILA "disfavors allowance of an unlicensed contractor's claim to recover damages for work requiring a license," but avers that "recovery is permissible when the party seeking to escape its obligation to the contractor has received the full protection contemplated by the statute." JBI MSJ Memo. at 5. JBI Electrical argues that the Defendants' interpretation of the CILA would allow them to use the statute "as 'an unwarranted shield for the avoidance of a just obligation.'" JBI MSJ Memo. at 5 (quoting Peck v. Ives, 1972-NMSC-053, ¶ 23). JBI Electrical argues that the clerical errors which caused its license to lapse do not prevent it from complying substantially with the CILA. See JBI MSJ Memo. at 6. JBI Electrical continues that its violation of the CILA was not willful. and that, therefore, it should be permitted to proceed with its damages suit. See JBI MSJ Memo. at 7. JBI Electrical emphasizes that it "had not performed work in New Mexico for several years prior to contracting with JMD" and, as a result, "was totally unaware of the lapse" in its New Mexico license. JBI MSJ Memo. at 7. JBI Electrical also notes that it took immediate action to remedy the defects in its license. See JBI MSJ Memo. at 7-8. JBI Electrical contends that it also meets the third substantial compliance factor, because it "demonstrated professional competence by solely employing licensed professionals for the project, and financial responsibility by maintaining bonding and insurance." JBI MSJ Memo. at 8. JBI argues that KW AQE "seeks to exploit CILA as a potential opportunity to obtain a windfall." JBI MSJ Memo. at 9.

JBI Electrical then insists that JMD Construction, instead of JBI Electrical, is the proper party for KW AQE's CILA claim. See JBI MSJ Memo. at 9-10. JBI notes that it has no direct

contractual relationship with KW AQE.  See JBI MSJ Memo. at 10.  JBI Electrical maintains that

the "Supreme Court of New Mexico has interpreted the provisions of CILA to preclude a general

contractor in direct privity with an owner from being compensated for the unlicensed work

performed by its Subcontractor."  JBI MSJ Memo. at 10.  JBI Electrical insists that allowing "an

owner to sue a Subcontractor with whom it had no contractual relationship would allow the general

contractor to both escape any liability and profit from its own violations of CILA."  JBI MSJ

Memo. at 12.

Next, JBI Electrical argues that JMD Construction may not assign its rights to KW AQE,

because JMD Construction lacks any cause of action against JBI Electrical.  See JBI MSJ Memo.

at 13.  JBI Electrical maintains that JMD Construction did not "make any reasonable inquiry into

JBI's licensing, prior to entering the contract."  JBI MSJ Memo. at 14.  JBI Electrical elaborates

that, although JMD could have accessed this information on the CID website, it did not check JBI

Electrical's licensing status because it was in a rush to contract with JBI Electrical as a result of

timing constraints.  See JBI MSJ Memo. at 14.  JBI Electrical contends that JMD thus breached

its duty under the CILA to ensure that JBI was licensed.  See JBI MSJ Memo. at 15.  JBI concludes

that it is entitled to summary judgment on KW AQE's CILA disgorgement claims, "because JBI

is not the proper party to such claims."  JBI MSJ Memo. at 15.

### 21.   The January 13, 2021, Hearing.

The Court held a hearing on January 13, 2021.  See Transcript of Hearing (taken January

13, 2021)("Jan. 13 Tr.").[14]  KW AQE spoke first, and began by noting that "there is a fair amount,

if not complete overlap between KW AQE's" MSJ and JMD's MSJ.  Jan. 13 Tr. at 1:20-25

---

[14]The Court's citations to the transcript of the hearing refer to the court reporter's original,
unedited version. Any final transcript may contain slightly different page and/or line numbers.

(Calvert). KW AQE stated that the JBI MJP "again, addresses the licensing issue. I think all three

of those are tied into the same facts, same arguments." Jan. 13 Tr. at 3:1-4 (Calvert). KW AQE

indicated that JBI Electrical's MSJ is also "on the same issues." Jan. 13 Tr. at 3:14-17 (Calvert).

The Court noted that the parties' briefing "signals there are not factual disputes here." Jan. 13 Tr.

at 3:21-24 (Court). KW AQE agreed in large part, although it identified one factual dispute:

> One of the issues was that the money that is sought to be recovered by KW AQE,
> they weren't the ones, according to one of the affidavits from JBI to actually pay
> JBI, so they shouldn't be entitled to recover those funds. In the Reply, there is a
> counter affidavit in joint checks. I think there is a factual dispute possibly over those
> payments . . . .

Jan. 13 Tr. at 4:7-13 (Calvert). KW AQE explained, however, that, otherwise, "for the most part,

the facts are undisputed . . . ." Jan. 13 Tr. at 4:12-14 (Calvert). KW AQE asserted that the key

issue is whether JBI Electrical was "licensed at the time that it contracted for and performed the

work in this matter." Jan. 13 Tr. at 6:7-10 (Calvert). KW AQE contended that "it doesn't matter

if a contractor later becomes licensed. They have to be licensed at the time that the contract was

entered into and at the time they performed work." Jan. 13 Tr. at 7:6-10 (Calvert). Next, KW

AQE argued that, because JBI Electrical can bring an action against JMD Construction, it cannot

bring an unjust enrichment claim against KW AQE. See Jan. 13 Tr. at 8:18-21 (Calvert). KW

AQE alleges that, via its unjust enrichment claim against KW AQE, JBI Electrical is "trying to

jump to the third party who had no privity with" JBI." Jan. 13 Tr. at 9:1-2 (Calvert).

KW AQE also discussed New Mexico state precedent, and averred that these cases "do not

allow an unlicensed contractor to pursue recovery of any funds and require these contractors

receiving funds to refund those monies to the owner." Jan. 13 Tr. at 9:14-17 (Calvert). KW AQE

emphasized that "the most damning evidence" regarding JBI Electrical's licensing issues "is that,

shortly after entering into the contract . . . JBI entered into a separate independent contractor

agreement with a licensed New Mexico contractor for $5,000.00 to pull the permits and call for

the inspections that were required because JBI could not do it . . . ."  Jan. 13 Tr. at 10:10-21 (Calvert).  KW AQE characterized JBI's conduct as an attempt "to essentially cover up the fact that they weren't licensed and couldn't do the work."  Jan. 13 Tr. at 10:22-25 (Calvert).

KW AQE then addressed JBI's "countervailing argument" that it complied substantially with the CILA.  Jan. 13 Tr. at 11:8-11 (Calvert).  KW AQE maintained that four substantial compliance cases exist in New Mexico that "didn't require the contractor to be licensed at the time it entered into the contract."  Jan. 13 Tr. at 11:15-19 (Calvert).  KW AQE explained that New Mexico adopted the substantial compliance rule from California in 1972.  See Jan. 13 Tr. at 11:20-23 (Calvert).  KW AQE noted that JBI Electrical does not meet the substantial compliance test's first element, because it was unlicensed at the time of contracting.  See Jan. 13 Tr. at 11:25-12:4 (Calvert).  As to the second element, KW AQE discussed its dispute with JBI Electrical regarding "what readily secured requires."  Jan. 13 Tr. at 12:7-8 (Calvert).  Here, KW AQE argues that JBI Electrical did not secure readily a license, because "essentially 100% of the work performed by JBI was done while it was unlicensed," and because JBI Electrical "took almost one year after the contract was entered to finally obtain one."  Jan. 13 Tr. at 12:24-25 (Calvert).  As to the test's third element, KW AQE argued that "the cases where California has recognized that element has been met are where the unlicensed contractor had another entity in the state that was licensed, had been approved by the licensing entity, had a bond with the licensing entity."  Jan. 13 Tr. at 13:20-25 (Calvert).  KW AQE continued that, here, by contrast, JBI Electrical does not operate a separate corporation New Mexico.  See Jan. 13 Tr. at 14:6-9 (Calvert).  KW AQE also emphasized that JBI Electrical was "without a license for three years" in New Mexico.  Jan. 13 Tr. at 17:7 (Calvert).  KW AQE alleged that there "is no way JBI entered into a Subcontract with" Universal Technical "to perform all licensed work on its behalf for $5,000 on a $2.2 million contract."  Jan. 13 Tr. at

18:10-14 (Calvert).  KW AQE insisted that "the law in New Mexico is if you are unlicensed, you

cannot Subcontract out the licensing requirement.  You can't turn around and pass through

someone else and his license the obligation of performing the work.  You individually, in entering

into the contract, have to be licensed."  Jan. 13 Tr. at 18:14-20 (Calvert).

KW AQE next addressed the JBI MJP.  See Jan. 13 Tr. at 18:22-25 (Calvert).  KW AQE

identified JBI Electrical's primary argument: that KW AQE, an owner, cannot bring an action

against JBI, a subcontractor, because they lack contractual privity.  See Jan. 13 Tr. at 19:2-5

(Calvert).  KW AQE argued that "there is no New Mexico decision that would support" JBI's

argument.  Jan. 13 Tr. at 19:5-6 (Calvert).  KW AQE also noted that JMD Construction has

assigned its right to sue JBI Electrical for unlicensed contracting to KW AQE.  See Jan. 13 Tr. at

20:22-25 (Calvert).  KW AQE concluded that

> all of the payments to JBI were funds directly from KW AQE.  KW AQE paid JBI
> by joint check all of the joint checks are attached and show that those payments
> were direct, KW AQE is merely seeking the return of those payments that it made
> direct to JBI where JBI was unlicensed at the time and not entitled to keep it.

Jan. 13 Tr. at 21:5-11 (Calvert).

JMD Construction then sought to supplement KW AQE's arguments.  See Jan. 13 Tr. at

21:25-22:1 (Gershner).  JMD Construction argued that, because of JBI's licensing gap, it is barred

statutorily from bringing an action against JMD Construction.  See Jan. 13 Tr. at 22:4-12

(Gershner).  JMD Construction continued that JBI has not alleged that CTC did not know about

the licensing lapse.  See Jan. 13 Tr. at 23:9-14 (Gershner).  Moreover, JMD Construction argued

that, under agency law, "it is very clear that CTC was JBI's agent for the purpose of maintaining

licensing" and "that the principle will be responsible of the action or inactions of its agent."  Jan.

13 Tr. at 23:16-23 (Gershner).  JMD emphasized that during a "three to four-year span," JBI's

"license was not readily renewed."  Jan. 13 Tr. at 24:16-17 (Gershner).  JMD Construction alleges

that Smiley, the party responsible for JBI Electrical's license, "was not physically at the site at all." Jan. 13 Tr. at 25:3-5 (Gershner). Last, JMD Construction characterized its position as "purely defensive, JMD is simply seeking for JBI's claims for compensation against JMD to be dismissed." Jan. 13 Tr. at 25:14-17 (Gershner).

JBI Electrical began argument and indicated that "largely we agree on many of the facts." Jan. 13 Tr. at 27:11 (Stevens-Block). JBI Electrical emphasized that there are two primary issues before the Court:

> First, was JBI in substantial compliance with the licensing laws of New Mexico? With respect to that question, there's a long line of New Mexico cases and fully support JBI's contention that it was in substantial compliance with the law. The second question, and this question goes to both JMD's motion for summary judgment as well as JBI's motion for judgment on the pleadings, is if in fact JBI was in substantial compliance with the licensing laws, can JMD, as the prime contractor responsible for the project, escape liability under the construction industry's licensing act by allying with the project owner, KW AQE, and attempting to contract around the responsibilities of the act via assignments. With respect to that question, the policy of the CILA, in conjunction with the very significant amount of paid off regarding compliance with the act, suggest that JMD is equally liable for JBI's violation of the statute and cannot escape liability. That really is the basis of JBI's Motion for Judgment on the Pleadings.

Jan. 13 Tr. at 28:5-25 (Stevens-Block). JBI Electrical argued that, in New Mexico, "courts do not rely on strict compliance with the law." Jan. 13 Tr. at 29:9-11 (Stevens-Block). JBI Electrical noted that four cases in New Mexico have addressed the issue of substantial compliance. See Jan. 13 Tr. at 29:21-30:1 (Stevens-Block)(citing Peck v. Ives, 1972-NMSC-053, 499 P.2d 684 ("Peck"); Roth v. Thompson, 1992-NMSC-011, 825 P.2d 1241; Koehler v. Donnelly, 1992-NMSC-058, 838 P.2d 980; and Fowler Bros., Inc. v. Bounds, 2008-NMCA-091, 188 P.3d 1261). JBI explained that Gamboa v. Urena, 2004-NMCA-053, 90 P.3d 534, is not a substantial compliance case, because the defendant never raised that issue. See Jan. 13 Tr. at 30:7-10 (Stevens-Block). JBI emphasized that "in fifty years the New Mexico legislature has never taken issue with the application of this doctrine." Jan. 13 Tr. at 31:7-9 (Stevens-Block). JBI argued that,

as case law has evolved, New Mexico courts have placed "the utmost importance on what does [ the CILA] require, and are the polices and purposes being fulfilled by these contractors that have lapses in the licensing." Jan. 13 Tr. at 35:1-3 (Stevens-Block). Regarding duration of time taken in previous cases to renew a lapsed license, JBI stated that: "Latipac and Peck had a license at the time of the contract, and then it took fifteen months for Latipac to renew after the performance. It took Peck seven months to renew after the performance, and Koehler quickly became renewed, but it still wasn't renewed until after the performance . . . ." Jan. 13 Tr. at 35:10-17 (Stevens-Block).

JBI Electrical then described the third element of the substantial compliance test, and argued that "this is probably the least important element to fulfilling the policies that were staked." Jan. 13 Tr. at 36:1 (Stevens-Block). JBI Electrical identified "important elements" as: "was it an inadvertent lapse"; and (ii) "did the responsible party renew immediately when they discovered the inadvertent lapse." Jan. 13 Tr. at 36:8-12 (Stevens-Block). JBI distinguished Fowler Bros., Inc. v. Bounds and Gamboa v. Urena from the present case, because, although the Court of Appeals of New Mexico determined that the contractors in those cases were not complying substantially with the CILA, neither contractor in these cases ever had a license, and both were "unwilling to get a license until it benefited them, which does not support the policy behind" the CILA. Jan. 13 Tr. at 36:8-12 (Stevens-Block). According to JBI Electrical, courts focus on "evidence of willful skirting of the rules." See id. at 36:8-12 (Stevens-Block). Jan. 13 Tr. at 37:1-4 (Stevens-Block).

JBI then explained the relationship between KW AQE, JMD Construction, and JBI Electrical:

> [J]ust to kind of high level, KW AQE is the project owner. They're a sophisticated developer. They hired JMD as the prime contractor, both under the actual requirement as well as a statutory obligation, JMD is required to hire licensed Subcontractors. My understanding is that JMD and KW AQE entered into a

> contract over a year before the contract was entered between JMD and JBI. At that time I think there was some significant time crunch. Technical JBI was asked to bid a couple of times in order for its quotes to complete overlap in line with JMD's contract with KW AQE, but in and around 2018, JBI did contract directly with JMD to perform the electrical contracting on this project. This is an extremely large-scale project. The work that was being done by JBI was multiple millions of dollars.

Jan. 13 Tr. at 37:5-20 (Stevens-Block). JBI Electrical then provided further detail about

its contractor status:

> JBI is based in Texas. They're a nationally recognized award-winning electrical contractor, they're licensed in 14 states, and those states include New Mexico, California, Colorado, many other states. So they hold a license in New Mexico consistently between 1995 and 2015 . . . and they maintained that license by renewing every two years and essentially to renew you pay a fee and show proof of a continuing education requirement. Not much for a renewal. There's no sitting for an exam, basically pay your money, take your CLE, and run. Sometime in 2015, JBI hired CT to coordinate all the 14 states licenses. Unbeknownst to JBI, in 2015 they were up for renewal and CT did not file the renewal paper or there was a clerical error. They had no knowledge of the lapse, because it -- had they had knowledge of the lapse, they would have simply paid the fee and shown proof of the CLE. They maintained license in all 15 other states. They were unaware of the last largely because they hadn't contracted in New Mexico in a number of years. In 2018 when they were approached by JMD, they acted under the belief they were licensed when they entered into the contract. It wasn't until they went to pull the permit on the project that they realized that the license had expired . . . . [T]he license expired and was canceled. The bond was not. They remained bonded with the state, but their license was expired and needed to be renewed. They had -- they had no reason to know, because they hasn't worked in this state, and not only that, but the -- if you, as a contract are with multiple state licenses, if you contract or enter into unlicensed contracting in one state, you have to disclose that to every other state application, so essentially by entering into unlicensed contracting with knowledge or willfully, JBI would have been putting into jeopardy all the 13 of their licenses in all of the states. It would be crazy to assume they willfully let this license expire, they willfully entered into the contract to willfully perform unlicensed contracting based on the history of maintaining license for 20 years, maintaining license in multiple states. So once JBI realized, which is of course when they went to pull the permit.

Jan. 13 Tr. at 38:5-20 (Stevens-Block). JBI Electrical compared its actions the contractor's actions

in Koehler v. Donnelly, which also had its license cancelled because of a clerical error where its

agent failed to file the proper paperwork. See Jan. 13 Tr. at 39:1-3 (Stevens-Block). JBI Electrical

stated that it told JMD Construction that it had a licensing problem and that JMD Construction

asked it to remain on the Project.  See Jan. 13 Tr. at 39:7-10 (Stevens-Block).  JBI Electrical

emphasized that "at no time did JMD not have full knowledge" of JBI Electrical's contract with

Universal Technical and JBI Electrical's renewal efforts.  See Jan. 13 Tr. at 42:1-3 (Stevens-

Block).  JBI Electrical explained that KW AQE views "JBI's inadvertent lapse as an opportunity

to obtain a windfall."  Jan. 13 Tr. at 42:5-7 (Stevens-Block).  JBI Electrical continued that, because

"JMD as the prime contractor has the ultimate responsibility to KW AQE to make sure that it hired

licensed Subcontractors" and that, if "KW AQE was so concerned about the CILA implications of

this case, KW AQE would be bringing its action against JMD in addition to KW AQE."  Jan. 13

Tr. at 44:17-23 (Stevens-Block).  JBI Electrical alleged that KW AQE and JMD Construction have

"entered into a side agreement to hold JBI responsible for the lapse in licensing."  Jan. 13 Tr. at

45:16-18 (Stevens-Block).

JBI Electrical next discussed the primary issue in its MJP.  See Jan. 13 Tr. at 46:1-3

(Stevens-Block).  JBI Electrical argued that JMD Construction has profited from JBI's work, and

that KW AQE and JMD Construction cannot seek restitution from JBI Electrical without also

holding JMD Construction responsible.  See Jan. 13 Tr. at 46:1-3 (Stevens-Block).  JBI Electrical

contended that, although

> I see the assignment of breach-of-contract claims with respect to JBI's work.  I
> don't particularly see an assignment of any statutory claims.  However, JMD has
> no statutory claims.  It's very clear under the case law, specifically Romero v.
> Parker, that a licensed contractor has no statutory claim against an unlicensed
> Subcontractor. So JMD can't assign its CILA claim to KW AQE because JMD
> doesn't have a claim to refund under CILA.

Jan. 13 Tr. at 48:1-11 (Stevens-Block).  JBI Electrical argued that, as a matter of public policy,

any contract assigning claims between KW AQE and JMD Construction is void, because it would

"allow an owner to hop-scotch and avoid liability of the general contractor who is equally as

responsible for the violation of CILA as the Subcontractor is."  Jan. 13 Tr. at 49:2-11 (Stevens-

Block).  The parties then agreed that the Court could dispose of the MSJs in one opinion.  See Jan.

13 Tr. at 62:4-25 (Court, Calvert, Gershner, Stevens-Block); id. at 67:14-15 (Stevens-

Block)(noting that "it does come down to largely the one issue about substantial compliance").

22.    **The KW Response.**

KW AQE responds to the JBI MSJ.  See KW AQE, LLC's Response to JBI's Cross-Motion

for Partial Summary Judgment, filed February 4, 2021 (Doc. 88)("KW MSJ Response").  KW

AQE states that it

> incorporates by reference its own motion for summary judgment pleadings and
> argument (Docs 53-57 & 71) and response to JBI's Motion for Judgment on the
> Pleadings (Doc. 69).  As the Cross Motion for Partial Summary Judgment raises
> issues already fully briefed in the pleadings above, KW AQE does not make any
> further argument.

KW Response at 1.

23.    **The JBI Electrical Reply.**

JBI Electrical filed a reply in support of its MSJ.  See Reply in Support of JBI's Cross-

Motion for Partial Summary Judgment at 1, filed February 26, 2021 (Doc. 90)("JBI Reply").  JBI

Electrical argues that KW AQE did not file a substantive response to the JBI MSJ, nor did it

"properly dispute the facts contained in" the MSJ.  JBI Reply at 1.  JBI Electrical therefore asserts

that the "undisputed facts contained therein are deemed admitted for the purposes of this motion."

JBI Reply at 1.  JBI Electrical insists that the Court "has held that 'when a party fails to respond

to a motion for summary judgment, a district court can properly grant the motion only 'if the

motion demonstrates no genuine issue of material fact exists and the movant is entitled to judgment

as a matter of law.'"  JBI Reply at 2 (quoting Tapia v. City of Albuquerque, 10 F. Supp. 3d 1323,

1350 (D.N.M. 2014)(Browning, J.)).  JBI Electrical concludes that "the undisputed facts (which

are deemed admitted for purposes of this motion) contained in JBI's Cross-Motion for Partial

Summary Judgment demonstrate that JBI is entitled to a judgment as a matter of law."  JBI Reply

at 2.

## LAW REGARDING VENUE

"Venue is defined as the appropriate district court in which to file an action."  Whiting v. Hogan, 855 F. Supp. 2d 1266, 1282 (D.N.M. 2012)(Browning, J.)(citing NLRB v. Line, 50 F.3d 311, 314 (5th Cir. 1995)).  The purpose of venue is to assure that lawsuits are filed in appropriately convenient courts for the matters raised and for the parties involved in the action. See Leroy v. Great W. United Corp., 443 U.S. 173, 185, (1979).  Venue should not be confused with subject-matter jurisdiction, see Wachovia Bank v. Schmidt, 546 U.S. 303, 315-16 (2006), or with personal jurisdiction, see Leroy v. Great W. United Corp., 443 U.S. at 185 ("The question of personal jurisdiction, which goes to the court's power to exercise control over the parties, is typically decided in advance of venue, which is primarily a matter of choosing a convenient forum.").  "To the extent that they are relevant, the laws relating to venue give added protection to defendants beyond those that are provided by the statutory and constitutional prerequisites of personal jurisdiction." 14D C. Wright, A. Miller & E. Cooper, Federal Practice and Procedure § 3801, at 15 (3d ed. 2007)("Wright & Miller").

The federal venue provision allows a plaintiff to file in: (i) "a judicial district in which any defendant resides, if all defendants are residents of the State in which the district is located"; (ii) "a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated"; or, (iii) "if there is no district in which an action may otherwise be brought as provided in this section, any judicial district in which any defendant is subject to the court's personal jurisdiction with respect to such action." 28 U.S.C. § 1391(b).  See Res. Assocs. Grant Writing & Evaluation Servs., Inc. v. Southampton Union Free Sch. Dist., 193 F. Supp. 3d 1200, 1226 (D.N.M. 2016)(Browning, J.).

Rule 12(b)(3) of the Federal Rules of Civil Procedure allows a defendant to assert, by

motion, that the court into which the plaintiff has hailed him or her is an improper venue to entertain the plaintiff's claims.  See Fed. R. Civ. P. 12(b)(3).  Rules 12(g) and 12(h), however, provide that if a party does not raise its objection to venue in its responsive pleading or in its first rule 12(b) motion, it waives the objection and accepts the plaintiff's chosen venue.  See Fed. R. Civ. P. 12(h)(1)("A party waives any defense listed in Rule 12(b)(2)-(5) by (A) omitting it from a motion in the circumstances described in Rule 12(g)(2); or (B) failing to either: (i) make it by motion under this rule; or (ii) include it in a responsive pleading or in an amendment allowed by Rule 15(a)(1) as a matter of course.").

## LAW REGARDING TRANSFER OF VENUE

In 1948, Congress enacted the federal change-of-venue statute, codified at 28 U.S.C. § 1404, to allow a district court to transfer an action filed in a proper, though not necessarily convenient, venue to a more convenient district.  That statute provides, in pertinent part: "For the convenience of the parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought or division to which all parties have consented."  28 U.S.C. § 1404(a).  Section 1404(a) affords a district court broad discretion to adjudicate motions to transfer based on a case-by-case review of convenience and fairness.  See Emp'rs Mut. Cas. Co. v. Bartile Roofs, Inc., 618 F.3d 1153, 1167 (10th Cir. 2010); Chrysler Credit Corp. v. Country Chrysler, Inc., 928 F.2d 1509, 1516 (10th Cir. 1991). "Recognizing that what is convenient for one litigant may not be convenient for the other, the Supreme Court has taught that section 1404(a) 'is intended to place discretion in the district court to adjudicate motions for transfer according to [a] . . . case-by-case consideration of convenience and fairness.'"  Res. Automation, Inc. v. Schrader-Bridgeport Int'l, Inc., 626 F.3d 973, 977 (7th Cir. 2010)(quoting Stewart Org., Inc. v. Ricoh Corp., 487 U.S. 22, 29 (1988)). "The statutory language guides the court's evaluation of the particular circumstances of each case and is broad

enough to allow the court to take into account all factors relevant to convenience and/or the interests of justice." Res. Automation, Inc. v. Schrader-Bridgeport Int'l, Inc., 626 F.3d at 977. The statute permits a "flexible and individualized analysis," and affords district courts the opportunity to look beyond a narrow or rigid set of considerations in their determinations. Stewart Org., Inc. v. Ricoh Corp., 487 U.S. at 29. In considering a motion to transfer, a court weighs the following discretionary factors:

> the plaintiff's choice of forum; the accessibility of witnesses and other sources of proof, including the availability of compulsory process to insure attendance of witnesses; the cost of making the necessary proof; questions as to the enforceability of a judgment if one is obtained; relative advantages and obstacles to a fair trial; difficulties that may arise from congested dockets; the possibility of the existence of questions arising in the area of conflict of laws; the advantage of having a local court determine questions of local law; and, all other considerations of a practical nature that make a trial easy, expeditious and economical.

Emp'rs Mut. Cas. Co. v. Bartile Roofs, Inc., 618 F.3d at 1167. See Tex. Gulf Sulphur v. Ritter, 371 F.2d 145, 147 (10th Cir. 1967)(stating the factors that courts consider in making a venue determination under § 1404(a)).

Section 1406 of the United States Code's Title 28 permits transfer to cure a venue defect. It provides: "The district court of a district in which is filed a case laying venue in the wrong division or district shall dismiss, or if it be in the interest of justice, transfer such case to any district or division in which it could have been brought." 28 U.S.C. § 1406(a). Although both § 1404(a) and § 1406(a) "were broadly designed to allow transfer instead of dismissal, § 1406(a) provides for transfer from forums in which venue is wrongly or improperly laid." Van Dusen v. Barrack, 376 U.S. 612, 634 (1964). Section 1631 addresses transfer to cure want of jurisdiction and provides that, when a

> court finds that there is a want of jurisdiction, the court shall, if it is in the interest of justice, transfer such action or appeal to any other such court in which the action could have been brought at the time it was filed or noticed, and the action or appeal shall proceed as if it had been filed in or noticed for the court to which it was

transferred on the date upon which it was actually filed in or noticed for the court from which it was transferred.

28 U.S.C. § 1631. The Tenth Circuit has held that 28 U.S.C. § 1631 was "specifically designed for cases transferred from one federal court to another for lack of jurisdiction," and that it "served to simplify the process and streamline its application." Ross v. Colo. Outward Bound Sch., Inc., 822 F.2d 1524, 1527 (10th Cir. 1987). The Tenth Circuit has also held that, although many courts have interpreted § 1406(a) to permit transfer where personal jurisdiction is lacking, the enactment of § 1631 makes such a "strained" construction "no longer necessary." Viernow v. Euripides Devel. Corp., 157 F.3d 785, 793 (10th Cir. 1998).

The "interest of justice" is a separate element of the transfer analysis that relates to the court system's efficient administration. Van Dusen v. Barrack, 376 U.S. at 626-27. "For this element, courts look to factors including docket congestion and likely speed to trial in the transferor and potential transferee forums; each court's relative familiarity with the relevant law; the respective desirability of resolving controversies in each locale; and the relationship of each community to the controversy." Res. Automation, Inc. v. Schrader-Bridgeport Int'l, Inc., 626 F.3d at 977 (citing Van Dusen v. Barrack, 376 U.S. at 645; Chicago, Rock Island & Pacific R.R. Co. v. Igoe, 220 F.2d 299, 303 (7th Cir. 1955); Allied Van Lines, Inc. v. Aaron Transfer & Storage, Inc., 200 F. Supp. 2d 941, 946 (N.D. Ill. 2002)(Castillo, J.); Hanley v. Omarc, Inc., 6 F. Supp. 2d 770, 777 (N.D. Ill. 1998)(Alesia, J.)). In some circumstances, "[t]he interest of justice may be determinative, warranting transfer or its denial even where the convenience of the parties and witnesses points toward the opposite result." Res. Automation, Inc. v. Schrader-Bridgeport Int'l, Inc., 626 F.3d at 977 (citing Coffey v. Van Dorn Iron Works, 796 F.2d 217, 220-21 (7th Cir. 1986)). The Tenth Circuit has interpreted the phrase -- "if it is in the interest of justice" -- to grant a district court discretion in making the decision to transfer the action. Driggers v. Clark, 422 F.

App'x 747, 749-50 (10th Cir. 2011)(unpublished)(citing Trujillo v. Williams, 465 F.3d 1210, 1222 (10th Cir. 2006)).

The Court has granted previously motions to transfer.  See, e.g., Montoya v. Fin. Fed. Credit, Inc., 872 F. Supp. 2d at 1281 ("Montoya").  In Montoya, the Court transferred the case under 28 U.S.C. § 1406(a), because (i) "there are potential statute-of-limitations problems for the Plaintiffs if the Court were to dismiss their case"; (ii) "there is no indication that the Plaintiffs filed their Complaint in this forum to harass" the other party; and (iii) the Plaintiffs were not forum shopping.  Montoya, 872 F. Supp. 2d at 1281-82.  The Court has also denied motions to transfer. See, e.g., Navajo Health Found. Sage Hosp., Inc. v. Burwell, 86 F. Supp. 3d 1211, 1248-51 (D.N.M. 2015)(Browning, J.)("Navajo Health").  In Navajo Health, the Court weighed the § 1404(a) factors and concluded that transfer was inappropriate, in large part, because "the parties' convenience, the witnesses' convenience, and the location of physical evidence" weighed "heavily against transfer."  Navajo Health, 86 F. Supp. 3d at 1250.  In that case, the evidence and the parties were more closely located to Albuquerque, New Mexico than to Phoenix, Arizona -- the forum that the Defendants wanted -- so the Court denied transfer.  Navajo Health, 86 F. Supp. 3d at 1250-51.

## LAW REGARDING FORUM SELECTION CLAUSES

The Court has previously stated:

> Contrary to the general rule that a defendant's removal of the action from state court waives or cures any objection to improper venue in the federal court, an objection to the lack of proper venue based on a clause designating a court of another state or a foreign court as the exclusive forum is not waived or cured if the defendant removes the action from state court.

Knight Oil Tools, Inc. v. Unit Petrol. Co., No. CIV 05-0669 JB\ACT 2005 WL 2313715, at *2 (D.N.M. Aug. 31, 2005)(Browning, J.)(citing 17 James Wm. Moore, Moore's Federal Practice § § 111.04[3][d], 111.36[5][a], at 111-42 to 111-43, 111-179 (3d ed. 2004)("Moore's")).  Accord

Lambert v. Kysar, 983 F.2d 1110, 1113 n.2 (1st Cir. 1993)("[A] valid forum selection clause operates to render venue improper, not only under 28 U.S.C. § 1391 [the general venue statute] but also under 28 U.S.C. § 1441(a) [the removal statute].").  See Int'l Software Sys., Inc. v. Amplicon, Inc., 77 F.3d 112, 113-15 (5th Cir. 1996)(without discussing removal issue, affirming dismissal on improper venue grounds of action removed from state court when forum selection clause specified state courts of another state as exclusive forum); Spradlin v. Lear Siegler Mgmt. Servs. Co., 926 F.2d 865, 866 (9th Cir. 1991)(without discussing removal issue, affirming dismissal of removed action on improper venue grounds based on clause making Saudi Arabia the exclusive forum).

"In the typical case not involving a forum-selection clause, a district court considering a § 1404(a) motion (or a forum non conveniens motion) must evaluate both the convenience of the parties and various public-interest considerations."  Atl. Marine Constr. Co. v. United States Dist. Court, 571 U.S. 49, 62 (2013)("Atlantic Marine")(footnote omitted).  "Ordinarily, the district court would weigh the relevant factors and decide whether, on balance, transfer would serve 'the convenience of parties and witnesses' and otherwise promote 'the interests of justice.'" Atlantic Marine, 571 U.S. at 62-63 (quoting 28 U.S.C. § 1404(a)).  "The calculus changes, however, when the parties' contract contains a valid forum-selection clause."  Atlantic Marine, 571 U.S. at 63.

> The "enforcement of valid forum-selection clauses, bargained for by the parties, protects their legitimate expectations and furthers vital interests of the justice system." [Stewart Organization, Inc. v. Ricoh Corp., 487 U.S. at 33, 108 S. Ct. 2239] . . . (KENNEDY, J., concurring). For that reason, and because the overarching consideration under § 1404(a) is whether a transfer would promote "the interest of justice," "a valid forum-selection clause [should be] given controlling weight in all but the most exceptional cases." [Stewart Organization, Inc. v. Ricoh Corp., 487 U.S.] at 33 [108 S. Ct. 2239] ([Kennedy, J., concurring]).

Atlantic Marine, 571 U.S. at 63.

"The presence of a valid forum-selection clause requires district courts to adjust their usual

§ 1404(a) analysis in three ways." Atlantic Marine, 571 U.S. at 63. "First, the plaintiff's choice

of forum merits no weight." Atlantic Marine, 571 U.S. at 63 ("[A]s the party defying the forum-

selection clause, the plaintiff bears the burden of establishing that transfer to the forum for which

the parties bargained for is unwarranted."). "Second, a court evaluating a defendant's § 1404(a)

motion to transfer based on a forum-selection clause should not consider arguments about the

parties' private interests." Atlantic Marine, 571 U.S. at 64 ("[A] district court may consider

arguments about public-interest factors only."). "Third, when a party bound by a forum-selection

clause flouts its contractual obligation and files a suit in a different forum, a § 1404(a) transfer of

venue will not carry with it the original venue's choice-of-law rules -- a factor that in some

circumstances may affect public-interest considerations." Atlantic Marine, 571 U.S. at 64. Given

these modifications to the 28 U.S.C. § 1404(a) factor analysis, the Supreme Court held that,

"[w]hen the parties have agreed to a valid forum-selection clause, a district court should ordinarily

transfer the case to the forum specified in that clause." Atlantic Marine, 571 U.S. at 62. See id. at

66 ("In all but the most unusual cases, therefore, 'the interest of justice' is served by holding parties

to their bargain.")(quoting 28 U.S.C. § 1404(a)); Niemi v. Lasshofer, 770 F.3d 1331, 1351 (10th

Cir. 2014)("We will enforce a mandatory forum selection clause unless the party challenging it

'clearly show[s] that enforcement would be unreasonable and unjust, or that the clause was invalid

for such reasons as fraud or overreaching.'")(quoting M/S Bremen v. Zapata Off-Shore Co., 407

U.S. 1, 15 (1972)("Bremen")). "[T]he proper mechanism for enforcement of a forum selection

clause is a motion to transfer under 28 U.S.C. § 1404(a)." Niemi v. Lasshofer, 770 F.3d at 1351.

See Atlantic Marine, 571 U.S. at 60. See also Presidential Hosp., LLC v. Wyndham Hotel Grp.,

LLC, 333 F. Supp. 3d 1179, 1210 (D.N.M. 2018)(Browning, J.)

1.      **Choice-of-Law Issues and Interpreting Forum Selection Clauses**.

In Stewart Organization v. Ricoh Corp., the Supreme Court held: "Federal law, specifically 28 U.S.C. § 1404(a), governs the District Court's decision whether to give effect to the parties' forum selection clause." 487 U.S. 22, 32 (1988). See Atlantic Marine, 571 U.S. at 52 ("[A] forum selection clause may be enforced by a motion to transfer under § 1404(a)."). There is a distinction, however, between what law governs the enforceability of a forum selection clause and what law governs the interpretation of a forum selection clause. See Yavuz v. 61 MM, Ltd., 465 F.3d 418, 430 (10th Cir. 2006). See also Weber v. PACT XPP Techs., AG, 811 F.3d 758, 770 (5th Cir. 2016)("[A]s several circuits have explicitly recognized, the question of enforceability is analytically distinct from the issue of interpretation."); Martinez v. Bloomberg LP, 740 F.3d 211, 220 (2d Cir. 2014)("Distinguishing between the enforceability and the interpretation of forum selection clauses, moreover, accords with the traditional divide between procedural and substantive rules developed under Erie Railroad Co. v. Tompkins, 304 U.S. 64 (1938)["Erie"]."). Notably, the Tenth Circuit has not drawn rigid distinctions between state and federal law when interpreting forum selection clauses, and has applied federal law when interpreting these clauses when "there are no material discrepancies between [state] law and federal common law on these matters." Excell, Inc. v. Sterling Boiler & Mech., Inc., 106 F.3d 318, 320-21 (10th Cir. 1997)(not deciding the choice-of-law issue between Colorado law and federal law). In contrast, the United States Court of Appeals for the Third Circuit has ruled that federal law cannot apply to forum selection-clause interpretation, because that would "frustrate[ ] the principles of Erie." Collins v. Mary Kay, Inc., 874 F.3d 176, 182 (3d Cir. 2017)("Applying federal common law to these issues would generate a sprawling federal general common law of contracts."). See Weber v. PACT XPP Techs., AG, 811 F.3d at 770 ("A choice-of-law analysis to determine what substantive law should

guide this court's interpretation of the [forum selection clause] is proper under ordinary principles governing diversity litigation."); Martinez v. Bloomberg LP, 740 F.3d at 221 ("Erie . . . warns against an approach that would force federal courts to generate a sprawling federal general common law of contracts to govern such questions [of interpretation] whenever they arise in the context of forum selection clauses."). But see Manetti-Farrow, Inc. v. Gucci Am., Inc., 858 F.2d 509, 513 (9th Cir. 1988)("Moreover, because enforcement of a forum clause necessarily entails interpretation of the clause before it can be enforced, federal law also applies to interpretation of forum selection clauses."). Since the Tenth Circuit's decision in Excell, Inc. v. Sterling Boiler & Mechanical, Inc., it has not confronted whether state or federal law should be used to interpret a forum selection clause. See Presidential Hosp., LLC v. Wyndham Hotel Grp., LLC, 333 F. Supp. 3d 1179, 1211 (D.N.M. 2018)(Browning, J). When confronted with a contract between foreign citizens with a forum selection clause, the Tenth Circuit, however has held that, "under federal law, the courts should ordinarily honor an international commercial agreement's forum-selection provision as construed under the law specified in the agreement's choice-of-law provision." Yavuz v. 61 MM, Ltd., 465 F.3d at 430 (emphasis in original).

 2.     **Enforceability of Forum Selection Clauses.**

The Supreme Court has noted that there is substantial overlap between precedent interpreting the enforceability of arbitration agreements and forum selection clauses. See Scherk v. Alberto-Culver Co., 417 U.S. 506, 518-19 (1974)("An agreement to arbitrate before a specified tribunal is, in effect, a specialized kind of forum-selection clause that posits not only the situs of suit but also the procedure to be used in resolving the dispute."). The Supreme Court has stated that "an arbitration or forum-selection clause in a contract is not enforceable if the inclusion of that clause in the contract was the product of fraud or coercion." Scherk v. Alberto-Culver Co., 417 U.S. at 518-19. Reiterating this rule, the Tenth Circuit has stated: "A plaintiff seeking to avoid a

choice provision on a fraud theory must, within the confines of Fed. R. Civ. P. 9(b) and 11, plead fraud going to the specific provision; the teachings of Scherk, interpreting Bremen, require no less." Riley v. Kingsley Underwriting Agencies, Ltd., 969 F.2d 953, 960 (10th Cir. 1992). The Tenth Circuit thus requires that a party seeking to avoid a forum selection clause produce evidence showing that the arbitration provision is a product of fraud or coercion. See Riley v. Kingsley Underwriting Agencies, Ltd., 969 F.2d at 960 ("Third, at no time did Riley offer any evidence on the stipulated issues tending to show that the arbitration provision (or any other choice provision, for that matter) was a product of fraud or coercion.")(emphasis in original). The Honorable Lourdes A. Martinez, former United States Magistrate Judge for the District of New Mexico, has similarly stated that "[a] general claim of fraud or misrepresentation concerning an entire contract does not affect the validity of a forum selection clause." Mann v. Auto. Protection Corp., 777 F. Supp. 2d 1234, 1240 (D.N.M. 2011)(Martinez, M.J.).

The Supreme Court has rejected the notion that the parties must negotiate specifically a forum selection clause for it to be enforceable. See Carnival Cruise Lines, Inc. v. Shute, 499 U.S. 585, 593 (1991)("[W]e do not adopt the Court of Appeals' determination that a nonnegotiated forum-selection clause in a form ticket contract is never enforceable simply because it is not the subject of bargaining."). Accord Marinechance Shipping, Ltd. v. Sebastian, 143 F.3d 216, 221 (5th Cir. 1998)(holding that a forum selection clause in a seaman's employment contract was enforceable even when the parties did not negotiate for the provision). Magistrate Judge Martinez has similarly held:

> This argument also fails because unequal bargaining position and form contracts do not invalidate forum selection provisions. The fact that Plaintiff is an individual and the contract was presented to him as a form contract does not invalidate the forum selection provision, and Plaintiff's belief that he could not negotiate or change the terms of the Agreement does not rise to the level of overreaching that would make it unreasonable or unfair to enforce the forum

selection provision.

Mann v. Auto. Prot. Corp., 777 F. Supp. 2d at 1240 (citing Carnival Cruise Lines, Inc. v. Shute,

499 U.S. at 593-94).

Courts have also imposed a high standard for negating a forum selection clause on the basis

that it is inconvenient.  The Tenth Circuit, for instance, has stated:

> Finally, in Carnival Cruise Lines, the Court relied on M/S Bremen in enforcing a
> domestic forum selection clause, despite inconvenience to the plaintiffs. Carnival
> Cruise Lines, [499 U.S. at 594].  Only a showing of inconvenience so serious as to
> foreclose a remedy, perhaps coupled with a showing of bad faith, overreaching or
> lack of notice, would be sufficient to defeat a contractual forum selection clause.
> Id.
>
> . . .
>
> The fact that an international transaction may be subject to laws and remedies
> different or less favorable than those of the United States is not a valid basis to deny
> enforcement, provided that the law of the chosen forum is not inherently unfair.
> See Carnival Cruise Lines, [499 U.S. at 594]; AVC Nederland B.V. v. Atrium Inv.
> P'ship, 740 F.2d 148, 158-59 (2d Cir. 1984); Medoil Corp. [v. Citicorp], 729
> F. Supp. [1456,]1460 [(S.D.N.Y. 1990)]; Karlberg European Tanspa, Inc. v. Jk-
> Josef Kratz Vertriebsgesellschaft mbH, 618 F. Supp. 344, 348 (N.D. Ill. 1985);
> Dukane Fabrics Int'l Inc. v. M.V. Hreljin, 600 F. Supp. 202, 203-04 (S.D.N.Y.
> 1985).  English law does not preclude Riley from pursuing an action for fraud and
> we agree with the Defendants that the Lloyd's Act does not grant statutory
> immunity for such claims.  See Lloyd's Act, § 14(3), Aplt. App. at 286 & Aple.
> Add. at 307-08. We have been shown nothing to suggest than an English court
> would not be fair, and in fact, our courts have long recognized that the courts of
> England are fair and neutral forums.  See M/S Bremen, 407 U.S. at 12 [92 S. Ct.
> 1907]; Syndicate 420 at Lloyd's London v. Early American Ins. Co., 796 F.2d 821,
> 829 (5th Cir. 1986); Bonny v. Society of Lloyd's, 784 F. Supp. 1350, 1353 (N.D.
> Ill. 1992).  Given the international nature of the insurance underwriting transaction,
> the parties' forum selection and choice of law provisions contained in the
> agreements should be given effect.

Riley v. Kingsley Underwriting Agencies, Ltd., 969 F.2d at 958.  Magistrate Judge Martinez

similarly held that, "[t]o invalidate a forum selection provision for reasons of inconvenience,

however, a party must show that enforcement of the provision would cause an inconvenience 'so

serious as to foreclose a remedy.'"  Mann v. Auto. Prot. Corp., 777 F. Supp. 2d at 1241 (quoting

Riley v. Kingsley Underwriting Agencies, Ltd., 969 F.2d at 958).

> ### 3.     Permissive and Mandatory Forum Selection Clauses.

"The difference between a mandatory and permissive forum selection clause is that '[m]andatory forum selection clauses contain clear language showing that jurisdiction is appropriate only in the designated forum.'"  Am. Soda, LLP v. U.S. Filter Wastewater Grp., Inc., 428 F.3d 921, 926 (10th Cir. 2005)(quoting Excell, Inc. v. Sterling Boiler & Mech., Inc., 106 F.3d at 321).  "In contrast, permissive forum selection clauses authorize jurisdiction in a designated forum, but do not prohibit litigation elsewhere."  Am. Soda, LLP v. U.S. Filter Wastewater Grp., Inc., 428 F.3d at 926-27 (citing Excell, Inc. v. Sterling Boiler Mech., Inc., 106 F.3d at 321). In K & V Scientific Co. v. BMW, the Tenth Circuit adopted the majority rule for enforcing forum selection clauses.  See 314 F.3d at 500.  Specifically, it concluded that, when venue is specified, such as when the parties designate a particular county or tribunal, and mandatory or obligatory language accompanies the designation, a forum selection clause will be enforced as mandatory. See K & V Sci. Co. v. BMW, 314 F.3d at 499.

In Milk 'N' More, Inc. v. Beavert, 963 F.2d 1342 (10th Cir. 1992), the Tenth Circuit held that the forum selection clause was mandatory and precluded removal of the case to federal court. See 963 F.2d at 1343.  In that case, the defendant appealed an order remanding the breach-of-contract action to a Kansas state court.  See 963 F.2d at 1343.  The federal district court concluded that an enforceable forum selection clause in the agreement required the remand.  See 963 F.2d at 1343.  The clause in the Milk 'N' More, Inc. v. Beavert agreement provided: "The parties herein have mutually agreed that said lease and the purchase option agreement contained herein, where applicable, shall be governed by the laws of the State of Kansas and the parties further agree that venue shall be proper under this agreement in Johnson County, Kansas."  963 F.2d at 1343.  The federal district court granted the motion to remand on the ground that the contractual agreement

contained an enforceable forum selection clause, relying on the principle that forum selection clauses are "prima facie valid and should be enforced" unless shown to be unreasonable. 963 F.2d at 1344 (quoting <u>Bremen</u>, 407 U.S. at 10). On appeal, the defendant contended that the federal district judge erred in construing the clause as a mandatory agreement between the parties to resolve any dispute under the contract exclusively in the state court in Johnson County, Kansas; he said instead that the court should have construed the clause as merely a permissive designation of venue. <u>See</u> <u>Milk 'N' More, Inc. v. Beavert</u>, 963 F.2d at 1344. The defendant contended that the district court erroneously construed the contract language as an agreement making Johnson County, the exclusive forum in which the parties could resolve disputes that arose under the agreement. <u>See</u> 963 F.2d at 1345. The Tenth Circuit affirmed, stating that the clause's dispositive portion provided that "venue shall be proper under this agreement in Johnson County, Kansas." 963 F.2d at 1345-46. The Tenth Circuit held: "We are persuaded that the district judge made the proper interpretation and correctly enforced the clause." 963 F.2d at 1346.

The Tenth Circuit continued that a waiver of one's statutory right to be in federal court must be "clear and unequivocal." 963 F.2d at 1346 (quoting <u>Regis Assocs. v. Rank Hotels</u>, 894 F.2d 193, 195 (6th Cir. 1990)). The Tenth Circuit acknowledges that, if there is ambiguity in the clause, the court should construe it against the drafter. <u>See</u> <u>Milk 'N' More, Inc. v. Beavert</u>, 963 F.2d at 1346. Nevertheless, the Tenth Circuit says that "[s]uch clauses are prima facie valid and should be enforced unless enforcement is shown by the resisting party to be unreasonable under the circumstances." 963 F.2d at 1346. The Tenth Circuit states that the provision that "venue shall be proper under this agreement in Johnson County, Kansas" was "reasonably clear and the wording strongly points to the state court of that county." 963 F.2d at 1346. The Tenth Circuit says the use of the word "shall" generally indicates a mandatory intent unless a convincing argument to the

contrary is made.  963 F.2d at 1346.  In <u>Milk 'N' More, Inc. v. Beavert</u>, the Tenth Circuit cited

with approval <u>Intermountain Sys., Inc. v. Edsall Constr. Co.</u>, 575 F. Supp. 1195, 1198 (D. Colo.

1983)(Kane, J.), stating that the case was particularly persuasive, because it held enforceable a

similar clause: "It is agreed for purposes of this agreement, venue shall be in Adams County,

Colorado." <u>Milk 'N' More, Inc. v. Beavert</u>, 963 F.2d at 1346.  In <u>K & V Scientific Co. v. BMW</u>,

the parties entered into a new agreement which, unlike their earlier agreement, contained a

jurisdictional and choice-of-law provision, which stated: "Jurisdiction for all and any disputes

arising out of or in connection with this agreement is Munich.  All and any disputes arising out of

or in connection with this agreement are subject to the laws of the Federal Republic of Germany."

314 F.3d at 496.  The plaintiff filed suit, asserting various contract, tort, and statutory causes of

action.  <u>See</u> 314 F.3d at 497.  The defendant removed the case to federal court, and moved to

dismiss under to rules 12(b)(2) and 12(b)(3) of the Federal Rules of Civil Procedure for lack of

personal jurisdiction and improper venue.  <u>See</u> 314 F.3d at 497. The district court granted the

defendant's motion to dismiss for improper venue.  <u>See</u> 314 F.3d at 497. The district judge

concluded that the forum selection clause contained in the second confidentiality agreement was

"unambiguous and enforceable," and demonstrated "[t]he parties' intent to locate jurisdiction for

this action solely in the courts of Munich."  314 F.3d at 497.  On appeal, the plaintiff argued that

the clause's language contained no reference to venue, contained no language designating the

courts in Munich as exclusive, and contained no language indicating that suit elsewhere is

impermissible.  <u>See</u> 314 F.3d at 497. The Tenth Circuit made the distinction between a venue

provision which fixes venue in a certain location -- a mandatory clause -- versus one which merely

grants jurisdiction to a certain place -- a permissive clause.  <u>See</u> <u>K & V Sci. Co. v. BMW</u>, 314 F.3d

at 498.  The Tenth Circuit set forth an analysis for determining whether forum selection clauses

within a contract are mandatory or permissive:

> This court and others have "frequently classified" forum selection clauses "as either mandatory or permissive."  Excell, Inc. v. Sterling Boiler Mech., Inc., 106 F.3d at 321. "Mandatory forum selection clauses contain clear language showing that jurisdiction is appropriate only in the designated forum." Id. (internal quotations omitted). "In contrast, permissive forum selection clauses authorize jurisdiction in a designated forum, but do not prohibit litigation elsewhere." Id. (internal quotations omitted).

K & V Sci. Co. v. BMW, 314 F.3d at 498.  The Tenth Circuit cited Milk 'N' More, Inc. v. Beavert,

noting that, there, it had concluded that a forum selection clause stating that "venue shall be proper

under this agreement in Johnson County, Kansas" was mandatory.  K & V Sci. Co. v. BMW, 314

F.3d at 498.  The Tenth Circuit concluded, however, that no Tenth Circuit case had yet dealt with

a forum selection clause similar to the one in that case.  See K & V Sci. Co. v. BMW, 314 F.3d at

501.

The Tenth Circuit stated that, "generally speaking," the Courts of Appeals are in

"agreement" that the following formula is to be used in determining whether the selection clause

is mandatory or permissive: "[W]here venue is specified [in a forum-selection clause] with

mandatory or obligatory language, the clause will be enforced; where only jurisdiction is specified

[in a forum selection clause], the clause will generally not be enforced unless there is some further

language indicating the parties' intent to make venue exclusive."  K & V Sci. Co. v. BMW, 314

F.3d at 499 (alterations in original)(quoting Paper Express, Ltd. v. Pfankuch Maschinen GmbH,

972 F.2d 753, 757 (7th Cir. 1992)).  The Tenth Circuit analyzed language from six forum selection

clauses considered permissive, including four different forum selection clauses wherein the

provision used the word "shall" together with the name of a court.  K & V Sci. Co. v. BMW, 314

F.3d at 499.  The K & V Scientific Co. v. BMW formula for the four clauses using the word "shall"

and considered permissive are:

> * "Any dispute arising between the parties hereunder shall come within the

jurisdiction of the competent Greek Courts, specifically of the Thessaloniki Courts."  John Boutari [& Son, Wines & Spirits, S.A. v. Attiki Imp. & Distribs. Inc.], 22 F.3d [51,] 52 [(2d Cir. 1994)].

. . . .

* "The courts of California, County of Orange, shall have jurisdiction over the parties in any action at law relating to the subject matter or the interpretation of this contract."  Hunt Wesson Foods, Inc. v. Supreme Oil Co., 817 F.2d 75, 76 (9th Cir. 1987).

. . . .

* "This agreement shall be construed and enforceable according to the law of the State of New York and the parties submit to the jurisdiction of the courts of New York."  Keaty [v. Freeport Indon., Inc.], 503 F.2d [955,] 956 [(5th Cir. 1974)] (concluding phrase was ambiguous and, when construed against drafter, was permissive).

* "This agreement shall be governed by and construed in accordance with the laws of the Federal Republic of Germany. * * * Place of jurisdiction shall be Dresden."  Hull Corp. v. Elbe Flugzeugwerke GmbH, 58 F. Supp. 2d 925, 926 (N.D. Ill. 1999).

K & V Sci. Co. v. BMW, 314 F.3d at 499. The other two examples of permissive clauses are:

* "The laws and courts of Zurich are applicable."  Caldas & Sons, Inc. v. Willingham, 17 F.3d 123, 127 (5th Cir. 1994).

. . . .

* "Place of jurisdiction is Sao Paulo/Brazil."  Citro Florida[, Inc. v. Citrovale, S.A.], 760 F.2d 1231, 1231 (11th Cir. 1985)(concluding phrase was ambiguous and, when construed against drafter, was permissive).

K & V Sci. Co. v. BMW, 314 F.3d at 499.  The Tenth Circuit in K & V Scientific Co. v. BMW

also noted that the courts had held the following clauses to be mandatory:

* "[P]lace of jurisdiction . . . is the registered office of the trustee [in Germany], to the extent permissible under the law."  Frietsch v. Refco, Inc., 56 F.3d 825, 827 (7th Cir. 1995); see id. at 829 (concluding that the phrase "to the extent permissible under the law" "would have no function if the [forum selection] clause were not mandatory -- if, in other words, a party could sue anywhere he wanted").

* "In all disputes arising out of the contractual relationship, the action shall be filed in the court which has jurisdiction for the principal place of business of the supplier . . . . The supplier also has the right to commence an action against the purchaser at the purchaser's principal place of business."  Paper Express[, Ltd. v.

Pfankuch Maschinen GmbH], 972 F.2d at 755; id. at 756 (concluding the last sentence "would be appropriate and meaningful only if the clause were in fact mandatory").

* "Licensee hereby agrees and consents to the jurisdiction of the courts of the State of Virginia.  Venue of any action brought hereunder shall be deemed to be in Gloucester County, Virginia."  Docksider[, Ltd. v. Sea Tech., Ltd.,] 875 F.2d [762,] 763 (9th Cir. 1989).

K & V Sci. Co. v. BMW, 314 F.3d at 499-500 (footnote omitted).

Using the majority rule, the Tenth Circuit had little trouble concluding that the forum selection clause at issue in K & V Scientific Co. v. BMW was permissive.  See 314 F.3d at 500.  The clause referred only to jurisdiction and did so in non-exclusive terms. See 314 F.3d at 500.  A clause is mandatory, in accordance with K & V Scientific Co. v. BMW, only when the venue is specific with mandatory language.  See 314 F.3d at 500.  Mandatory language is venue coupled with such terms as "exclusive," "sole," or "only."  314 F.3d at 500.  If the paragraph is ambiguous -- capable of being construed as either permissive or mandatory -- the paragraph is deemed to be permissive.  The Tenth Circuit in K & V Scientific Co. v. BMW states:

Even if the clause were deemed to be ambiguous (i.e., capable of being construed as either permissive or mandatory), the rule in this circuit and others is that the clause must be construed against the drafter, in this case defendant.  See Milk 'N' More, 963 F.2d at 1346 (holding "if there is any ambiguity in the clause [the court] should construe it against the drafter").  Accordingly, the clause would be deemed permissive.

K & V Sci. Co. v. BMW, 314 F.3d at 500-01 (citations omitted).

In an unpublished decision that follows K & V Scientific Co. v. BMW, the Tenth Circuit clarifies that the K & V Scientific Co. v. BMW decision addresses the issue

whether a recognition-of-jurisdiction provision implies an exclusive selection of venue.  Use of mandatory language like "shall" in a clause dealing directly with venue carries stronger implications regarding the intent to designate an exclusive forum.  See Milk 'N' More, 963 F.2d at 1346 (holding clause stating that "venue shall be proper . . . in" effected an exclusive designation of forum).  When, as here, the relation of such language to the question of venue is at most derivative, through a jurisdictional provision, decisions such as "Milk 'N' More . . . are of little

assistance in resolving the . . . dispute."  K & V Scientific, 314 F.3d at 498-99.

King v. PA Consulting Grp., Inc., 78 F. App'x 645, 648 n.2 (10th Cir. 2003)(unpublished)(emphasis in original).  The Tenth Circuit, in American Soda, LLP v. U.S. Filter Wastewater Group, Inc., has also recognized that a party to a contract can waive venue in federal court in a forum selection clause, thus requiring remand to State court:

> The parties not only consented to the jurisdiction of the Colorado state courts, they went a step further by designating the state courts or arbitration as "the exclusive forum for the resolution of any disputes related to or arising out of [the contract]." We conclude that by consenting to state court jurisdiction and selecting the state courts as the "exclusive forum," the parties indicated their intent to make venue exclusive in state court with respect to any disputes not resolved in arbitration. Because the forum selection clause at issue is mandatory, U.S. Filter unequivocally waived its right to remove this lawsuit to federal court.

428 F.3d at 927.

The Court has concluded that a forum selection clause is mandatory when the clause states that a certain district or county is "the exclusive jurisdiction" for litigation.  Montoya, 872 F. Supp. 2d at 1276 ("The word exclusive in relation to Harris County as a venue indicates the parties' intent that Harris County be the exclusive venue for any suits.")(emphasis in original). The Court has also determined that a forum selection clause with "shall" language was mandatory. See Presbyterian Healthcare Servs. v. Goldman, Sachs & Co., 122 F. Supp. 3d 1157, 1211 (D.N.M. 2015)(Browning, J.).  Although acknowledging the Tenth Circuit's rule that "shall" language does not automatically make a forum selection clause mandatory, it determined that the forum selection clause in that case strongly "parallels [the] structure of the clause in Docksider, Ltd v. Sea Technology, Ltd.," and so concluded that the clause was mandatory.  Presbyterian Healthcare Servs. v. Goldman, Sachs & Co., 122 F. Supp. 3d at 1211 (quoting Riley v. Kingsley Underwriting Agencies, Ltd., 969 F.2d at 958).

## NEW MEXICO LAW REGARDING UNJUST ENRICHMENT

"To prevail in unjust enrichment, 'one must show that: (1) another has been knowingly benefitted at one's expense (2) in a manner such that allowance of the other to retain the benefit would be unjust.'"  City of Rio Rancho v. Amrep Sw. Inc., 2011-NMSC-037, ¶ 54, 260 P.3d 414, 428 (quoting Ontiveros Insulation Co. v. Sanchez, 2000-NMCA-051, ¶ 11,  3  P.3d at 698). Equitable claims are typically unavailable if there is an adequate remedy at law.  See Gen. Tel. Co. of the Sw. v. State Tax Comm'n, 1962-NMSC-005, ¶ 18, 367 P.2d 711, 715; Sims v. Sims, 1996-NMSC-078, ¶ 28, P.2d 153, 159 ("[E]quity will not act if there is a complete and adequate remedy at law.")(quoting S.P.C.S., Inc. v. Lockheed Shipbuilding & Constr. Co., 631 P.2d 999, 1001 (Wash. App. 1981))).   Additionally,  the  "'hornbook rule  [is]  that quasi-contractual remedies . . . are not to be created when an enforceable express contract regulates the relations of the parties with respect to the disputed issue.'" Elliott Indus. Ltd. P'ship v. BP America Production Co., 407 F.3d 1091, 1117 (10th Cir. 2005)("Elliott Indus.")(quoting Member Servs. Life Ins. v. Am. Nat'l Bank & Tr. Co. of Sapulpa, 130 F.3d 950, 957 (10th Cir. 1997)).[15]  In Elliott Indus., for example, the Tenth Circuit held that the plaintiffs' leases with ConocoPhillips that defined ConocoPhillips' royalty obligations precluded the plaintiffs' claims that ConocoPhillips' royalty payment practices unjustly enriched it at the plaintiffs' expense.  See 407 F.3d at 1117.  The plaintiffs contended that the leases did not preclude their unjust-enrichment claim, because they

---

[15]As the Tenth Circuit has explained, "when a panel of this Court has rendered a decision interpreting state law, that interpretation is binding on district courts in this circuit, and on subsequent panels of this Court, unless an intervening decision of the state's highest court has resolved the issue." Wankier v. Crown Equip. Corp., 353 F.3d 862, 866 (10th Cir. 2003).  The Court has critiqued the Elliott Indus. decision in the past, though on a different legal issue, and concluded that the Supreme Court of New Mexico would follow a different path.  See Anderson Living Tr. v. WPX Energy Prod., LLC, 312 F.R.D. 620, 625-630 (D.N.M. 2015)(Browning, J.) The Court reiterates that interpretation here, though not on the issue quoted above.

did not contain an express contractual provision covering ConocoPhillips' deduction of a thirty-nine percent processing fee from the plaintiffs' royalty payments.  See 407 F.3d at 1117.  The Tenth Circuit reasoned, however, that, although "the contracts may not delineate any specific deductions," the leases "control how royalties are to be paid." 407 F.3d at 1117.  The Tenth Circuit concluded, therefore, that the district court properly granted ConocoPhillips summary judgment on the plaintiffs' unjust-enrichment claim, because "the claim for underpayment of royalties is grounded in the parties' contractual relationships."  407 F.3d at 1117.  See Anderson Living Tr. v. ConocoPhillips Co., LLC, 952 F. Supp. at 1033.

## LAW REGARDING MOTIONS TO DISMISS UNDER RULE 12(b)(6)

Rule 12(b)(6) authorizes a court to dismiss a complaint for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6).  "The nature of a rule 12(b)(6) motion tests the sufficiency of the allegations within the four corners of the complaint after taking those allegations as true." Mobley v. McCormick, 40 F.3d 337, 340 (10th Cir. 1994).  A court may also consider documents to which the complaint refers, if their adequacy is central to the plaintiffs' claims and their authenticity is unquestioned.  See Armstrong v. N.M. Disability Det. Servs., 278 F. Supp. 3d 1193, 1201 n.3 (D.N.M. 2017)(Browning, J.)(concluding that the Court properly considered notices attached to the motion and not to the complaint, because the complaint referenced them, their adequacy was central to the plaintiffs' claims, and their authenticity was unquestioned). See also GFF Corp. v. Associated Wholesale Grocers, Inc., 130 F.3d 1381, 1384 (10th Cir. 1997)("[I]f a plaintiff does not incorporate by reference or attach a document to its complaint, but the document is referred to in the complaint and is central to the plaintiff's claim, a defendant may submit an indisputably authentic copy to the court to be considered[.]").

A complaint's sufficiency is a question of law, and, when considering a rule 12(b)(6)

motion, a court must accept as true all well-pled factual allegations in the complaint, view those allegations in the light most favorable to the non-moving party, and draw all reasonable inferences in the plaintiff's favor.  See Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. at 322 ("[O]nly if a reasonable person could not draw . . . an inference [of plausibility] from the alleged facts would the defendant prevail on a motion to dismiss."); Smith v. United States, 561 F.3d 1090, 1098 (10th Cir. 2009)("[F]or purposes of resolving a Rule 12(b)(6) motion, we accept as true all well-pleaded factual allegations in a complaint and view these allegations in the light most favorable to the plaintiff.")(quoting Moore v. Guthrie, 438 F.3d 1036, 1039 (10th Cir. 2006)).  At the motion-to-dismiss stage, the court does not weigh the evidence, and "is interested only in whether it has jurisdiction and whether the Plaintiffs plead a claim to relief that is plausible on its face."  Begay v. Pub. Serv. Co. of N.M., 710 F. Supp. 2d 1161, 1199 (D.N.M. 2010)(Browning, J.).

A complaint need not set forth detailed factual allegations, yet a "pleading that offers labels and conclusions or a formulaic recitation of the elements of a cause of action" is insufficient.  Iqbal, 556 U.S. 662, 678 (2009)(citing Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007)("Iqbal")). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."  Iqbal, 556 U.S. at 678.  "Factual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact)."  Bell Atl. Corp. v. Twombly, 550 U.S. at 555 (citation omitted). See Duncan v. Citibank, No. CIV 06-0246 JB/KBM, 2006 WL 4063021, at *3 (D.N.M. June 30, 2006)(Browning, J.)(dismissing a civil cause of action under the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § § 1961-1968 ("RICO") cause of action from a complaint where the complaint alleged a single physical act, and not a pattern of racketeering activity, and a pattern of activity is one of the elements necessary to state a RICO claim).

To survive a motion to dismiss, a plaintiff's complaint must contain sufficient facts that, if assumed to be true, state a claim to relief that is plausible on its face.  See Bell Atl. Corp. v. Twombly, 550 U.S. at 570; Mink v. Knox, 613 F.3d 995, 1000 (10th Cir. 2010).  "A claim has facial plausibility when the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  Iqbal, 556 U.S. at 678 (citing Bell Atl. Corp. v. Twombly, 550 U.S. at 556).  "Thus, the mere metaphysical possibility that some plaintiff could prove some set of facts in support of the pleaded claims is insufficient; the complainant must give the court reason to believe that this plaintiff has a reasonable likelihood of mustering factual support for these claims."  Ridge at Red Hawk, LLC v. Schneider, 493 F.3d 1174, 1177 (10th Cir. 2007)(emphasis omitted).  A court will not construe a plaintiff's pleadings "so liberally that it becomes his advocate."  Bragg v. Chavez, No. CIV 07-0343 JB/WDS, 2007 WL 5232464, at *25 (D.N.M. Aug. 2, 2007)(Browning, J.).  The Tenth Circuit has stated:

> "[P]lausibility" in this context must refer to the scope of the allegations in a complaint: if they are so general that they encompass a wide swath of conduct, much of it innocent, then the plaintiffs "have not nudged their claims across the line from conceivable to plausible."  The allegations must be enough that, if assumed to be true, the plaintiff plausibly (not just speculatively) has a claim for relief.

Robbins v. Oklahoma, 519 F.3d 1242, 1247 (10th Cir. 2008)(quoting Bell Atl. Corp. v. Twombly, 550 U.S. at 570)(internal citations omitted)).  See Gallegos v. Bernalillo Cty. Bd. of Cty. Comm'rs, 278 F. Supp. 3d 1245, 1259 (D.N.M. 2017)(Browning, J.).

Generally, the sufficiency of a complaint must rest on its contents alone.  See Casanova v. Ulibarri, 595 F.3d at 1125.  Emphasizing this point, the Tenth Circuit, in Carter v. Daniels, 91 F. App'x 83 (10th Cir. 2004) states: "When ruling on a Rule 12(b)(6) motion, the district court must examine only the plaintiff's complaint.  The district court must determine if the complaint alone is sufficient to state a claim; the district court cannot review matters outside of the

complaint." 91 F. App'x at 85.[16]   There are three limited exceptions to this general principle: (i) documents that the complaint incorporates by reference, see Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. at 322; (ii) "documents referred to in the complaint if the documents are central to the plaintiff's claim and the parties do not dispute the documents' authenticity," Jacobsen v. Deseret Book Co., 287 F.3d 936, 941 (10th Cir. 2002); and (iii) "matters of which a court may take judicial notice," Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. at 322.  See Brokers' Choice of Am., Inc. v. NBC Universal, Inc., 861 F.3d at 1103 (holding that the district court did not err by reviewing a seminar recording and a television episode on a rule 12(b)(6) motion, which were "attached to or referenced in the amended complaint," central to the plaintiff's claim, and "undisputed as to their accuracy and authenticity").  "[T]he court is permitted to take judicial notice of its own files and records, as well as facts which are a matter of public record."  Van Woudenberg v. Gibson, 211 F.3d 560, 568 (10th Cir. 2000), abrogated on other grounds by McGregor v. Gibson, 248 F.3d 946, 955 (10th Cir. 2001).

In Gee v. Pacheco, 627 F.3d 1178 (10th Cir. 2010), the defendants "supported their motion with numerous documents, and the district court cited portions of those motions in granting the motion."  627 F.3d at 1186.  The Tenth Circuit held that "[s]uch reliance was improper" and that,

---

[16]Carter v. Daniels is an unpublished opinion, but the Court can rely on an unpublished opinion to the extent its reasoned analysis is persuasive in the case before it.  See 10th Cir. R. 32.1(A), 28 U.S.C. ("Unpublished opinions are not precedential, but may be cited for their persuasive value.").  The Tenth Circuit has stated:

> In this circuit, unpublished orders are not binding precedent, . . . and . . . citation to unpublished opinions is not favored . . . . However, if an unpublished opinion . . . has persuasive value with respect to a material issue in a case and would assist the court in its disposition, we allow a citation to that decision.

United States v. Austin, 426 F.3d 1266, 1274 (10th Cir. 2005).  The unpublished Tenth Circuit opinions cited herein have persuasive value with respect to a material issue, and will assist the Court in its disposition of this Memorandum Opinion and Order.

even if "the district court did not err initially in reviewing the materials, the court improperly relied on them to refute Mr. Gee's factual assertions and effectively convert the motion to one for summary judgment." 627 F.3d at 1186-87. In other cases, the Tenth Circuit has emphasized that, "[b]ecause the district court considered facts outside of the complaint . . . it is clear that the district court dismissed the claim under Rule 56(c) and not Rule 12(b)(6)." Nard v. City of Okla. City, 153 F. App'x 529, 534 n.4 (10th Cir. 2005). The Court has previously ruled that, when a plaintiff references and summarizes the defendants' statements in a complaint, the Court cannot rely on documents containing those statements that the defendants attach in their briefing. See Mocek v. City of Albuquerque, No. CIV 11-1009 JB/KBM, 2013 WL 312881, at *50-51 (D.N.M. Jan. 14, 2013)(Browning, J.). The Court reasoned that the statements were neither incorporated by reference nor central to the plaintiff's allegations in the complaint, because the plaintiff cited the statements only to attack the defendant's reliability and truthfulness. See 2013 WL 312881, at *50-51. The Court also previously has ruled that, when determining whether to toll a statute of limitations in an action alleging fraud and seeking subrogation from a defendant, the Court may not use interviews and letters attached to a motion to dismiss, which show that a plaintiff was aware of the defendant's alleged fraud before the statutory period expired. See Great Am. Co. v. Crabtree, No. CIV 11-1129 JB/KBM, 2012 WL 3656500, at *3, *22-23 (D.N.M. Aug. 23, 2012)(Browning, J.)("Crabtree"). The Court in Crabtree determined that the documents did not fall within any of the Tenth Circuit's exceptions to the general rule that a complaint must rest on the sufficiency of its contents alone, as the complaint did not incorporate the documents by reference or refer to the documents. See 2012 WL 3656500, at *22-23; Mocek v. City of Albuquerque, 2013 WL 312881, at *50 (refusing to consider statements that were not "central to [the plaintiff's] claims").

Conversely, in a securities class action and as an exception to the general rule, the Court concluded that the Court may consider a defendant's operating certification, to which the plaintiffs referred in their complaint, and which was central to whether the plaintiffs adequately alleged a loss, when ruling on the defendant's motion to dismiss without converting the motion into one for summary judgment.   See SEC v. Goldstone, 952 F. Supp. 2d 1060, 1217-18 (D.N.M. 2013)(Browning, J.)(considering, on a motion to dismiss, emails referenced in the complaint as "documents referred to in the complaint," which are "central to the plaintiff's claim" and whose authenticity the plaintiff did not challenge); Genesee Cty. Emps.' Ret. Sys. v. Thornburg Mortg. Secs. Tr. 2006-3, 825 F. Supp. 2d 1082, 1150-51 (D.N.M. 2011)(Browning, J.); Mata v. Anderson, 760 F. Supp. 2d 1068, 1101 (D.N.M. 2009)(Browning, J.)(relying on documents outside of the complaint, because they were "documents that a court can appropriately view as either part of the public record, or as documents upon which the Complaint relies, and the authenticity of which is not in dispute").

**LAW REGARDING JUDGMENT ON THE PLEADINGS UNDER RULE 12(c)**

"After the pleadings are closed -- but early enough not to delay trial -- a party may move for judgment on the pleadings." Fed. R. Civ. P. 12(c).  A rule 12(c) motion is designed to provide a means of disposing of cases when the material facts are not in dispute between the parties. See Kruzits v. Okuma Mach. Tool, Inc., 40 F.3d 52, 54 (3d Cir. 1994)("Under Rule 12(c), we will not grant judgment on the pleadings unless the movant clearly establishes that no material issue of fact remains to be resolved and that he is entitled to judgment as a matter of law.")(citation and internal quotation marks omitted)). A "[j]udgment on the pleadings should not be granted 'unless the moving party has clearly established that no material issue of fact remains to be resolved and the party is entitled to judgment as a matter of law.'"   Park Univ. Enters., Inc. v. Am. Cas. Co. of

Reading, Pa., 442 F.3d 1239, 1244 (10th Cir. 2006)(citing United States v. Any & All Radio Station Transmission Equip., 207 F.3d 458, 462 (8th Cir. 2000)).  Claims dismissed pursuant to a motion under rule 12(c) are dismissed with prejudice.  See In re Great Lakes Dredge & Dock Co. LLC, 624 F.3d 201, 209 (5th Cir. 2010).

"Any party may move for judgment on the pleadings if no material facts are in dispute and the dispute can be resolved on both the pleadings and any facts of which the Court can take judicial notice."  Ramirez v. Wal-Mart Stores, Inc., 192 F.R.D. at 304 (citing Fed. R. Civ. P. 12(c)). A motion pursuant to rule 12(c) is generally treated in the same manner as a motion to dismiss under rule 12(b)(6).  See Ramirez v. Wal-Mart Stores, Inc., 192 F.R.D. at 304 (citing Irish Lesbian & Gay Org. v. Giuliani, 143 F.3d 638, 644 (2d Cir. 1998)).  A motion for a judgment on the pleadings will be granted if the pleadings demonstrate that the moving party is entitled to judgment as a matter of law.  See Ramirez v. Wal-Mart Stores, Inc., 192 F.R.D. at 304.

A court considering a motion for judgment on the pleadings should "accept all facts pleaded by the non-moving party as true and grant all reasonable inferences from the pleadings in favor of the same."  Park Univ. Enters. Inc. v. Am. Cas. Co. of Reading, Pa., 442 F.3d at 1244. The court must view the facts presented in the pleadings and draw the inferences therefrom in the light most favorable to the nonmoving party.  See Ramirez v. Wal-Mart Stores, Inc., 192 F.R.D. at 304.  All of the nonmoving parties' allegations are deemed to be true, and all of the movants' contrary assertions are taken to be false.  See Nat'l Metro. Bank v. United States, 323 U.S. 454, 456-57 (1945); Ramirez v. Dep't of Corr., 222 F.3d 1238, 1240 (10th Cir. 2000); Freeman v. Dep't of Corr., 949 F.2d 360, 361 (10th Cir. 1991).

The same standards that govern a motion to dismiss under rule 12(b)(6) also govern a motion for judgment on the pleadings under rule 12(c).  See Atl. Richfield Co. v. Farm Credit

Bank, 226 F.3d 1138, 1160 (10th Cir. 2000).  Under rule 12(b)(6), a court may dismiss a complaint

for "failure to state a claim upon which relief can be granted."  Fed. R. Civ. P. 12(b)(6).  "The

nature of a Rule 12(b)(6) motion tests the sufficiency of the allegations within the four corners of

the complaint after taking those allegations as true."  Mobley v. McCormick, 40 F.3d 337, 340

(10th Cir. 1994). A complaint's sufficiency is a question of law, and when considering and

addressing a rule 12(b)(6) motion, a court must accept as true all of the complaint's well-pleaded

factual allegations, view those allegations in the light most favorable to the nonmoving party, and

draw all reasonable inferences in the plaintiff's favor.  See Moore v. Guthrie, 438 F.3d 1036, 1039

(10th Cir. 2006); Hous. Auth. of Kaw Tribe v. City of Ponca City, 952 F.2d 1183, 1187 (10th Cir.

1991).

     A complaint challenged by a rule 12(b)(6) motion to dismiss does not require detailed

factual allegations, but a plaintiff's obligation to set forth the grounds of his or her entitlement to

relief "requires more than labels and conclusions, and a formulaic recitation of the elements of a

cause of action will not do."  Bell Atl. Corp. v. Twombly, 550 U.S. at 555.  "Factual allegations

must be enough to raise a right to relief above the speculative level, on the assumption that all the

allegations in the complaint are true (even if doubtful in fact)."  Bell Atl. Corp. v. Twombly, 550

U.S. at 555. "[T]he Supreme Court recently . . . prescribed a new inquiry for us to use in reviewing

a dismissal: whether the complaint contains 'enough facts to state a claim to relief that is plausible

on its face.'"  Ridge at Red Hawk, LLC v. Schneider, 493 F.3d at 1177 (quoting Bell Atl. Corp. v.

Twombly, 550 U.S. at 558, 562).  "The [Supreme] Court explained that a plaintiff must 'nudge his

claims across the line from conceivable to plausible' in order to survive a motion to dismiss."

Ridge at Red Hawk, LLC v. Schneider, 493 F.3d at 1177 (quoting Bell Atl. Corp. v. Twombly,

550 U.S. at 570)(alterations omitted).  "Thus, the mere metaphysical possibility that some plaintiff

could prove some set of facts in support of the pleaded claims is insufficient; the complaint must

give the court reason to believe that this plaintiff has a reasonable likelihood of mustering factual

support for these claims." Ridge at Red Hawk, LLC v. Schneider, 493 F.3d at 1177.  The Tenth

Circuit has stated:

>    "[P]lausibility" in this context must refer to the scope of the allegations in a
>    complaint: if they are so general that they encompass a wide swath of conduct,
>    much of it innocent, then the plaintiffs "have not nudged their claims across the line
>    from conceivable to plausible."  The allegations must be enough that, if assumed to
>    be true, the plaintiff plausibly (not just speculatively) has a claim for relief.
>
>    This requirement of plausibility serves not only to weed out claims that do
>    not (in the absence of additional allegations) have a reasonable prospect of success,
>    but also to inform the defendants of the actual grounds of the claim against them.
>    "Without some factual allegation in the complaint, it is hard to see how a claimant
>    could satisfy the requirement of providing not only 'fair notice' of the nature of the
>    claim, but also 'grounds' on which the claim rests." Bell Atl. Corp. v. Twombly,
>    127 S. Ct. at 1965 n.3.  See Airborne Beepers & Video, Inc. v. AT & T Mobility
>    LLC, 499 F.3d 663, 667 (7th Cir. 2007)("[A]t some point the factual detail in a
>    complaint may be so sketchy that the complaint does not provide the type of notice
>    of the claim to which the defendant is entitled under Rule 8.").  The Twombly Court
>    was particularly critical of complaints that "mentioned no specific time, place, or
>    person involved in the alleged conspiracies." 127 S. Ct. at 1971 n.10.  Given such
>    a complaint, "a defendant seeking to respond to plaintiffs' conclusory
>    allegations . . . would have little idea where to begin." Id.

Robbins v. Oklahoma, 519 F.3d at 1247-48 (footnotes and citations omitted).

In determining the complaint's sufficiency, all well-pled factual allegations are to be taken

as true.  See Timpanogos Tribe v. Conway, 286 F.3d 1195, 1204 (10th Cir. 2002).  "Nevertheless,

conclusory allegations without supporting factual averments are insufficient to state a claim upon

which relief can be based." Hall v. Bellmon, 935 F.2d 1106, 1110 (10th Cir. 1991). "Moreover,

in analyzing the sufficiency of the plaintiff's complaint, the court need accept as true only the

plaintiff's well-pleaded factual contentions, not his conclusory allegations." Hall v. Bellmon, 935

F.2d at 1110.  Only well-pled facts, as distinguished from conclusory allegations, are admitted

when considering a motion to dismiss for failure to state a claim upon which relief can be granted.

See Smith v. Plati, 258 F.3d 1167, 1174 (10th Cir. 2001).

A court must convert a motion to dismiss into a motion for summary judgment if "matters outside the pleading are presented to and not excluded by the court," and "all parties . . . [are] given reasonable opportunity to present all material made pertinent to such a motion by Rule 56."  Fed. R. Civ. P. 12(d).  Facts subject to judicial notice may be considered without converting a motion to dismiss into a motion for summary judgment.  See Grynberg v. Koch Gateway Pipeline Co., 390 F.3d 1276, 1279 n.1 (10th Cir. 2004)(citing 27A Federal Procedure, Lawyers' Ed. § 62:520 (2003)). Furthermore, when considering a motion to dismiss, "the court is permitted to take judicial notice of its own files and records, as well as facts which are a matter of public record." Van Woudenberg ex rel. Foor v. Gibson, 211 F.3d 560, 568 (10th Cir. 2000), abrogated on other grounds by McGregor v. Gibson, 248 F.3d 946, 955 (10th Cir. 2001).  A court may consider documents to which the complaint refers if the documents are central to the plaintiff's claim, and the parties do not dispute the documents' authenticity.  See Jacobsen v. Deseret Book Co., 287 F.3d 936, 941-42 (10th Cir. 2002).  If, however, a complaint does not reference or attach a document, but the complaint refers to the document and the document is central to the plaintiff's claim, the defendant may submit an "indisputably authentic copy to the court to be considered on a motion to dismiss."  GFF Corp. v. Associated Wholesale Grocers, Inc., 130 F.3d 1381, 1384 (10th Cir. 1997).  See 5A Charles Alan Wright & Arthur Miller, Federal Practice & Procedure § 1327 (3d ed. 2004)("[W]hen the plaintiff fails to introduce a pertinent document as part of her pleading . . . the defendant may introduce the document as an exhibit to a motion attacking the sufficiency of the pleading.").

## LAW REGARDING SUMMARY JUDGMENT

Rule 56(a) of the Federal Rules of Civil Procedure states: "The court shall grant summary

judgment if the movant shows that there is no genuine dispute as to any material fact and the

movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "The movant bears the

initial burden of 'show[ing] that there is an absence of evidence to support the nonmoving party's

case.'"  Herrera v. Santa Fe Pub. Sch., 956 F. 2d 1191, 1221 (D.N.M. 2013)(Browning, J.)(quoting

Bacchus Indus., Inc. v. Arvin Indus., Inc., 939 F.2d 887, 891 (10th Cir. 1991)(alteration in Herrera

v. Santa Fe Pub. Sch.)).  See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)("Celotex").

> Before the court can rule on a party's motion for summary judgment, the moving
> party must satisfy its burden of production in one of two ways: by putting evidence
> into the record that affirmatively disproves an element of the nonmoving party's
> case, or by directing the court's attention to the fact that the non-moving party lacks
> evidence on an element of its claim, "since a complete failure of proof concerning
> an essential element of the nonmoving party's case necessarily renders all other
> facts immaterial."  Celotex, 477 U.S. at 323-25.  On those issues for which it bears
> the burden of proof at trial, the nonmovant "must go beyond the pleadings and
> designate specific facts to make a showing sufficient to establish the existence of
> an element essential to his case in order to survive summary judgment."  Cardoso
> v. Calbone, 490 F.3d 1194, 1197 (10th Cir. 2007)(internal quotations and brackets
> omitted).

Plustwik v. Voss of Nor. ASA, No. 2:11CV00757 DS, 2013 WL 1945082, at *1 (D. Utah May 9,

2013)(Sam, J.)(emphasis added).  "If the *moving* party will bear the burden of persuasion at trial,

that party must support its motion with credible evidence -- using any of the materials specified in

Rule 56(c) -- that would entitle it to a directed verdict if not controverted at trial."  Celotex, 477

U.S. at 331 (Brennan, J., dissenting)(emphasis in original).[17]  Once the movant meets this burden,

rule 56 requires the nonmoving party to designate specific facts showing that there is a genuine

issue for trial.  See Celotex, 477 U.S. at 324; Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256

---

[17]Although the Honorable William J. Brennan, Jr., then-Associate Justice of the Supreme
Court, dissented in Celotex, this sentence is widely understood to be an accurate statement of the
law.  See 10A Charles Allen Wright & Arthur R. Miller, Federal Practice and Procedure § 2727,
at 470 (3d ed. 1998)("Although the Court issued a five-to-four decision, the majority and dissent
both agreed as to how the summary-judgment burden of proof operates; they disagreed as to how
the standard was applied to the facts of the case.").

(1986)("Liberty Lobby").  In American Mechanical Solutions, LLC Northland Piping, Inc., 184 F. 3d 1030 (D.N.M. 2016)(Browning, J.), the Court granted summary judgment for the defendant when the plaintiff did not offer expert evidence supporting causation or proximate causation in its breach-of-contract or breach-of-the-implied-warranty-of-merchantability claims.  See 184 F. 3d at 1075-78.  The Court reasoned that the plaintiff could prove neither the breach-of-contract claim's causation requirement nor the breach-of-the-implied-warranty-of-merchantability claim's proximate-causation requirement with mere common knowledge, and so New Mexico law required that the plaintiff bolster its arguments with expert testimony, which the plaintiff had not provided.  See 184 F. Supp. 3d at 1067, 1073, 1075, 1079.  The Court determined that, without the requisite evidence, the plaintiff failed to prove "an essential element of the nonmoving party's case," rendering "all other facts immaterial."  184 F. Supp. 3d at 1075 (internal quotation marks omitted)(quoting Plustwik v. Voss of Nor. ASA, 2013 WL 1945082, at *1).  Thus, if a plaintiff has the burden of proof, and the plaintiff has no competent evidence, the defendant may move, without any competent evidence itself, past the plaintiff's lack of competent evidence, and secure summary judgment.  See, e.g., Celotex, 477 U.S. at 323-25 (providing that summary judgment is proper where a plaintiff lacks evidence on an essential element of its case); Am. Mech. Sols., LLC v. Northland Piping, Inc., 184 F. Supp. 3d at 1075 (granting summary judgment because plaintiff lacked evidence on causation); Morales v. E.D. Etnyre & Co., 382 F. Supp. 2d 1252, 1272 (D.N.M. 2005)(Browning, J.)(granting summary judgment because plaintiff lacked competent evidence that defendants defectively manufactured an oil distributor).  A conclusory assertion that the plaintiff lacks evidence is insufficient, however, to secure summary judgment; the defendant must make some evidentiary showing that the plaintiff lacks competent evidence.  See Halley v. Huckaby, 902 F.3d 1136, 1143 (10th Cir. 2018)(stating that summary judgment may be warranted

if the movant notes a lack of evidence for an essential element of the claim).  See also 11 James

Wm. Moore et al., Moore's Federal Practice § 56.40[1][b][iv], at 56-109 to -111 (3d ed. 2018).

The party opposing a motion for summary judgment must "set forth specific facts showing

that there is a genuine issue for trial as to those dispositive matters for which it carries the burden

of proof."  Applied Genetics Int'l, Inc. v. First Affiliated Sec., Inc., 912 F.2d 1238, 1241 (10th Cir.

1990).  See Vitkus v. Beatrice Co., 11 F.3d 1535, 1539 (10th Cir. 1993)("However, the nonmoving

party may not rest on its pleadings but must set forth specific facts showing that there is a genuine

issue for trial as to those dispositive matters for which it carries the burden of proof."  (internal

quotation marks omitted)).  Rule 56(c)(1) provides: "A party asserting that a fact . . . is genuinely

disputed must support the assertion by . . . citing to particular parts of materials in the record,

including depositions, documents, electronically stored information, affidavits or declarations,

stipulations (including those made for purposes of the motion only), admissions, interrogatory

answers, or other materials . . . ."  Fed. R. Civ. P. 56(c)(1)(A).  It is not enough for the party

opposing a properly supported motion for summary judgment to "rest on mere allegations or

denials of his pleadings."  Liberty Lobby, 477 U.S. at 259.  See Abercrombie v. City of Catoosa,

896 F.2d 1228, 1231 (10th Cir. 1990); Otteson v. United States, 622 F.2d 516, 519 (10th Cir.

1980)("[O]nce a properly supported summary judgment motion is made, the opposing party may

not rest on the allegations contained in his complaint, but must respond with specific facts showing

the existence of a genuine factual issue to be tried."  (citation and internal quotation marks

omitted)).

Nor can a party "avoid summary judgment by repeating conclusory opinions, allegations

unsupported by specific facts, or speculation."  Colony Nat'l Ins. v. Omer, No. 07-2123-JAR, 2008

WL 2309005, at *1 (D. Kan. June 2, 2008)(Robinson, J.)(citing Fed. R. Civ. P. 56(e); Argo v. Blue

Cross & Blue Shield of Kan., Inc., 452 F.3d 1193, 1199 (10th Cir. 2006)(McConnell, J.)).   "In responding to a motion for summary judgment, 'a party cannot rest on ignorance of facts, on speculation, or on suspicion and may not escape summary judgment in the mere hope that something will turn up at trial.'"   Colony Nat'l Ins. v. Omer, 2008 WL 2309005, at *1 (quoting Conaway v. Smith, 853 F.2d 789, 794 (10th Cir. 1988)).

To deny a motion for summary judgment, genuine factual issues must exist that "can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." Liberty Lobby, 477 U.S. at 250.  A mere "scintilla" of evidence will not avoid summary judgment. Vitkus v. Beatrice Co., 11 F.3d at 1539 (citing Liberty Lobby, 477 U.S. at 248).  Rather, there must be sufficient evidence on which the fact finder could reasonably find for the nonmoving party.  See Liberty Lobby, 477 U.S. at 251 (quoting Schuylkill & Dauphin Improvement Co. v. Munson, 81 U.S. (14 Wall.) 442, 448 (1871)("Schuylkill")); Vitkus v. Beatrice Co., 11 F.3d at 1539.  "[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party.  If the evidence is merely colorable or is not significantly probative, summary judgment may be granted."   Liberty Lobby, 477 U.S. at 249 (citations omitted).  Where a rational trier of fact, considering the record as a whole, cannot find for the nonmoving party, "there is no 'genuine issue for trial.'"   Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986)(quoting First Nat'l Bank of Ariz. v. Cities Serv. Co., 391 U.S. 253, 289 (1968)).

When reviewing a motion for summary judgment, the court should keep in mind certain principles.  First, the court's role is not to weigh the evidence but to assess the threshold issue whether a genuine issue exists as to material facts requiring a trial.  See Liberty Lobby, 477 U.S. at 249.  Second, the ultimate standard of proof is relevant for purposes of ruling on a summary

judgment, such that, when ruling on a summary judgment motion, the court must "bear in mind the actual quantum and quality of proof necessary to support liability." Liberty Lobby, 477 U.S. at 254. Third, the court must resolve all reasonable inferences and doubts in the nonmoving party's favor and construe all evidence in the light most favorable to the nonmoving party. See Hunt v. Cromartie, 526 U.S. 541, 550-55 (1999); Liberty Lobby, 477 U.S. at 255 ("The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." (citation omitted)). Fourth, the court cannot decide any issues of credibility. See Liberty Lobby, 477 U.S. at 255.

There are, however, limited circumstances in which the court may disregard a party's version of the facts. This doctrine developed most robustly in the qualified immunity arena. In Scott v. Harris, 550 U.S. 372 (2007), the Supreme Court of the United States concluded that summary judgment is appropriate where video evidence quite clearly contradicted the plaintiff's version of the facts. See 550 U.S. at 378-81. The Supreme Court explained:

> At the summary judgment stage, facts must be viewed in the light most favorable to the nonmoving party only if there is a "genuine" dispute as to those facts. Fed. Rule Civ. Proc. 56(c). As we have emphasized, "[w]hen the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts . . . . Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" Matsushita Elec. Industrial Co. v. Zenith Radio Corp., 475 U.S. [at] 586-587 . . . (footnote omitted). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." Anderson v. Liberty Lobby, Inc., 477 U.S. [at] 247-248 . . . . When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.
>
> That was the case here with regard to the factual issue whether respondent was driving in such fashion as to endanger human life. Respondent's version of events is so utterly discredited by the record that no reasonable jury could have believed him. The Court of Appeals should not have relied on such visible fiction;

it should have viewed the facts in the light depicted by the videotape.

Scott v. Harris, 550 U.S. at 380-81 (alterations in Scott v. Harris)(emphasis in Liberty Lobby).

The Tenth Circuit applied this doctrine in Thomson v. Salt Lake County, 584 F.3d 1304

(10th Cir. 2009), and explained:

> [B]ecause at summary judgment we are beyond the pleading phase of the litigation,
> a plaintiff's version of the facts must find support in the record: more specifically,
> "[a]s with any motion for summary judgment, '[w]hen opposing parties tell two
> different stories, one of which is blatantly contradicted by the record, so that no
> reasonable jury could believe it, a court should not adopt that version of the
> facts[.]'" York v. City of Las Cruces, 523 F.3d 1205, 1210 (10th Cir. 2008)(quoting
> Scott [v. Harris], 550 U.S. at 380); see also Estate of Larsen ex rel. Sturdivan v.
> Murr, 511 F.3d 1255, 1258 (10th Cir. 2008).

Thomson v. Salt Lake Cty., 584 F.3d at 1312 (second alteration in Thomson v. Salt Lake Cty.,

third and fourth alterations in York v. City of Las Cruces).  "The Tenth Circuit, in Rhoads v. Miller,

[352 F. App'x 289 (10th Cir. 2009)] explained that the blatant contradictions of the record must

be supported by more than other witnesses' testimony." Lymon v. Aramark Corp., 728 F. Supp. 2d

1222, 1249 (D.N.M. 2010)(Browning, J.), aff'd, 499 F. App'x 771 (10th Cir. 2012).

To allege a claim for relief, rule 8 of the Federal Rules of Civil Procedure requires a

pleading to contain

> (1)     a short and plain statement of the grounds for the court's jurisdiction, unless
>          the court already has jurisdiction and the claim needs no new jurisdictional
>          support;
>
> (2)     a short and plain statement of the claim showing that the pleader is entitled
>          to relief; and
>
> (3)     a demand for the relief sought, which may include relief in the alternative
>          or different types of relief.

Fed. R. Civ. P. 8.  Parties may allege new claims in motions for summary judgment.  See Evans v.

McDonald's Corp., 936 F.2d at 1090-91.  When this occurs, courts treat the motion for summary

judgment as a request to amend the complaint pursuant to rule 15 of the Federal Rules of Civil

Procedure.  See Viernow v. Euripides Dev. Corp., 157 F.3d 790 n.9 (10th Cir. 1998).  The Tenth

Circuit has stated that "[a]s a general rule, a plaintiff should not be prevented from pursuing a valid

claim just because she did not set forth in the complaint a theory on which she could recover,

provided always that a late shift in the thrust of the case will not prejudice the other party in

maintaining his defense upon the merits."  Evans v. McDonald's Corp., 936 F.2d at 1090-91

(quotation marks omitted).  While the purpose of "fact pleading" is to give defendants fair notice

of claims against them "without requiring the plaintiff to have every legal theory or fact developed

in detail before the complaint is filed and the parties have opportunity for discovery," plaintiffs

may not "wait until the last minute to ascertain and refine the theories on which they intend to

build their case."  Evans v. McDonald's Corp., 936 F.2d at 1091.

## LAW REGARDING DIVERSITY JURISDICTION AND ERIE

Under Erie Railroad Co. v. Tompkins, 304 U.S. 64 (1983)("Erie"), a federal district court

sitting in diversity applies "state law with the objective of obtaining the result that would be

reached in state court."  Butt v. Bank of Am., N.A., 477 F.3d 1171, 1179 (10th Cir. 2007).  Accord

Mem. Hosp. v. Healthcare Realty Tr. Inc., 509 F.3d 1225, 1229 (10th Cir. 2007).  The Court has

held that if a district court exercising diversity jurisdiction cannot find a Supreme Court of New

Mexico "opinion that [governs] a particular area of substantive law . . . [the district court]

must . . . predict how the Supreme Court of New Mexico would [rule]."  Guidance Endodontics,

LLC v. Dentsply Int'l., Inc., 708 F. Supp. 2d 1209, 1224-25 (D.N.M. 2010)(Browning, J.).  "Just

as a court engaging in statutory interpretation must always begin with the statute's text, a court

formulating an Erie prediction should look first to the words of the state supreme court."  Peña v.

Greffet, 110 F. Supp. 3d 1103, 1132 (D.N.M. 2015)(Browning, J.).[18]  If the Court finds only an

---

[18]In performing its Erie-mandated duty to predict what a state supreme court would do if

opinion from the Court of Appeals of New Mexico, while "certainly [the Court] may and will

consider the Court of Appeal[s'] decision in making its determination, the Court is not bound by

the Court of Appeal[s'] decision in the same way that it would be bound by a Supreme Court

decision." Mosley v. Titus, 762 F. Supp. 2d 1298, 1332 (D.N.M. 2010)(Browning, J.)(noting that

where the only opinion on point is "from the Court of Appeals, . . . the Court's task, as a federal

district court sitting in this district, is to predict what the Supreme Court of New Mexico would do

if the case were presented to it")(citing Wade v. EMCASCO Ins., 483 F.3d 657, 666 (10th Cir.

2007)(explaining that, "[w]here no controlling state decision exists, the federal court must attempt

to predict what the state's highest court would do," and that, "[i]n doing so, it may seek guidance

from decisions rendered by lower courts in the relevant state")))[19]   The Court may also rely on

---

faced with a case, see Comm'r v. Estate of Bosch, 387 U.S. 456 (1987), a federal court may
sometimes contradict the state supreme court's own precedent if the federal court concludes that
the state supreme court would, given the opportunity, overrule its earlier holding, see Anderson
Living Trust v. WPX Energy Prod., LLC, 27 F. Supp. 3d 1188, 1247 n.30 (D.N.M.
2014)(Browning, J.).  Courts should, obviously, be reticent to formulate an Erie prediction that
conflicts with state-court precedent; even if the prediction turns out to be correct, such predictions
produce disparate results between cases filed in state and federal courts, as the old state supreme
court precedent usually binds state trial courts.  The factors to which a federal court should look
before making an Erie prediction that a state supreme court will overrule its prior precedent vary
depending upon the case, but some consistent ones include: (i) the age of the state supreme court
decision from which the federal court is considering departing -- the younger the state case is, the
less likely it is that departure is warranted; (ii) the amount of doctrinal reliance that the state courts
-- especially the state supreme court -- have placed on the state decision from which the federal
court is considering departing; (iii) apparent shifts away from the doctrine that the state decision
articulates, especially if the state supreme court has explicitly called an older case's holding into
question; (iv) changes in the composition of the state supreme court, especially if mostly dissenting
justices from the earlier state decision remain on the court; and (v) the decision's patent illogic or
its inapplicability to modern times.  See Peña v. Greffet, 110 F. Supp. 3d at 1132 n.17.  In short, a
state supreme court case that a federal court Erie predicts will be overruled is likely to be very old,
neglected by subsequent state-court cases -- perhaps because it is in a dusty corner of the common
law which does not get much attention or have much application -- and clearly wrong.

    [19]The Supreme Court has addressed what the federal courts may use when there is not a
decision on point from the state's highest court:

Tenth Circuit decisions interpreting New Mexico law.  See Anderson Living Trust v. WPX Energy

Prod., LLC, 27 F. Supp. 3d at 1243 & n.30.[20]  Ultimately, "the Court's task is to predict what the

---

The highest state court is the final authority on state law, but it is still the duty of the federal courts, where the state law supplies the rule of decision, to ascertain and apply that law even though it has not been expounded by the highest court of the State.  An intermediate state court in declaring and applying the state law is acting as an organ of the State and its determination, in the absence of more convincing evidence of what the state law is, should be followed by a federal court in deciding a state question.  We have declared that principle in *West v. American Telephone and Telegraph Co.*, 311 U.S. 223 (1940), decided this day.  It is true that in that case an intermediate appellate court of the State had determined the immediate question as between the same parties in a prior suit, and the highest state court had refused to review the lower court's decision, but we set forth the broader principle as applicable to the decision of an intermediate court, in the absence of a decision by the highest court, whether the question is one of statute or common law.

. . . .

We have held that the decision of the Supreme Court upon the construction of a state statute should be followed in the absence of an expression of a countervailing view by the State's highest court, and we think that the decisions of the Court of Chancery [the New Jersey trial court] are entitled to like respect as announcing the law of the State.

. . . .

The question has practical aspects of great importance in the proper administration of justice in the federal courts.  It is inadmissible that there should be one rule of state law for litigants in the state courts and another rule for litigants who bring the same question before the federal courts owing to the circumstance of diversity of citizenship.  In the absence of any contrary showing, the rule [set forth by two New Jersey trial courts, but no appellate courts] appears to be the one which would be applied in litigation in the state court, and whether believed to be sound or unsound, it should have been followed by the Circuit Court of Appeals.

Fid. Union Tr. Co. v. Field, 311 U.S. 169, 177-80 (1940)(footnotes and citations omitted).  The Supreme Court has softened this position over the years; federal courts are no longer bound by state trial or intermediate court opinions, but "should attribute [them] some weight . . . where the highest court of the State has not spoken on the point."  Comm'r v. Estate of Bosch, 387 U.S. at 465 (citing King v. Order of United Commercial Travelers, 333 U.S. 153, 159 (1948)).  See 17A James Wm. Moore et al., Moore's Federal Practice § 124.20 (3d ed. 1999)("Decisions of intermediate state appellate courts usually must be followed . . . [and] federal courts should give some weight to state trial courts decisions." (emphasis and title case omitted)).

[20]In determining the proper weight to accord Tenth Circuit precedent interpreting New Mexico law, the Court must balance the need for uniformity between federal court and state court

interpretations of state law with the need for uniformity among federal judges. If the Court adheres too rigidly to Tenth Circuit case law, ignoring changes undergone by a state's law in the ensuing years, then parties litigating state-law claims will be subject to a different body of substantive law, depending on whether they litigate in state court or federal court. This result frustrates the purpose of Erie, which held that federal courts must apply state court interpretations of state law, rather than their own, in part so that parties achieve a consistent result regardless of the forum. This consideration pulls the Court toward according Tenth Circuit precedent less weight and according state court decisions issued in the ensuing years more weight. On the other hand, when the state law is unclear, it is desirable for there to at least be uniformity among federal judges as to its proper interpretation. Otherwise, different federal judges within the same circuit -- or even the same district, as district courts' decisions are not binding, even upon themselves -- would be free to adopt differing interpretations of a state's law. This consideration pulls the Court towards a stronger respect for vertical stare decisis, because a Tenth Circuit decision on point -- regardless whether it accurately reflects state law --at least provides consistency at the federal level, so long federal district judges are required to follow it.

The Court must decide how to weigh Tenth Circuit case law against more-recent state court decisions, choosing a point on the spectrum between the two extremes: rigidly adhering to Tenth Circuit precedent unless there is intervening case law directly on point from the state's highest court, on one end; and independently interpreting the state law, regarding the Tenth Circuit precedent as no more than persuasive authority, on the other. In striking this balance, the Court notes that it is generally more concerned about systemic inconsistency between the federal courts and the state courts than it is about inconsistency among federal judges. Judges, even those within a jurisdiction with ostensibly identical governing law, sometimes interpret and apply the law differently from one another; this inconsistency is part and parcel of a common-law judicial system. More importantly, litigants seeking to use forum selection to gain a substantive legal advantage cannot easily manipulate such inconsistency: cases are assigned randomly to district judges in this and many federal districts; and, regardless, litigants cannot know for certain how a given judge will interpret the state law, even if they could determine the identity of the judge pre-filing or pre-removal. All litigants know in advance is that whomever federal district judge they are assigned will look to the entirety of the state's common law in making his or her determination -- the same as a state judge would. Systemic inconsistency between the federal courts and state courts, on the other hand, not only threatens the principles of federalism, but litigants may more easily manipulate the inconsistency. When the Tenth Circuit issues an opinion interpreting state law, and the state courts subsequently shift away from that interpretation, litigants -- if the district courts strictly adhere to the Tenth Circuit opinion -- have a definite substantive advantage in choosing the federal forum over the state forum, or vice versa.

The Court further notes that district courts may be in a better position than the Tenth Circuit to be responsive to changes in state law. Tenth Circuit decisions interpreting a particular state's law on a specific issue are further apart in time than the collective district courts are. More importantly, the Tenth Circuit does not typically address such issues with the frequency that the state's courts themselves do. As such, Tenth Circuit precedent can lag behind developments in state law -- developments that the district courts may be nimble enough to perceive and adopt. Additionally, much of the benefit of having a consistent Tenth Circuit-wide interpretation of a particular state's law is wasted. Other than Oklahoma, every state encompassed by the Tenth

_____

Circuit contains only one federal judicial district, and there is relatively little need for federal judges in Wyoming and Kansas to have a uniform body of New Mexico law to which to look. Last, the Court notes, respectfully, that district courts may be in a better position than the Tenth Circuit to develop expertise on the state law of the state in which they sit.  Every federal judicial district in the nation, except the District of Wyoming, covers at most one state.  It is perhaps a more workable design for each district court to keep track of legal developments in the state law of its own state(s) than it is for the Tenth Circuit to monitor separate legal developments in eight states.

Having outlined the relevant considerations, the Court thinks the proper stance on vertical stare decisis in the context of federal court interpretations of state law is as follows: the Tenth Circuit's cases are binding as to their precise holding -- what the state law was on the day the opinion was published -- but lack the positive precedential force that its cases interpreting a federal statute or the federal Constitution possess.  A district court considering a state law issue after the publication of a Tenth Circuit opinion on point may not come to a contrary conclusion based <u>only</u> on state court cases that were available to the Tenth Circuit and that the Tenth Circuit considered, but it may come to such a conclusion based on intervening state court cases.

When interpreting state law, the Tenth Circuit does not and cannot issue a case holding that *x* is the law in New Mexico; it holds that the <u>proper interpretation</u> of New Mexico law, at the time the opinion is released, is *x*.  Its holdings are descriptive, not prescriptive -- interpretive, not normative.  Because federal judicial opinions lack independent substantive force on state law issues, but possess such force regarding federal law issues, the Court thinks the following is not an unfair summary of the judicial interpretive process: (i) when interpreting federal law, the federal appellate courts consider the existing body of law, and then issue a holding that both reflects and influences the body of law; that holding subsequently becomes a part of the body of law; but (ii) when interpreting state law, the federal appellate courts consider the existing body of law, and then issue a holding that only reflects the body of law; that holding does not subsequently become a part of the body of law.  The federal district courts are bound to conclude that the Tenth Circuit's reflection of the then-existing body of law was accurate.  The question is whether they should build a doctrine atop the case and use the existence of the Tenth Circuit's case to avoid any responsibility to independently consider the whole body of state law that exists when the time comes that diversity litigants raise the issue in their courtrooms.  Giving such effect to the Tenth Circuit's interpretations of state law is at tension with <u>Erie</u>, giving independent substantive effect to federal judicial decisions -- <u>i.e.</u>, applying federal law -- in a case brought in diversity.

The purpose of <u>Erie</u> is well-known and simple, and the Court should not complicate it beyond recognition: it is that the same substantive law governs litigants' cases regardless whether they are brought in a federal or state forum.  For simplicity's sake, most courts have settled on the formulation that "the federal court must attempt to predict how the states' highest court would rule if confronted with the issue."  <u>Moore's Federal Practice</u> § 124.22[3] (citing <u>Comm'r v. Estate of Bosch</u>, 387 U.S. at 465 ("[A]n intermediate appellate state court [decision] is a datum for ascertaining state law which is not to be disregarded by a federal court unless it is convinced by other persuasive data that the highest court of the state would decide otherwise." (citation and internal quotation marks omitted))).  This formulation may not be the most precise one if the goal is to ensure identical outcomes in state and federal court -- the Honorable Milton I. Shadur, United States District Judge, looks to state procedural rules to determine in which state appellate circuit

the suit would have been filed were it not in federal court, and then applies the state law as that circuit court interprets it, see Abbott Labs. v. Granite State Ins., 573 F. Supp. 193, 196-200 (N.D. Ill. 1983)(Shadur, J.)(noting that the approach of predicting the state supreme court's holdings will often lead to litigants obtaining a different result in federal court than they would in state court, where only the law of the circuit in which they filed -- and certainly not nonexistent, speculative state supreme court law -- governs) -- but it is a workable solution that has achieved consensus. See Allstate Ins. v. Menards, Inc., 285 F.3d 630, 637 (7th Cir. 2002)("[W]e adhere today to the general rule, articulated and applied throughout the United States, that, in determining the content of state law, the federal courts must assume the perspective of the highest court in that state and attempt to ascertain the governing substantive law on the point in question."). This formulation, built out of ease-of-use, does not relieve courts of their Supreme Court-mandated obligation to consider state appellate and trial court decisions. To the contrary, even non-judicial writings by influential authors, statements by state supreme court justices, the closeness of the vote on a prior case addressing the issue, and personnel changes on the court -- considerations that would never inform a federal court's analysis of federal law -- may validly come into play. The question is whether the district courts must abdicate, across-the-board, the "would decide" aspect of the Erie analysis to their parent appellate courts when the Court of Appeals has declared an interpretation of state law.

The Erie doctrine results in federal cases that interpret state law withering with time. While cases interpreting federal law become more powerful over time -- forming the groundwork for doctrines, growing upward from one application (Congress may create a national bank) to many (Congress may set quotas on wheat-growing for personal consumption), expanding outward from the general (states must grant criminal jury trials) to the specific (the jury need not be twelve people, nor must it be unanimous) -- federal cases interpreting state law often become stale. New state court cases -- even when not directly rebuking the federal court's statement of law -- alter the common-law legal landscape with their dicta, their insinuations, and their tone. The Supreme Court, which picks its cases sparingly and for maximum effect, almost never grants certiorari to resolve issues of state law.

The Court's views on Erie, of course, mean little if the Tenth Circuit does not agree. In Wankier v. Crown Equipment Corp., the Tenth Circuit said that,

> [w]here no controlling state decision exists, the federal court must attempt to predict what the state's highest court would do. In performing this ventriloquial function, however, the federal court is bound by ordinary principles of *stare decisis*. Thus, when a panel of this Court has rendered a decision interpreting state law, that interpretation is binding on district courts in this circuit, and on subsequent panels of this Court, unless an intervening decision of the state's highest court has resolved the issue.

Wankier v. Crown Equip. Corp., 353 F.3d 862, 866 (10th Cir. 2003)(McConnell, J.). From this passage, it seems clear that the Tenth Circuit permits a district court to deviate from its view of state law only on the basis of a subsequent case "of the state's highest court." The American Heritage Dictionary of the English Language 1402 (William Morris ed., New College ed. 1976)(defining "unless" as "[e]xcept on the condition that; except under the circumstances that").

state supreme court would do." Wade v. EMCASCO Ins. Co., 483 F.3d at 666.  Accord Mosley

v. Titus, 762 F. Supp. 2d at 1332 (citation omitted); Rimbert v. Eli Lilly & Co., 577 F. Supp. 2d

1174, 1188-89 (D.N.M. 2008)(Browning, J.).

---

A more aggressive reading of the passage -- namely the requirement that the intervening case "resolv[e] the issue," Wankier v. Crown Equip. Corp., 353 F.3d at 866 -- might additionally compel the determination that any intervening case law must definitively and directly contradict the Tenth Circuit interpretation to be considered "intervening."

    It is difficult to know whether Judge McConnell's limitation of "intervening decision" to cases from the highest state court was an oversight or intentional.  Most of the Tenth Circuit's previous formulations of this rule have defined intervening decisions inclusively as all subsequent decisions of "that state's courts," a term which seems to include trial and intermediate appellate courts.  Even Koch v. Koch Industries, Inc., 203 F.3d 1202, 1231 (10th Cir. 2000), the primary authority upon which Wankier v. Crown Equipment Corp. relies, uses the more inclusive definition.  In fact, Wankier v. Crown Equipment Corp. quotes its relevant passage:

> In the absence of intervening Utah authority indicating that a plaintiff is not required to prove a safer, feasible alternative design, we are bound to follow the rule of Allen [v. Minnstar, Inc., 8 F.3d 1470 (10th Cir. 1993), a Tenth Circuit case interpreting an issue of Utah law], as was the district court. "Following the doctrine of stare decisis, one panel of this court must follow a prior panel's interpretation of state law, absent a supervening declaration to the contrary by that state's courts or an intervening change in the state's law." Koch v. Koch Indus., Inc., 203 F.3d at 1231.

Wankier v. Crown Equip. Corp., 353 F.3d at 867.

    Whether the decision to limit the intervening authority a district court can consider was intentional or not, the Tenth Circuit has picked it up and run with it.  In Kokins v. Teleflex, Inc., the Tenth Circuit, quoting Wankier v. Crown Equipment Corp., refused to consider an opinion from the Court of Appeals of Colorado holding directly the opposite of an earlier Tenth Circuit interpretation of Colorado law.  See Kokins v. Teleflex, Inc., 621 F.3d 1290, 1297 (10th Cir. 2010)(Holmes, J.)("[T]he Colorado Court of Appeals decided Biosera[, Inc. v. Forma Scientific, Inc., 941 P.2d 284 (Colo. Ct. App. 1998)], so it is not an 'intervening decision of the state's highest court.'" (emphasis in original)(quoting Wankier v. Crown Equip. Corp., 353 F.3d at 866)).

    The Tenth Circuit has set forth a stringent restriction on its district courts' ability to independently administer the Erie doctrine.  More importantly, the Tenth Circuit's view may be at tension with the above-quoted Supreme Court precedent, as well as its own prior case law. Moore's lists the Tenth Circuit as having been, at one time, a "court[ that] hold[s] that a prior federal appellate decision [interpreting state law] is persuasive." Moore's § 124.22[4] (citing State Farm Mut. Auto. Ins. v. Travelers Indem. Co., 433 F.2d 311, 312 (10th Cir. 1970)).  Still, the Court is bound to abide by the Tenth Circuit's interpretation of Erie.

## ANALYSIS

This case turns primarily on one issue: whether JBI Electrical complied substantially with the CILA's licensing requirements.  See Tr. at 3:1-4 (Calvert)(indicating that the pending motions "address[] the licensing issue.  I think all three of those are tied into the same facts, same arguments"); id. at 67:14-15 (Stevens-Block)(averring that the case "does come down to largely the one issue about substantial compliance").   The Court concludes that JBI Electrical complied substantially with the statute.  See N.M.S.A. § 60-13-30.  The CILA instructs:

> A.   No contractor shall act as agent or bring or maintain any action in any court of the state for the collection of compensation for the performance of any act for which a license is required by the Construction Industries Licensing Act without alleging and proving that such contractor was a duly licensed contractor at the time the alleged cause of action arose.
>
> B.   Any contractor operating without a license as required by the Construction Industries Licensing Act shall have no right to file or claim any mechanic's lien as now provided by law.

N.M.S.A. § 60-13-30.   See Fischer v. Rakagis, 1955-NMSC-057, ¶ 6, 286 P.2d 312, 316 (upholding this statute in a challenge based on the Constitutions of the United States and New Mexico).   JBI Electrical insists that it complied substantially with the applicable licensing requirements and, therefore, is entitled to bring this action.  See Tr. at 38:5-20 (Stevens-Block). By contract, JMD Construction and KW AQE maintain that, because JBI Electrical lacked a license at the time that it contracted with JMD Construction and for a significant portion of the contract period, it is barred statutorily from seeking compensation.  See Tr. at 17:7-18:20 (Calvert). The Supreme Court of New Mexico applies a six-part test, which considers three mandatory threshold questions, followed by three discretionary factors, when evaluating whether a contractor has complied substantially with N.M.S.A § 60-13-30.  See Koehler v. Donnelly, 1992-NMSC-058, ¶ 14, 838 P.2d 980, 983; Roth v. Thompson, 1992-NMSC-011, ¶ 7, 825 P.2d 1241, 1242-43; Peck v. Ives, 1972-NMSC-053, ¶ 5, 499 P.2d at 685.  Under this six-part test, the Court concludes that

JBI Electrical complied substantially with N.M.S.A. § 60-13-1, because JBI Electrical has been licensed in New Mexico for approximately twenty-five years and moved quickly to get its license reactivated upon the discovery that it had lapsed.

I.    **JBI ELECTRICAL COMPLIED SUBSTANTIALLY WITH THE CILA, N.M.S.A. § 60-13-1, BECAUSE IT SATISFIES FIVE OF THE SIX FACTORS IN THE SUPREME COURT OF NEW MEXICO'S SUBSTANTIAL COMPLIANCE TEST.**

The Supreme Court of New Mexico explained the substantial compliance test's background in Peck:

> The doctrine of substantial compliance developed in California, which has a licensing act similar to that of New Mexico.  The culmination of this development came in the case of Latipac, Inc. v. Superior Court of Marin Cty., 64 Cal. 2d 278, 49 Cal. Rptr. 676, 411 P.2d 564 (1966), in which the California Supreme Court outlined what it considered to be the elements of the doctrine as it existed in that state.  Those elements are: "(1) the fact that plaintiff (contractor) held a valid license at the time of contracting, (2) that plaintiff readily secured a renewal of that license and (3) that the responsibility and competence of plaintiff's managing officer were officially confirmed throughout the period of performance of the contract."  The California court did not hold that all of these elements necessarily had to exist in any one fact situation in order for the doctrine to apply.  In Latipac, they were all present.

Peck v. Ives, 1972-NMSC-053, ¶ 20, 84 N.M. 62, 65, 499 P.2d 684, 687 (quoting of Latipac, Inc. v. Superior Court of Marin Cty., 64 Cal. 2d 278, 49 Cal. Rptr. 676, 411 P.2d 564 ("Lapitac").[21]

---

[21]California's substantial compliance doctrine has since been codified:

> The judicial doctrine of substantial compliance shall not apply under this section where the person who engaged in the business or acted in the capacity of a contractor has never been a duly licensed contractor in this state.  However, notwithstanding subdivision (b) of Section 143, the court may determine that there has been substantial compliance with licensure requirements under this section if it is shown at an evidentiary hearing that the person who engaged in the business or acted in the capacity of a contractor (1) had been duly licensed as a contractor in this state prior to the performance of the act or contract, (2) acted reasonably and in good faith to maintain proper licensure, and (3) acted promptly and in good faith to remedy the failure to comply with the licensure requirements upon learning of the failure.

A.     **THE SUPREME COURT OF NEW MEXICO'S SUBSTANTIAL**
       **COMPLIANCE TEST CONTAINS SIX FACTORS.**

Peck v. Ives is the first New Mexico case to apply the substantial compliance doctrine.  See

1972-NMSC-053, ¶ 20, 84 N.M. 62, 65, 499 P.2d 684, 687.  In Peck v. Ives, the plaintiff contractor

sought to foreclose on a mechanic's lien[22] against a property owner for whom the plaintiff had

agreed to construct a house.  See 1972-NMSC-053, ¶ 1, 499 P.2d 684, 684-85.  The owner filed a

motion for summary judgment, arguing that, because the contractor was not licensed properly

under the CILA, he was barred from foreclosing on the lien.  See 1972-NMSC-053, ¶ 1, 499 P.2d

684, 684-85.   The Supreme Court of New Mexico explains that the CILA "provides a

comprehensive method for the licensing and control of contractors in order to protect the public

from either irresponsible or incompetent contractors."  1972-NMSC-053, ¶ 5, 84 N.M. 62, 63, 499

P.2d 684, 685.  The Supreme Court of New Mexico then applies the three-part test, as discussed

above.  See 1972-NMSC-053, ¶ 20, 499 P.2d 684, 687.  Regarding the first element, the Supreme

_____

Cal. Bus. & Prof. Code § 7031(e).

[22]New Mexico law provides:

Every person performing labor upon, providing or hauling equipment, tools or
machinery for or furnishing materials to be used in the construction, alteration or
repair of any mine, building, wharf, bridge, ditch, flume, tunnel, fence, machinery,
railroad, road or aqueduct to create hydraulic power or any other structure, who
performs labor in any mine or is a registered surveyor or who surveys real property
has a lien upon the same for the work or labor done, for the specific contract or
agreed upon charge for the surveying or equipment, tools or machinery hauled or
provided or materials furnished by each respectively, whether done, provided,
hauled or furnished at the instance of the owner of the building or other
improvement or his agent.  Every contractor, Subcontractor, architect, builder or
other person having charge of any mining or of the construction, alteration or repair,
either in whole or in part, of any building or other improvement shall be held to be
the agent of the owner for the purposes of this section.

N.M.S.A. § 48-2-2.

Court of New Mexico explains that the contractor had a valid license when he contracted with the owner.  See 1972-NMSC-053, ¶ 20, 84 N.M. 62, 65, 499 P.2d 684, 687.  The Supreme Court of New Mexico notes that "[t]his is a crucial element of the doctrine, as pointed out in Latipac." 1972-NMSC-053, ¶ 20, 499 P.2d 684, 687.  As to the second element, the Supreme Court of New Mexico explains that the contractor "readily secured a renewal of his license," because he renewed his license approximately seven months after completing construction.  See 1972-NMSC-053, ¶ 21, 499 P.2d 684, 687-88.  Regarding the third element, the Supreme Court of New Mexico indicates that it is "doubtful that this last element is necessary in this case."  1972-NMSC-053, ¶¶ 21, 499 P.2d 684, 687-88.  Specifically, "the context in which this requirement arose in Lapitac involved a license which had expired," but Peck does not involve an expired license.  1972-NMSC-053, ¶¶ 21, 499 P.2d 684, 687-88.  The Supreme Court of New Mexico states that, in Lapitac, the Supreme Court of California "was concerned with whether the corporation employed an individual during the period of expiration who was responsible and competent enough to qualify for a license."  Peck v. Ives, 1972-NMSC-053, ¶ 21, 499 P.2d 684, 687-88.  The Supreme Court of New Mexico then notes that "most important" in its decision is the purpose underlying the substantial compliance doctrine.  Peck v. Ives, 1972-NMSC-053, ¶ 22, 499 P.2d 684, 688.  The Supreme Court of New Mexico describes the CILA's purpose as "to protect the public from incompetent and irresponsible builders. . . .  In view of the severity of the sanctions and the forfeitures which could be involved, we are reluctant to construe the statute more broadly than necessary for the achievement of its purpose."  Peck v. Ives, 1972-NMSC-053, ¶ 22, 499 P.2d 684, 688.  The Supreme Court of New Mexico hopes to prevent CILA from being used as "an 'unwarranted shield for the avoidance of a just obligation.'"  1972-NMSC-053, ¶ 23, 499 P.2d 684, 688 (no citation for quotation).  Consequently, the Supreme Court of New Mexico reversed the district court's

grant of summary judgment in the owner's favor.  See 1972-NMSC-053, ¶ 1, 84 N.M. 62, 62, 499 P.2d 684, 684.

By contrast, in Roth v. Thompson, the Supreme Court of New Mexico held that an unlicensed contractor had not complied substantially with N.M.S.A. § 60-13-30, and, therefore, was barred statutorily from using the courts to foreclose on a mechanic's lien.  See 1992-NMSC-011, ¶ 1-5, 825 P.2d 1241, 1242 (Franchini, J.).   In Roth v. Thompson, the property owner defendant hired a contractor to construct a home, and the contractor hired the subcontractor plaintiff to perform plastering work.  See Roth v. Thompson, 1992-NMSC-011, ¶ 3, 825 P.2d 1241, 1242.  The plaintiff entered the plastering contract in April, 1988, and engaged in plastering until July, 1988.  See Roth v. Thompson, 1992-NMSC-011, ¶ 3, 825 P.2d 1241, 1242.  The plaintiff took the necessary licensing examinations in June and July, 1988, and received a license in late August, 1988.  See 1992-NMSC-011, ¶ 3, 825 P.2d 1241, 1242.  The Supreme Court of New Mexico first examines the CILA's purpose, and explains that, "to protect the public, our legislature has chosen to harshly penalize unlicensed contractors by denying them access to the courts to collect compensation for work performed. . . .  This is true even with respect to work which has been fully and satisfactorily performed."  Roth v. Thompson, 1992-NMSC-011, ¶ 7, 825 P.2d 1241, 1243 (citing Triple B Corp. v. Brown & Root, Inc., 1987-NMSC-058, 739 P.2d 968).  The Supreme Court of New Mexico states:

> "The object sought to be accomplished by the Act is a healthy, ordered market in which consumers may contract with competent, reliable construction contractors who have passed the scrutiny of a licensing division.  The wrong to be remedied is the exploitation of the public by incompetent and unscrupulous contractors who are unable or unwilling to obtain a license."

Roth v. Thompson, 1992-NMSC-011, ¶ 7, 825 P.2d 1241, 1242-43 (quoting Mascarenas v. Jaramillo, 1991-NMSC-014, ¶ 14, 806 P.2d 59, 62).  Accord Koehler v. Donnelly, 1992-NMSC-058, ¶ 7, 838 P.2d 980, 982 (same).  The Supreme Court of New Mexico affirmed the trial court,

explaining that it had "recognized the public policy considerations in requiring adherence to licensing requirements and the legislative intent in promulgating those requirements that the public be protected from incompetent and irresponsible builders" when it determined that the plaintiff had not complied substantially with the statute. Roth v. Thompson, 1992-NMSC-011, ¶ 9, 825 P.2d 1241, 1243. The Supreme Court of New Mexico then applies the tripartite Latipac test, and first notes that the plaintiff was unlicensed when he entered the contract. See Roth v. Thompson, 1992-NMSC-011, ¶ 17, 825 P.2d 1241, 1245. Second, the Supreme Court of New Mexico explains that the plaintiff's "efforts to secure a new license when his performance under the Subcontract was near completion do not satisfy the requirement that he readily secure 'renewal' of his license." 1992-NMSC-011, ¶ 18, 113 N.M. 331, 335, 825 P.2d 12411241, 1245 (no citation for quotation). Regarding the third factor, the Supreme Court of New Mexico notes that the plaintiff also does not demonstrate his responsibility and competence throughout the period of performance, because there was no "evidence of a managing officer or other entity officially confirming" the plaintiff's competence. 1992-NMSC-011, ¶ 18, 825 P.2d 1241, 1245. The Supreme Court of New Mexico contrasts the case with Lapitac, where the contractor satisfied this element, because, "although the contracting company's license had lapsed, the managing officer of that company was the qualifying party for a separate corporation possessing a valid contractor's license throughout the period of performance in that case." 1992-NMSC-011, ¶ 18, 825 P.2d 1241, 1245. Because the plaintiff "fails to satisfy any of the elements of the substantial compliance doctrine," the Supreme Court of New Mexico affirmed the lower court's grant of summary judgment in the defendant's favor. Roth v. Thompson, 1992-NMSC-011, ¶ 18, 825 P.2d 1241, 1245.

The same year, the Supreme Court of New Mexico again addressed the substantial

compliance doctrine in <u>Koehler v. Donnelly</u>, 1992-NMSC-058, 838 P.2d 980.[23]  In this case, the

Supreme Court of New Mexico holds that the plaintiff contractor complied substantially with the

statute and, therefore, could file a lien under N.M.S.A. § 60-13-30.  See <u>Koehler v. Donnelly</u>,

1992-NMSC-058, ¶ 1, 114 N.M. 363, 364, 838 P.2d 980, 981.  The plaintiff contractor, who had

held a roofing construction license for approximately three years, did not realize his license had

been cancelled and entered into a contract to build a roof on the defendant's property.  See <u>Koehler</u>

<u>v. Donnelly</u>, 1992-NMSC-058, ¶ 1-3, 114 N.M. 363, 364, 838 P.2d 980, 981.  The Supreme Court

of New Mexico began by emphasizing that, "in exceptional circumstances, the purpose of the

CILA is not furthered by strict enforcement."  1992-NMSC-058, ¶ 7, 838 P.2d 980, 982.  The

Supreme Court of New Mexico continues that "[t]he doctrine of substantial compliance was

adopted because we do not insist on literal compliance in a situation where the party seeking to

escape his obligation has received the full protection contemplated by the statute."  <u>Koehler v.</u>

<u>Donnelly</u>, 1992-NMSC-058, ¶ 10, 114 N.M. 363, 365, 838 P.2d 980, 982.

    The Supreme Court of New Mexico then discusses the tripartite <u>Lapitac</u> test as applied to

the plaintiff.  See <u>Koehler v. Donnelly</u>, 1992-NMSC-058, ¶ 11-13, 114 N.M. at 365,  838 P.2d

980, 982.  The Supreme Court of New Mexico notes that it had described previously the first

element of the test as "'crucial.'"  1992-NMSC-058, ¶ 11, 114 N.M. at 365, 838 P.2d 980, 982-83

(quoting <u>Roth v. Thompson</u>, 1992-NMSC-011, ¶ 18, 825 P.2d at 1243, and <u>Peck v. Ives</u>, 1972-

NMSC-053, ¶ 20, 499 P.2d at 687).  Here, however, the plaintiff

> did not hold a valid license at the time of contracting or at any time during
> performance.  Yet, unlike the contractors in *Roth* and *Mascarenas,* Donnelly[, the
> plaintiff,] did not willfully enter into a contract in violation of the CILA.  He
> obtained a license in 1987, and subsequently renewed it.  He had no knowledge that
> his license had been canceled or even that it was in jeopardy.  The cancellation of

---

[23]The Honorable Gene Edward Franchini, Justice of the Supreme Court of New Mexico,
authored <u>Roth v. Thompson</u>, <u>Koehler v. Donnelly</u>, and <u>Mascarenas v. Jaramillo</u>.

his license occurred for reasons beyond his control and not for reasons of incompetence or discipline by the CID. He had no willfulness or knowledge of his violation and he was fiscally responsible and competent at all times during the performance of the contract. Therefore, Donnelly's failure to meet the first element of the test will not defeat his claim.

Koehler v. Donnelly, 1992-NMSC-058, ¶ 11, 114 N.M. at 365-66, 838 P.2d 980, 982-83. With respect to the second element, the Supreme Court of New Mexico concludes that the plaintiff readily secured a renewal of his license, because, once he "learned that his license had been canceled, he took immediate steps and his license was reinstated." 1992-NMSC-058, ¶ 12, 114 N.M. 363, 365-66, 838 P.2d 980, 982-83. The Supreme Court of New Mexico elaborates that it was not concerned whether the plaintiff's fitness for licensure varied in the interval between expiration and renewal, because the plaintiff demonstrated immediately his fiscal responsibility by submitting a cash collateral when he learned that his license had been cancelled. See 1992-NMSC-058, ¶ 11, 114 N.M. at 365-66, 838 P.2d at 982-83. Regarding the third element, the Supreme Court of New Mexico notes that the plaintiff was "both competent and fiscally responsible during the inadvertent lapse of his license." 1992-NMSC-058, ¶ 13, 114 N.M. 363, 366, 838 P.2d 980, 983. The Supreme Court of New Mexico adds that the CILA's purposes are satisfied, because the public was never endangered since the plaintiff remained competent and responsible throughout construction. See 1992-NMSC-058, ¶ 14, 114 N.M. 363, 366, 838 P.2d 980, 983. Accordingly, the Supreme Court of New Mexico holds that the plaintiff complied substantially with the CILA's licensing requirements and may bring a mechanic's lien against the defendant. See Koehler v. Donnelly, 1992-NMSC-058, ¶ 15, 114 N.M. at 366, 838 P.2d 980, 983.

The Court of Appeals of New Mexico also has applied the substantial compliance doctrine in several instances. See Romero v. Parker, 2009-NMCA-047, ¶ 18, 207 P.3d 350, 357 (holding that, where a contractor "ha[s] not complied at all with the CILA licensing requirements," it cannot bring an action to recover compensation under the substantial compliance doctrine); Fowler Bros.,

Inc. v. Bounds, 2008-NMCA-091, ¶ 38, 188 P.3d 1261, 1271 (concluding that a contractor did not comply substantially with an Arizona licensing statute similar to CILA).  See also BC & L Pavement Servs., Inc. v. Higgins, 2002-NMCA-087, ¶ 17, 51 P.3d 533, 539 (holding that "the doctrine of substantial compliance does not apply to the requirement of Section 60-13-12(B) that a contractor have a valid license when submitting a bid on a public contract"); overruled on other grounds by Rio Grande Chapter of Sierra Club v. New Mexico Mining Comm'n, 2003-NMSC-005, ¶ 17, 61 P.3d 806.  The Court of Appeals of New Mexico cases, while instructive, tend to interpret more strictly N.M.S.A. § 60-13-30.  See, e.g., High Country Landscapes, LLC v. McDonald, No. A-1-CA-37439, 2021 WL 288480, at *5 (N.M. Ct. App. Jan. 28, 2021)(stating that, "[g]iven this Court's strict application of the licensure requirements under CILA, we need not look beyond the plain language of these statutes").  See also Mosley v. Titus, 762 F. Supp. 2d 1298, 1332 (D.N.M. 2010)(Browning, J.)(concluding that while "certainly [the Court] may and will consider the Court of Appeal[s'] decision in making its determination, the Court is not bound by the Court of Appeal[s'] decision in the same way that it would be bound by a Supreme Court decision").  Because the "Supreme Court of New Mexico has held several times . . . that a statute's stated purpose must be considered in interpreting a statute and is evidence of the statutes proper interpretation," the Court must go beyond the CILA's plain language and evaluate the statute in light of its purpose in alignment with the Supreme Court of New Mexico.  Harjo v. City of Albuquerque, 307 F. Supp. 3d 1163, 1219 (D.N.M. 2017)(Browning, J.), modified on reconsideration, 326 F. Supp. 3d 1145 (D.N.M. 2018)

Based on the foregoing caselaw, the Court concludes that the Supreme Court of New Mexico applies a six-part test, which considers three mandatory threshold questions, followed by three discretionary factors, when evaluating whether a contractor has complied substantially with

N.M.S.A § 60-13-30.  See Koehler v. Donnelly, 1992-NMSC-058, ¶ 14, 838 P.2d 980, 983; Roth v. Thompson, 1992-NMSC-011, ¶ 7, 825 P.2d 1241, 1242-43; Peck v. Ives, 1972-NMSC-053, ¶ 5, 499 P.2d at 685.  The Supreme Court of New Mexico asks consistently the following questions: (i) whether the plaintiff contractor was an incompetent, irresponsible, or unscrupulous builder who endangered the public at large; see Koehler v. Donnelly, 1992-NMSC-058, ¶ 14, 838 P.2d 980, 983; Roth v. Thompson, 1992-NMSC-011, ¶ 7, 825 P.2d 1241, 1242-43; Peck v. Ives, 1972-NMSC-053, ¶ 5, 499 P.2d at 685; (ii) whether the party seeking to escape its obligation -- typically the defendant who hired the contractor -- has received the full protection that the CILA contemplates, and is therefore using the CILA as "an unwarranted shield for the avoidance of a just obligation," Peck v. Ives, 1972-NMSC-053, ¶ 23, 499 P.2d at 688; (iii) whether the plaintiff "willfully enter[ed] into a contract in violation of the CILA," or whether "the plaintiff's licensing lapse occurred for reasons beyond his control and not for reasons of incompetence or discipline by the CID," Koehler v. Donnelly, 1992-NMSC-058, ¶ 11, 838 P.2d at 982-83; (iv) whether the plaintiff had a valid license at the time of contracting, see Peck v. Ives, 1972-NMSC-053, ¶ 20, 499 P.2d at 687; Koehler v. Donnelly, 1992-NMSC-058, ¶ 11, 838 P.2d at 982-83;[24] (v) whether the plaintiff "readily secured a renewal of that license," Peck v. Ives, 1972-NMSC-053, ¶¶ 21, 499 P.2d 684, 687-88; and (vi) whether "the responsibility and competence of plaintiff's managing

---

[24]The Supreme Court of New Mexico explains in Koehler v. Donnelly that, although it described previously this element as "crucial," it is not dispositive where the plaintiff has "no willfulness or knowledge of his violation and he was fiscally responsible and competent at all times during the performance of the contract." Koehler v. Donnelly, 1992-NMSC-058, ¶ 11, 838 P.2d 980, 982-83.  The Court, therefore, views this element as an important consideration that is not dispositive, although the Supreme Court of New Mexico implies in earlier cases in dicta that this factor is outcome determinative.  See, e.g., Roth v. Thompson, 1992-NMSC-011, ¶ 9, 825 P.2d at 1243 ("That a contractor held a valid license at the time the contract was entered into is a crucial element of the substantial compliance doctrine."); Peck v. Ives, 1972-NMSC-053, ¶ 20, 84 N.M. 62, 65, 499 P.2d 684, 687 (concluding that the plaintiff "held a valid license at the time of contracting.  This is a crucial element of the doctrine").

officer were officially confirmed throughout the period of performance of the contract," <u>Peck v. Ives</u>, 1972-NMSC-053, ¶ 20, 499 P.2d at 687.  To foreclose on a mechanic's lien, a plaintiff must satisfy each of the first three elements (the "threshold inquiry"), which the Supreme Court of New Mexico derives from the CILA and the substantial compliance doctrine's purpose, <u>see</u> <u>Peck v. Ives</u>, 1972-NMSC-053, ¶ 22, 499 P.2d at 688 (explaining that the "most important" part of deciding substantial compliance cases is the doctrine and, by extension, the CILA's underlying purpose), while the final three factors (the "<u>Latipac</u> factors"), create a discretionary balancing test, <u>see</u> <u>Peck v. Ives</u>, 1972-NMSC-053, ¶ 20, 84 N.M. 62, 65, 499 P.2d 684, 687 (describing the <u>Latipac</u> factors and concluding that "not . . . all of these elements necessarily had to exist in any one fact situation in order for the doctrine to apply").  The Court concludes that, if this case were before the Supreme Court of New Mexico, it would analyze all six of the foregoing factors as described above.

      **B.**      **UNDER THE SIX PART TEST, JBI ELECTRICAL COMPLIED SUBSTANTIALLY WITH THE CILA, BECAUSE IT** JBI ELECTRICAL HAS **BEEN LICENSED IN NEW MEXICO FOR APPROXIMATELY TWENTY-FIVE YEARS AND MOVED QUICKLY TO GET ITS LICENSE REACTIVATED UPON THE DISCOVERY THAT IT HAD LAPSED.**

      The Court concludes that JBI Electrical satisfies the threshold inquiry. <u>See</u> <u>Koehler v. Donnelly</u>, 1992-NMSC-058, ¶ 11, 838 P.2d at 982-83.  First, there is no evidence that JBI Electrical endangered the public by being unscrupulous or irresponsible, given that JBI Electrical's licensing lapse occurred because of a clerical error committed by CT Corporation.  <u>See</u> JBI Response ¶ 8, at 3 (asserting this fact); KW Reply at 1 (admitting this fact); Benes Aff. ¶ 6, at 2. At the time the license lapsed, JBI Electrical had hired CT Corporation to manage its corporate registrations and licenses in fourteen states.  <u>See</u> JBI Response ¶ 8, at 3 (asserting this fact); KW Reply at 1 (admitting this fact); Benes Aff. ¶ 6, at 2.  CT Corporation's website encourages clients to "trust CT Corporation to navigate compliance anywhere you do business."  <u>CT Corporation</u>,

Wolters Kluwer, https://www.wolterskluwer.com/en/solutions/ct-corporation (last visited Feb. 20, 2021).[25]  With respect to licensing, CT Corporation states that it can "easily manage complex requirements.  There are over 75,000 federal, state, and local jurisdictions.  As their compliance requirements become more complex, we're the partner that can help you manage them all.  CT Corporation is here to help you with business license needs."  Business License Solution, Wolters Kluwer,   https://www.wolterskluwer.com/en/solutions/ct-corporation/business-license-solutions (last visited Feb. 20, 2021).  The Court concludes that JBI Electricals's decision to hire an outside corporation which specializes in business licensing "in 150+ countries" -- which is a common practice in the construction industry -- in fact demonstrates its commitment to maintaining consistently its license across jurisdictions.   CT Corporation, Wolters Kluwer, https://www.wolterskluwer.com/en/solutions/ct-corporation (last visited Feb. 20, 2021).  Here, JBI Electrical did not realize that CT Corporation did not file the proper paperwork to renew its New Mexico license.  See JBI Response ¶ 8, at 3 (asserting this fact); KW Reply at 1 (admitting this fact); Benes Aff. ¶ 6, at 2.  Accordingly, like the plaintiff in Koehler v. Donnelly, JBI Electrical's "competence and responsibility as a contractor was never jeopardized in this case and the public was, pursuant to the purpose of the CILA, protected."  Koehler v. Donnelly, 1992-NMSC-058, ¶ 14, 838 P.2d 980, 983.   Second, the Defendants here have received the full protection contemplated by the CILA, and are thus using the CILA as "an unwarranted shield for the avoidance of a just obligation," contrary to the statute's purpose.  Peck v. Ives, 1972-NMSC-053,

---

[25]The Court takes judicial notice that this information is on CT Corporation's website.  See O'Toole v. Northrop Grumman Corp., 499 F.3d 1218, 1224 (10th Cir. 2007)(taking judicial notice of a website's posting of historical retirement fund earnings).  "It is not uncommon for courts to take judicial notice of factual information found on the world wide web."  O'Toole v. Northrop Grumman Corp., 499 F.3d at 1225.  The Court does not take these statements for their truth, but just as a representation that CT Corporation makes to get and keep its customers.

¶ 23, 84 N.M. 62, 66, 499 P.2d 684, 688.  As to the final threshold issue, here, unlike the plaintiff Roth v. Thompson, JBI Electrical did not "willfully enter into a contract in violation of the CILA." Koehler v. Donnelly, 1992-NMSC-058, ¶ 11, 838 P.2d 980, 982.  See Roth v. Thompson, 1992-NMSC-011, ¶ 2,  825 P.2d 1241, 1242.  Instead, like the plaintiff in Koehler v. Donnelly, JBI Electrical's "licensing lapse occurred for reasons beyond" its "control," -- CT Corporation's clerical error -- "and not for reasons of incompetence or discipline by the CID."  Koehler v. Donnelly, 1992-NMSC-058, ¶ 11, 838 P.2d 980, 982.  The Court concludes, therefore, that JBI Electrical meets the first three threshold elements of the Supreme Court of New Mexico's substantial compliance test.

Because JBI Electrical satisfies the threshold inquiry, the Court next applies the three Lapitac factors and concludes that JBI Electrical satisfies two of the three factors.  See Lapitac, 64 Cal.2d 278, 411 P.2d 564.  Like the plaintiffs in Roth v. Thompson and Koehler v. Donnelly, JBI Electrical does not satisfy the first factor, because JBI Electrical lacked a valid license at the time it contracted with JMD Construction to do electrical work on the FedEx Freight Center.  See Roth v. Thompson, 1992-NMSC-011, ¶ 18, 825 P.2d 1241, 1245; Koehler v. Donnelly, 1992-NMSC-058, ¶ 11, 838 P.2d 980, 982-83.  As the Supreme Court of New Mexico explains in Koehler v. Donnelly, however, although it described previously this element as "crucial," it is not dispositive where, as here, the plaintiff has "no willfulness or knowledge of his violation and he was fiscally responsible and competent at all times during the performance of the contract."  Koehler v. Donnelly, 1992-NMSC-058, ¶ 11, 114 N.M. 363, 365-66, 838 P.2d 980, 982-83.  In this case, as discussed, JBI Electrical's licensing violation was neither willful nor knowing.  See JBI Response ¶ 4 (asserting this fact); KW AQE Reply at 1 (admitting this fact); Benes Aff. ¶ 3-5; Smiley Aff. ¶ 7.  Moreover, although its license had expired, JBI Electrical remained bonded and insured with

the CID during the period in which its license lapsed, see JBI Response ¶ 8, at 4, demonstrating

its fiscal responsibility. JBI's licensure in fourteen states also indicates its ongoing competence.

See JBI Response ¶ 4, at 3 (asserting this fact); KW AQE Reply at 1 (admitting this fact); Benes

Aff. ¶ 3-5, at 2; Smiley Aff. ¶ 7, at 2. Second, after JBI Electrical learned that its license had

lapsed, JBI Electrical secured readily a renewal of its license. See JBI Response ¶ 4, at 3 (asserting

this fact); KW AQE Reply at 1 (admitting this fact); Benes Aff. ¶ 3-5, at 2; Smiley Aff. ¶ 7, at 2.

Like the plaintiff in Koehler v. Donnelly, once JBI discovered its licensing lapse, it "took

immediate steps and . . . [its] license was reinstated." Koehler v. Donnelly, 1992-NMSC-058,

¶ 12, 114 N.M. 363, 365-66, 838 P.2d 980, 982-83. Specifically, JBI Electrical contracted with

JMD Construction in April, 2018, and realized that its license had lapsed in May, 2018. See KW

Reply at 5. JBI Electrical then informed JMD Construction that its license had lapsed and

"immediately commenced obtaining a renewal of their licensure by submitting the appropriate

paperwork to the state . . . . [D]ue to a number of technical clerical issues unrelated to JBI's

qualifications . . . CID took months to process and issue the license." JBI MSJ Response ¶ 10, at

4 (asserting this fact). See KW AQE Reply (admitting this fact). Third, "the responsibility and

competence of" JBI Electrical's "managing officer were officially confirmed throughout the period

of performance of the contract." Koehler v. Donnelly, 1992-NMSC-058, ¶ 12, 114 N.M. 363, 365-

66, 838 P.2d 980, 982-83. Smiley took and passed the electrical contractor's certification

examination in July, 2018. See JBI Response ¶ 10, at 4 (asserting this fact); KW AQE Reply at 1

(admitting this fact); Benes Aff. ¶ 3-5; Smiley Aff. ¶¶ 3, 7 at 2. In sum, JBI Electrical has been

licensed in New Mexico for approximately twenty-five years and moved quickly to get its license

reactivated upon the discovery that it had lapsed. Accordingly, the Court determines that JBI

Electrical has complied substantially with N.M.S.A. § 60-13-1 during the time period at issue, and

is, therefore, eligible to foreclose on its Claim of Lien.

The Court agrees with the Defendants the operative date for licensure under N.M.S.A. § 60-13-1 is "the time the work was performed." Hungry Horse LLC v. E Light Elec. Servs., Inc., 569 F. App'x 566, 572 (10th Cir. 2014). See March 3 Tr. at 24:14-19 (Court, Calvert). The Defendants also note correctly that JBI Electrical lacked an official license during the majority of the time period during which it performed work. See March 3 Tr. at 24:14-19 (Calvert). This interpretation comports with the statute's text, because "the alleged cause of action arose" during the period in which JBI Electrical performed the work. N.M.S.A. § 60-13-1. Because JBI Electrical complied substantially with the CILA, however, JBI Electrical was "duly licensed at the time the work was performed." Hungry Horse LLC v. E Light Elec. Servs., Inc., 569 F. App'x at 572.

## II.    JBI ELECTRICAL NEED NOT DISGORGE PAYMENTS THAT IT RECEIVED FOR ITS WORK ON THE FEDEX FREIGHT CENTER, BECAUSE IT COMPLIED SUBSTANTIALLY WITH N.M.S.A. § 60-13-1.

"The doctrine of substantial compliance prevents a forfeiture on the part of a contractor who has performed work on a project as long as the party for whom the work is performed has received all the protections due it under the licensing statute." BC & L Pavement Servs., Inc. v. Higgins, 2002-NMCA-087, ¶ 20, 132 N.M. 490, 496, 51 P.3d 533, 539, overruled by Rio Grande Chapter of Sierra Club v. New Mexico Mining Comm'n, 2003-NMSC-005, ¶ 20, 133 N.M. 97, 61 P.3d 806. As the Court concludes above, JBI Electrical complied substantially with N.M.S.A. § 60-13-1, and the Defendants received all protections due them under the CILA. See Analysis § I. The Supreme Court of New Mexico has held that, under the CILA, "no contractor operating without a license may bring judicial action for compensation. Furthermore, the unlicensed contractor must return any amount received as a result of the contracting work." Koehler v. Donnelly, 1992-NMSC-058, ¶ 6, 838 P.2d 980, 981-82. Relying upon Mascarenas v. Jaramillo,

1191-NMSC-014, 806 P.2d 59, KW AQE therefore argues that, because JBI Electrical was unlicensed, it "may not retain payments as a matter of public policy." KW MSJ Memo. at 8. The Court disagrees with this contention, because JBI complied substantially with the CILA.

In <u>In re Luna</u>, No. 7-11-14983 TA, 2013 WL 1290438 (Bankr. D.N.M. March 27, 2013)(Thuma, B.J.), the Honorable David T. Thuma, United States Bankruptcy Judge for the United States Bankruptcy Court for the District of New Mexico, addresses a similar issue, and appears to agree with the Court's reasoning. <u>See</u> 2013 WL 1290438, at *5-6. There, during the course of the defendant's performance on a remodeling project, the CID suspended the defendant's "license for nonrenewal. Defendant thought he had completed the paperwork necessary to renew the license, but it turned out he had not. Defendant was not timely informed of the problem because he had moved and the paperwork from the state licensing division was sent to his old address." <u>In re Luna</u>, 2013 WL 1290438, at *1. Bankruptcy Judge Thuma notes that it "is not clear to the Court that the <i>Mascarenas</i> rule should be extended to the facts of this case, because here the Defendant was a licensed contractor, applied for a renewal of his license, and thought he had taken the steps required to obtain the renewal." <u>In re Luna</u>, 2013 WL 1290438, at *6. Bankruptcy Judge Thuma states that the CILA's purpose "would not necessarily be furthered by extending the <i>Mascarenas</i> rule to cases where a duly licensed and experienced contractor becomes unlicensed in the middle of a job because he mishandles his renewal paperwork." <u>In re Luna</u>, 2013 WL 1290438, at *6. Bankruptcy Judge Thuma did not decide the issue, however, because he explains that, regardless whether the plaintiff could recover the contract amount under <u>Mascarenas v. Jaramillo</u>, that sum would be dischargeable in bankruptcy. <u>See</u> <u>In re Luna</u>, 2013 WL 1290438, at *6.

In <u>Mascarenas v. Jaramillo</u>, the Supreme Court of New Mexico considered, as an issue of first impression, whether the recipient of work can recover payments made on a contract to an

unlicensed contractor.  See 1991-NMSC-014, ¶ 11, 806 P.2d 59, 62.  The parties had entered an oral agreement in which the defendant unlicensed contractor agreed to construct a trailer park on the plaintiff landowner's property.  See 1991-NMSC-014, ¶ 2, 806 P.2d 59, 60.  The defendant's work did not pass inspection and, as a result, the plaintiff hired other contractors to correct the defendant's work.  See 1991-NMSC-014, ¶ 2, 806 P.2d 59, 60.  The corrective work cost the plaintiff more than she had initially paid the defendant.  See 1991-NMSC-014, ¶ 2-3, 806 P.2d 59, 60.  The plaintiff filed suit against the unlicensed contractor "on claims of breach of contract, breach of implied warranty and negligence."  1991-NMSC-014, ¶ 4, 111 N.M. 410, 412, 806 P.2d 59, 61.  The defendant "counterclaimed to recover the balance of the contract price and for defamation." 1991-NMSC-014, ¶ 4, 111 N.M. 410, 412, 806 P.2d 59, 61.  The Supreme Court of New Mexico notes that "similar policy considerations and goals apply to both" this suit, and to the issue whether an unlicensed contractor may recover for his or her work.  1991-NMSC-014, ¶ 11, 111 N.M. 410, 413, 806 P.2d 59, 62.  The Supreme Court of New Mexico states that the "object sought to be accomplished by the" the CILA "is a healthy, ordered market in which consumers may contract with competent, reliable construction contractors who have passed the scrutiny of a licensing division.  The wrong to be remedied is the exploitation of the public by incompetent and unscrupulous contractors who are unable or unwilling to obtain a license." 1991-NMSC-014, ¶ 13, 111 N.M. 410, 413, 806 P.2d 59, 62.  The Supreme Court of New Mexico emphasizes that, in sum, "the wrongs to be remedied are circumstances which permit unlicensed contractors to flourish and profit at the expense of the public."   1991-NMSC-014, ¶ 15, 806 P.2d 59, 62-63.  The Supreme Court of New Mexico continues that "allowing recovery of payments made on a contract to an unlicensed construction contractor serves and advances the purpose of the" CILA, because the decision's "practical effect will be to further inhibit unlicensed contractors from engaging in

construction work without a license." 1991-NMSC-014, ¶ 15, 806 P.2d 59, 62-63.  The Supreme

Court of New Mexico explains that

> Section 60-13-30(A) prohibits an unlicensed contractor from using the courts of
> this state to collect compensation for his work, no matter how expertly performed.
> He could, however, evade the harsh consequences of Section 60-13-30(A) by
> collecting most or all of the contract price before significant commencement of
> performance.  Our ruling today effectively ends this sort of practice. As a matter of
> public policy, an unlicensed contractor may not retain payments made pursuant to
> a contract which requires him to perform in violation of the Construction Industries
> Licensing Act.  This is true even if, as here, the consumer has knowledge that the
> contractor is unlicensed.  The public policy behind the licensing requirement of the
> Act is so strong that the element of consumer knowledge is of no consequence in
> our decision.

Mascarenas v. Jaramillo, 1991-NMSC-014, ¶ 16, 111 N.M. 410, 414, 806 P.2d 59, 63.   The

Supreme Court of New Mexico, therefore, holds that the plaintiff was entitled to recover all funds

that she paid the defendant.  See 1991-NMSC-014, ¶ 16, 111 N.M. 410, 414, 806 P.2d 59, 63.

In the present case, the Court concludes that, were this case before the Supreme Court of

New Mexico, the Supreme Court of New Mexico would focus heavily on whether allowing KW

AQE to recover the money it paid JBI Electrical would further the CILA's purpose.   See

Mascarenas v. Jaramillo, 1991-NMSC-014, ¶ 16, 111 N.M. 410, 414, 806 P.2d 59, 63.    First,

Justice Franchini of the Supreme Court of New Mexico authored Mascarenas v. Jaramillo  and two

of the Supreme Court of New Mexico's substantial compliance doctrine cases -- Roth v. Thompson

and Koehler v. Donnelly.  The Court infers, therefore, that the substantial compliance doctrine

likewise applies in situations like the one described in Mascarenas v. Jaramillo, 1991-NMSC-014,

¶ 16, 111 N.M. 410, 414, 806 P.2d 59, 63.  Specifically, the test is whether a ruling allowing JBI

Electrical to retain payments made on the Subcontract would encourage "incompetent and

unscrupulous contractors who are unable or unwilling to obtain a license" to exploit the public.

1991-NMSC-014, ¶ 13, 111 N.M. 410, 413, 806 P.2d 59, 62.  Unlike the contractor in Mascarenas

v. Jaramillo, who made no attempts to become licensed in New Mexico, JBI Electrical was both

willing and able to obtain a license once it realized its license had lapsed.  See JBI MSJ Response ¶ 10, at 4 (asserting this fact); KW AQE Reply (admitting this fact).  Its immediate efforts to reinstate its license, combined with its success in doing so, demonstrate that JBI Electrical is neither incompetent nor unscrupulous.  See Mascarenas v. Jaramillo, 1991-NMSC-014, ¶ 13, 111 N.M. 410, 413, 806 P.2d 59, 62.  The work itself, which passed inspection, acts as further evidence of JBI Electrical's competence and that it did not endanger the public.  The Court agrees with Bankruptcy Judge Thuma's reasoning in In re Luna, because the CILA's purpose "would not necessarily be furthered by extending the *Mascarenas* rule to cases where a duly licensed and experienced contractor becomes unlicensed . . . because he mishandles his renewal paperwork." In re Luna, 2013 WL 1290438, at *6.  In essence, applying the Mascarenas rule to JBI Electrical would not advance the CILA's deterrence goals, because JBI Electrical was a competent contactor which made diligent efforts to secure a license.  See In re Luna, 2013 WL 1290438, at *6.  In fact, the CILA's drafters likely would seek to encourage large contractors like JBI Electrical to hire compliance experts like CT Corporation to ensure that their multiple licenses are well managed.

True enough, as the Defendants have noted, the Supreme Court of New Mexico stated that "an unlicensed contractor that has performed work for which a license is required is not entitled to retain the funds charged for the unlicensed work."  State v. Platt, 1992-NMCA-110, ¶¶ 16-17, 114 N.M. 721, 725, 845 P.2d 815, 819 890 (citing Mascarenas v. Jaramillo, 111 N.M. 410, 806 P.2d 59 (1991)), abrogated on other grounds by State v. Cruz, 2011-NMSC-038, ¶¶ 16-17, 150 N.M. 548, 263 P.3d.  The Supreme Court of New Mexico has never addressed this principle in light of the substantial compliance doctrine.  A contrary result, however, would be nonsensical, because it would allow a substantially compliant contractor to foreclose on a mechanic's lien, while simultaneously forcing it to disgorge funds that it received as a result of the contract at issue.  It

follows that a contractor who succeeded on a foreclosure would subsequently be forced to surrender those funds.  This cannot be the result that Justice Franchini, who authored all three substantial compliance opinions by the Supreme Court of the New Mexico, would have intended, because the Supreme Court of New Mexico avoids "unreasonable" interpretations which "lead[] to absurd results that would be impossible to justify."  Chavez v. Mountain States Constructors, 1996-NMSC-070, ¶ 41, 122 N.M. 579, 587, 929 P.2d 971, 979 (Franchini, J.).  JBI Electrical, therefore, need not disgorge its funds because it complied substantially with the CILA's licensing requirements.

### III.  THE COURT DISMISSES JBI ELECTRICAL'S UNJUST ENRICHMENT CLAIM, COUNT IV OF THE AMENDED COMPLAINT, BECAUSE JBI ELECTRICAL LACKS PRIVITY OF CONTRACT WITH KW AQE, AND JBI ELECTRICAL HAS A CONTRACTUAL REMEDY AGAINST JMD CONSTRUCTION.

"A person who has been unjustly enriched at the expense of another is required to make restitution to the other."  Restatement (First) of Restitution § 1 (1937).[26]  "To prevail on a claim

---

[26]The Supreme Court of New Mexico has relied upon the Restatement First of Restitution when analyzing unjust enrichment claims.  See, e.g., Sunwest Bank of Albuquerque, N.A. v. Colucci, 1994-NMSC-027, ¶ 12, 117 N.M. 373, 376, 872 P.2d 346, 349; Hydro Conduit Corp. v. Kemble, 1990-NMSC-061, ¶ 8, 110 N.M. 173, 175, 793 P.2d 855, 857.  See also United States ex rel. Sunworks Division of Sun Collector Corp. v. Insurance Co. of North Am., 695 F.2d 455, 458 (10th Cir. 1982)(discussing the Restatement of Restitution § 1 when analyzing an unjust enrichment claim under New Mexico law).  The Supreme Court of New Mexico last cited the Restatement of Restitution in 2003.  See Chase Manhattan Bank v. Candelaria, 2004-NMSC-017, ¶ 10, 135 N.M. 527, 530, 90 P.3d 985, 988.  The Restatement Third of Restitution was published in 2011, and the Supreme Court of New Mexico has not relied directly on it.  Justice Antonin Scalia writes, regarding the Restatement Third of Restitution:

> I write separately to note that modern Restatements -- such as the Restatement (Third) of Restitution and Unjust Enrichment (2010), which both opinions address in their discussions of the disgorgement remedy -- are of questionable value, and must be used with caution.  The object of the original Restatements was "to present an orderly statement of the general common law."  Restatement of Conflict of Laws, Introduction, p. viii (1934).  Over time, the Restatements' authors have abandoned the mission of describing the law, and have chosen instead to set forth

for unjust enrichment, 'one must show that: (1) another has been knowingly benefitted at one's expense (2) in a manner such that allowance of the other to retain the benefit would be unjust.'" City of Rio Rancho v. Amrep Sw. Inc., 2011-NMSC-037, ¶ 54, 150 N.M. 428, 260 P.3d 414, 428-29 (quoting Ontiveros Insulation Co. v. Sanchez, 2000-NMCA-051, ¶ 11, 129 N.M. 200, 3 P.3d 695 (Armijo, J.)[27]).

> A person confers a benefit upon another if he gives to the other possession of or some other interest in money, land, chattels, or choses in action, performs services beneficial to or at the request of the other, satisfies a debt or a duty of the other, or in any way adds to the other's security or advantage.

Restatement (First) of Restitution § 1 cmt. b. "The theory has evolved largely to provide relief where, in the absence of privity, a party cannot claim relief in contract and instead must seek refuge

---

their aspirations for what the law ought to be. Keyes, The Restatement (Second): Its Misleading Quality and a Proposal for Its Amelioration, 13 Pepp. L. Rev. 23, 24-25 (1985). Section 39 of the Third Restatement of Restitution and Unjust Enrichment is illustrative; as Justice THOMAS notes, *post,* at 1068 (opinion concurring in part and dissenting in part), it constitutes a "'novel extension'" of the law that finds little if any support in case law. Restatement sections such as that should be given no weight whatever as to the current state of the law, and no more weight regarding what the law ought to be than the recommendations of any respected lawyer or scholar. And it cannot safely be assumed, without further inquiry, that a Restatement provision describes rather than revises current law."

Kansas v. Nebraska, 574 U.S. 445, 475-76 (2015)(Scalia, J., concurring in part and dissenting in part). In Montana v. United States, 440 U.S. 147, Chief Justice William Rehnquist notes that the Supreme Court's "references to law review articles and drafts or finally adopted versions of the Restatement of Judgments are not intended to bind the Court to the views expressed therein on issues not presented by the facts of this case." 440 U.S. at 164 (Rehnquist, J., concurring). The Court, therefore, relies upon the Restatement First of Restitution in analyzing the unjust enrichment claims in the present case, because the Supreme Court of New Mexico has referenced solely the Restatement First of Restitution, and because of the concerns Justice Scalia expresses that the Restatement Third of Restitution "constitutes a 'novel extension' of the law that finds little support if any in case law." Kansas v. Nebraska, 574 U.S. at 476-76 (2015)(Scalia, J., concurring in part and dissenting in part)(quoting Thomas, J., concurring in part and dissenting in part).

[27]The Honorable M. Christina Armijo served on the Court of Appeals of New Mexico from 1996 to 2001. In 2001, she was then appointed as a United States District Judge for the United States District Court for the District of New Mexico.

in equity." Ontiveros Insulation Co. v. Sanchez, 2000-NMCA-051, 129 N.M. 200, 203-04, 3 P.3d 695, 698-99.  Accord Acevedo v. Sw. Airlines Co., No. CIV 16-0024 MV/LF, 2018 WL 2392215, at *12 (D.N.M. May 25, 2018)(same)(Vazquez, J.); Hunt v. N. Carolina Logistics, Inc., 193 F. Supp. 3d 1253, 1266 (D.N.M. 2016)(Browning, J.)(same).

JBI Electrical brings its unjust enrichment claim against KW AQE only.  See Am. Compl. ¶¶ 33-36, at 5 (Count IV).  KW AQE argues that JBI Electrical cannot allege successfully an unjust enrichment claim, because it was unlicensed.  See KW AQE MSJ Memo. at 6.  Cf. Little v. Jacobs, 2014-NMCA-105, ¶¶ 11, 336 P.3d 398, 401 ("The Supreme Court of New Mexico has rejected attempts by unlicensed contractors to recover under the equitable defense of unjust enrichment.").  As discussed above, the Supreme Court of New Mexico has held that, where a contractor complies substantially with the CILA, the contractor is not barred from bringing suit.  See Koehler v. Donnelly, 1992-NMSC-058, ¶ 12, 114 N.M. 363, 365-66, 838 P.2d 980, 982-83.  The Court concludes that likewise, here, because JBI Electrical complied substantially with the statute, it is not prohibited from bringing an unjust enrichment claim because of its previous licensing status.  See Analysis § I-II.

KW AQE also argues correctly that, under New Mexico law, unjust enrichment remedies are strongly disfavored if remedies are available to a party under contract law.  See KW AQE MSJ Memo. at 7.  See also Sims v. Sims, 1996-NMSC-078, ¶ 28, 122 N.M. 618, 930 P.2d 153, 159 ("Equity will not act if there is a complete and adequate remedy at law.").  The Court has held previously that New Mexico law allows "plaintiffs to pursue unjust enrichment claims when those claims are the subject of a contract between the plaintiff and a different party, but not when the plaintiff can pursue the contract claim."  Abraham v. WPX Energy Prod., LLC, 20 F. Supp. 3d at 1272.  "New Mexico courts have permitted plaintiffs to bring unjust enrichment claims against

third parties to recover what would otherwise be the subject of a contract." Abraham v. WPX
Energy Prod., LLC, 20 F. Supp. 3d at 1273 (citing Ontiveros Insulation Co. v. Sanchez, 2000-
NMCA-051, 129 N.M. 200, 203-04, 3 P.3d 695, 698-99).  Nonetheless, "[s]ubcontractors' suits
against property owners are generally not favored."  Ontiveros Insulation Co. v. Sanchez, 2000-
NMCA-051, 129 N.M. 200, 204, 3 P.3d 695, 699.  See George M. Morris Const. Co. v. Four
Seasons Motor Inn, Inc., 1977-NMSC-064, ¶ 11, 90 N.M. 654, 656-57, 567 P.2d 965, 967-68
(holding that a subcontractor lacked a personal cause of action against an owner).

The Supreme Court of New Mexico has recognized exceptions, however, to this general
principle.  First, "'a Subcontractor who has lost his mechanic's lien claim against a property owner
may have a claim in quantum meruit where the owner has not paid the general contractor.'" Hydro
Conduit Corp. v. Kemble, 1990-NMSC-061, ¶ 8, 110 N.M. 173, 175, 793 P.2d 855, 857 (quoting
United States for & on Behalf of Sunworks Div. of Sun Collector Corp. v. Ins. Co. of N. Am., 695
F.2d 455 (10th Cir. 1982)("Sunworks")(citing Terry v. Pipkin, 1959-NMSC-049, 66 N.M. 4, 340
P.2d 840)).   Additionally, where the owner and subcontractor have an employer-employee
relationship, the Supreme Court of New Mexico has held a subcontractor may be able to recover
from an owner, despite a  lack of contractual privity.  See Platco Corp. v. Shaw, 1967-NMSC-123,
¶ 4, 78 N.M. 36, 37, 428 P.2d 10, 11.  The Supreme Court of New Mexico has also allowed
quantum valebant[28] actions to go forward between two parties in privity of contract, where: (i) a

---

[28]Like quantum meruit, quantum valebant is a less commonly used form of restitutionary
recovery:

In principle, restitutionary remedies provide the complaining party either with
specific relief (e.g., return of the chattel wrongfully taken or retained) or with the
monetary value of the goods or services provided.  In the latter instance, courts
usually speak of a recovery in quantum valebant (as much as the goods are worth)
or in quantum meruit (as much as the plaintiff deserves), sometimes the action itself

party induced a contractor perform additional work not in the contract; (ii) the contractor performed the work in good faith, and the inducing party refused to pay for the additional costs the contractor incurred.  See Danley v. City of Alamogordo, 1978-NMSC-031, ¶ 9, 91 N.M. 520, 522, 577 P.2d 418, 420.  See also J.R. Hale Contracting Co. v. Union Pac. R.R., 2008-NMCA-037, ¶ 70, 143 N.M. 574, 594, 179 P.3d 579, 599 (reversing the trial court's dismissal of a subcontractor's quantum meruit claims against an owner where the subcontractor alleged that the general contractor never billed the owner for the Subcontractor's additional work).

Here, most importantly, KW AQE and JBI Electrical are not in contractual privity.  See J.R. Kemper, Building and Construction Contracts: Right of Subcontractor who Has Dealt Only with Primary Contractor to Recover Against Property Owner in Quasi-Contract, 62 A.L.R.3d 288 (Originally published in 1975)("With respect to privity: the subject assumes a lack of privity as between Subcontractor and owner."); JBI Response at 15 ("KW AQE and JBI were not in contractual privity in any manner related to the project.").  JBI Electrical, however, had a contractual relationship with JMD Construction, and has brought breach-of-contract claims against JMD Construction directly.  See Am. Compl. ¶¶ 8-32, at 2-5.  "New Mexico law strongly disfavors unjust enrichment claims when remedies exist under contract law."  Steadfast Ins. Co. v. Legacy Safety & Consulting, LLC, No. CV 15-00218 WJ/CG, 2015 WL 12803775, at *4 (D.N.M. June

---

is said to be one in quantum meruit or one in quantum valebant.  This shorthand description may be useful, but it can also be misleading.  Quantum valebant or meruit is nothing but a method of measurement, and neither provides a standard of liability.  A plaintiff may recover in quantum meruit for services provided under an express contract if the agreement is silent or ambiguous as to the price.  On the other hand, quantum meruit is the method commonly used to put a value on the services for which payment should be made in a quasi-contract case.

Howard O. Hunter, Recoveries in Quantum Valebant and Quantum Meruit, Modern Law of Contracts § 16:8.

25, 2015)(Johnson, J.).   See Abraham v. WPX Energy Prod., LLC, 20 F. Supp. 3d at 1272.

Moreover, none of the exceptions to this general principle apply in this case.  See Hydro Conduit

Corp. v. Kemble, 1990-NMSC-061, ¶ 8, 110 N.M. 173, 175, 793 P.2d 855, 857.   JBI Electrical

has not lost its claim against JMD Construction; its claims for breach of contract, breach of the

implied warranty of good faith and fair dealing, and foreclosure on the claim of lien are currently

before the Court.  See Hydro Conduit Corp. v. Kemble, 1990-NMSC-061, ¶ 8, 110 N.M. 173, 175,

793 P.2d 855, 857; Am. Compl. ¶¶ 8-32, at 2-5.  Moreover, JBI Electrical does not allege, and

there is no evidence of, an employer-employee relationship between JBI Electrical and KW AQE.

See Platco Corp. v. Shaw, 1967-NMSC-123, ¶ 4, 78 N.M. 36, 37, 428 P.2d 10, 11; JBI Response

at 15.    The exception that Danley v. City of Alamogordo describes also cannot salvage JBI

Electrical's unjust enrichment claim against KW AQE,  because, as discussed above, KW AQE

and JBI Electrical have never been in privity of contract.  See 1978-NMSC-031, ¶ 9, 91 N.M. 520,

522, 577 P.2d 418, 420; JBI Response at 15.[29]   JBI Electrical's "remedy," therefore, "is . . . best

sought from the underlying general contractor," JMD Construction.  Ontiveros Insulation Co. v.

Sanchez, 2000-NMCA-051, 129 N.M. 200, 204, 3 P.3d 695, 699.[30]  The Court therefore dismisses

---

[29]Danley v. City of Alamogordo  could support a quasi-contractual claim by JBI Electrical
against JMD Construction.  See 1978-NMSC-031, ¶ 9, 91 N.M. 520, 522, 577 P.2d 418, 420.  Like
the defendant in Danley v. City of Alamogordo, JBI Electrical alleges that the JMD Construction
directed it to "perform additional work that was not required by the Project plans and
specifications," but "JBI has not been paid for the changes and additional work."  Am. Compl.
¶¶ 12-14, at 3.  These allegations remain in dispute, however, and JBI Electrical has not brought
unjust enrichment claims against JMD Construction.  See Am. Compl. ¶ 34, at 5.  The Court,
therefore, declines to analyze these potential claims at this stage of the proceedings.

[30]The facts currently before the Court do not indicate how much of the contract price KW
AQE has paid to JMD Construction.  The Supreme Court of New Mexico has held, however, that
"[g]enerally, a Subcontractor cannot recover against the landowner in quasi-contract when that
landowner has paid 'a very substantial part' of the contract amount to the general contractor."
Sundance Mech. & Util. Corp. v. Atlas, 1994-NMSC-084, ¶ 17, 118 N.M. 250, 255, 880 P.2d 861,

Count IV of the Amended Complaint, and KW AQE is dismissed as a Defendant in this action.

III. **THE CONTRACT'S FORUM SELECTION CLAUSE DOES NOT REQUIRE THE COURT TO TRANSFER THE CASE TO THE EASTERN DISTRICT OF ARKANSAS, BECAUSE N.M.S.A. § 57-28A-1 RENDERS THE CONTRACTUAL FORUM SELECTION CLAUSE VOID.**

N.M.S.A. § 57-28A-1(a)-(b) provides:

A.    A provision of a construction contract, agreement, understanding, specification or other documentation that is made part of a construction contract for an improvement to real property in New Mexico is void, unenforceable and against the public policy of the state if the provision:

(1)    makes the construction contract subject to the laws of another state; or

(2)    requires any litigation arising from the construction contract to be conducted in another state.

B.    Any mediation, arbitration or other dispute resolution proceeding arising from or relating to a construction contract for work performed in this state shall be conducted in this state.

N.M.S.A. § 57-28A-1(a)-(b).  The statute defines a construction contract as

a public, private, foreign or domestic contract or agreement relating to construction, alteration, repair or maintenance of any real property in New Mexico and includes agreements for architectural services, demolition, design services, development,

---

866 (quoting Annotation, Building and Construction Contracts: Right of Subcontractor Who Has Dealt Only with Primary Contractor to Recover Against Property Owner in Quasi Contract, 62 A.L.R.3d 288, 295 (1975)).  Compare Ontiveros Insulation Co. v. Sanchez, 2000-NMCA-051, 129 N.M. 200, 205, 3 P.3d 695, 700 (upholding the trial court's finding that an owner's payment of 52% of the underlying contract was not very substantial), with Sundance Mechanical & Util. Corp., 118 N.M. at 253, 255, 880 P.2d at 864, 866 (noting payments of 85% on underlying contract as "a substantial portion thereof").  This prohibition makes logical sense: "It follows . . . that if a defendant has already *paid* for the benefit, there has been no enrichment, much less *unjust* enrichment."  Ontiveros Insulation Co. v. Sanchez, 2000-NMCA-051, 129 N.M. 200, 205, 3 P.3d 695, 700 (emphasis in original).  Evidence from KW AQE that it had paid a substantial portion of its contract with JMD Construction, therefore, would have acted as an additional protection against suits in equity by JBI Electrical.  See Sundance Mech. & Util. Corp. v. Atlas, 1994-NMSC-084, ¶ 17, 118 N.M. 250, 255, 880 P.2d 861, 866.  Without more information on the issue, however, the Court cannot determine what percentage payment would have been sufficient in this case.

engineering services, excavation or other improvement to real property, including buildings, shafts, wells and structures, whether on, above or under real property.

N.M.S.A. § 57-28A-1(c).  The Court remains the only court to have interpreted this statute.  See

Presidential Hosp., LLC v. Wyndham Hotel Grp., LLC, 333 F. Supp. 3d 1179, 1228 (D.N.M.

2018)(Browning, J.)("No New Mexico court or any other court has interpreted this statute.").  The

Court concludes that the N.M.S.A. § 57-28A-1 applies in this case, because the Subcontract at

issue is a construction contract for an improvement to real property in New Mexico.  See Order at

2-3.

    The Subcontract contains a forum selection clause, but that clause is "void, unenforceable,

and against the public policy of the state . . . ."  N.M.S.A. § 57-28A-1(A).  JBI Electrical attaches

the Subcontract to its Complaint, but omits the portion of the Subcontract containing the forum

selection clause.  JMD Construction does not include a copy of the Subcontract with the MTD, but

states that  "the parties contract is clear that 'the Parties shall submit the matter to the binding

dispute resolution below . . . Litigation in the state of Arkansas.'"  Am. MTD at 4.  See Subcontract

at 22-23 (omitting pages 25-26 of the original Contract); JBI Electrical Response at 4 (explaining

that JBI Electrical "does not dispute that the contract at issue contains a forum selection clause

requiring litigation to be heard in Arkansas").  JBI Electrical argues that the forum selection clause

"is voided," and "there wasn't any reply."  Mar. 9 Tr. at 19:14-16 (Stevens-Block).  JBI Electrical

contracted with KW AQE to provide "all labor and materials necessary to perform a complete

turnkey electrical contract."  Am. Compl. ¶ 10, at 3.  Further, the Property at issue in the

Subcontract "is located at the NWC of I-40 and Atrisco Vista Boulevard NW, Albuquerque,

Bernalillo County, New Mexico."  Am. Compl. ¶ 4, at 2.  The Subcontract, therefore, is a

"construction contract" under N.M.S.A. § 57-28A-1(c).  Consequently, the forum selection clause

in the Subcontract is void and unenforceable, because, under N.M.S.A. § 57-28A-1, the

Subcontract is "a construction contract for an improvement to real property in New Mexico" that "requires any litigation arising from the construction contract to be conducted in another state." N.M.S.A. § 57-28A-1.  Accordingly, the Court denies JMD Construction's Motion to Transfer Venue.  <u>See</u> Order at 3-4.

## IV.   JMD CONSTRUCTION VALIDLY ASSIGNED ITS CLAIMS AGAINST JBI ELECTRICAL TO KW AQE.

JMD Construction and KW AQE contracted to assign JMD Construction's claims against JBI Electrical to KW AQE.  <u>See</u> Settlement and Assignment Agreement at 7 (dated Nov. 6, 2019), filed September 24, 2020 (Doc. 68)("Assignment Agreement").  "An assignment of a right is a manifestation of the assignor's intention to transfer it by virtue of which the assignor's right to performance by the obligor is extinguished in whole or in part and the assignee acquires a right to such performance."  Restatement (Second) of Contracts § 317 (1981).  Here, the Assignment Agreement explains JBI Electrical's claims against the Defendants:

> WHEREAS, JBI filed Suit against JMD in the United States District Court for the District of New Mexico on July 3, 2019 to collect sums purportedly owed by JMD under the parties' Subcontract;
>
> WHEREAS, on June 3, 2019 JBI filed a claim of lien on the subject property and on July l, 2019, JBI filed an amended claim of lien on the subject property;

Assignment Agreement at 7.  The Assignment Agreement then describes JMD Construction and KW AQE's claims against JBI Electrical:

> WHEREAS, JMD and KW assert that JBI's work under the Subcontract was incomplete and defective;
>
> WHEREAS, JMD has a claim sounding in breach of contract to complete and correct JBI's incomplete and defective work;
>
> WHEREAS, KW asserts that it has a claim against JMD for breach of contract related to incomplete and defective electrical work;
>
> WHEREAS, JMD asserts that it has a claims against JBI for breach of contract and

negligent construction related to incomplete and defective electrical work;

WHEREAS, KW asserts that it has a claim against JMD and JBI for negligent construction or negligent supervision, among other claims; and

WHEREAS, JMD and KW wish to settle KW's claims against JMD in exchange for an assignment of the claims against JBI to KW Projects, LLC.

Assignment Agreement at 7-8.  JMD Construction and KW AQE thus agree that

1.   JMD hereby assigns and transfers to KW Projects, LLC all its claims and rights against JBI, including but not limited to its claims for breach of contract and for negligence, but expressly retains any obligations to JBI under such Subcontract.   JMD represents and warrants the following: (i) that it has full and valid legal title, right, and interest to the claims and rights to be assigned hereunder free and clear of any and all liens, claims or encumbrances of any kind or nature, and it has not transferred, assigned, encumbered or hypothecated to anyone any title, right and interest to the claims or rights; (ii) that there are no existing impediments to the transfer of the claims or rights; (iii) that it shall indemnify and defend KW Projects, LLC from any claim of ownership to the claims and rights from any other person; and (iv) that the claims and rights being assigned include all of the rights of JMD against JBI.

2.   In exchange for JMD's assignment of claims and rights against JBI to KW Projects, LLC, KW hereby covenants not to sue only JMD for breach of contract and negligence in connection with the electrical work performed by JBI.  For purposes of clarity, KW expressly reserves any and all statutory claims that may exist against JMD and all claims and rights against JBI, including but not limited to those claims and rights that JMD has assigned to KW Projects, LLC hereunder.

Assignment Agreement at 8.  In sum, to protect itself from KW AQE's claims, JMD Construction agrees to both indemnify KW AQE against JBI Electrical's claims, and to assign its claims against JBI Electrical to KW AQE.  See Assignment Agreement at 7-8.

JBI Electrical argues that JMD Construction cannot assign its claims against JBI Electrical to KW AQE.  See JBI MSJ Response at 7.  JBI Electrical first attacks this right under the CILA, contending that an owner may not recover directly from an unlicensed contractor and that it would be contrary to the CILA's policy to allow a general contractor to assign its claims against an unlicensed contractor to the owner.  See JBI MSJ Response at 7.  As explained, see Analysis § I-

II, because the Court concludes that JBI Electrical complied substantially with the CILA's licensing requirements, this section likewise does not apply here to prevent collections actions by JMD Construction against JBI Electrical.

Moreover, assignments of rights or duties are presumptively valid, absent: (i) a prohibition by statute; or (ii) a violation of public policy.  See 29 Public Policy Limitations, Williston on Contracts § 74:23 (4th ed.).[31]  For example, the Social Security Act, 42 U.S.C. §§ 301-1305, prohibits assigning future Social Security payments.  See 29 Public Policy Limitations, Williston on Contracts § 74:23 (4th ed.).  In general, however, "[a]n assignment of a debt not yet due and which may never become due is effective if it appears that there is an existing contract or employment out of which the debt may arise."  29 Future rights -- Rights Which May Never Mature, 29 Williston on Contracts § 74:16 (4th ed.).  The Supreme Court of New Mexico has concluded that tort claims' assignment is presumptively valid:

> [T]he validity of the subrogation clause is challenged as an assignment of claim for personal injuries.  We find a lack of unanimity in the several jurisdictions concerning the assignability of medical expense coverage in an insurance policy. . . .  We have held that the provisions of the Workmen's Compensation Act . . . providing for assignments of personal injury causes of action are valid.  Castro v. Bass, 74 N.M. 254, 392 P.2d 668; White v. New Mexico Highway Commission, 42 N.M. 626, 83 P.2d 457.  We see no reason why an insurance contract which has the same effect should not be binding.

Motto v. State Farm Mut. Auto. Ins. Co., 1969-NMSC-178, ¶ 4, 81 N.M. 35, 36, 462 P.2d 620,

---

[31]The Supreme Court of New Mexico has relied regularly on Williston's treatise on contract law.  See, e.g., Phoenix Funding, LLC v. Aurora Loan Servs., LLC, 2017-NMSC-010, ¶ 24, 390 P.3d 174, 180; Lucero, Jr. v. Northland Ins. Co., 2015-NMSC-011, ¶ 22, 346 P.3d 1154, 1159; Horne v. Los Alamos Nat. Sec., L.L.C., 2013-NMSC-004, ¶ 41, 296 P.3d 478, 488. Because the Supreme Court of New Mexico's recent jurisprudence on assignment agreements' validity is limited, the Court also looks to Williston's description of the relevant law on assignment agreements.

621.  JBI Electrical cites to no cases and the Court can find none that prohibit assignment of breach of contract claims by a general contractor to an owner.  See JBI Electrical Response at 8 (admitting that it could find no case law on this issue).  Moreover, no New Mexico law prohibits assignment of the claims at issue in this case.  Based on a similar case, which allowed assignment of tort law claims, however, the Court concludes that the Supreme Court of New Mexico would approve of the Assignment Agreement in this case.  See Motto v. State Farm Mut. Auto. Ins. Co., 1969-NMSC-178, ¶ 4, 81 N.M. 35, 36, 462 P.2d 620, 621.  The Restatement Second of Contracts also explains that an assignment may also be invalid where the "assignment is validly precluded by contract."   Restatement (Second) of Contracts § 317 (1981).  The Subcontract here contains no provision prohibiting assignment of claims in litigation relating to the Subcontract.   See Subcontract at 1-26.  If JBI Electrical had wished to prohibit JMD Construction from assigning these claims, it could have included a similar provision in the Subcontract; the Court declines to invent such a provision, particularly where the Subcontract is the result of arms-length negotiation between sophisticated actors.   JBI Electrical admits, in fact, that "I see the assignment of breach-of-contract claims with respect to JBI's work.  I don't particularly see an assignment of any statutory claims."  Jan. 13 Tr. at 48:1-11 (Stevens-Block).  The Court concludes that JBI Electrical has conceded that JMD Construction may assign its claims to KW AQE, with the exception of disgorgement claims under the CILA.  See Jan. 13 Tr. at 48:1-11 (Stevens-Block).  The Court also agrees with JBI Electrical that "JMD has no statutory claims" against it under the CILA.  Jan. 13 Tr. at 48:1-11 (Stevens-Block).  See Analysis § II.  In that sense, JBI Electrical agrees with the Court, therefore, that the Assignment Agreement is valid.  Consequently, the Court holds that KW AQE may pursue claims against JBI Electrical on JMD Construction's behalf.

IT IS ORDERED that: (i) Defendant JMD Construction Services, LLC's Motion to

Dismiss or Transfer, filed July 26, 2019 (Doc. 6), is denied; (ii) Defendant KW AQE, LLC's Motion for Summary Judgment, filed August 25, 2020 (Doc. 53), is granted in part and denied in part; (iii) Defendant JMD Construction Services, LLC's Motion for Summary Judgment, filed September 9, 2020 (Doc. 61), is granted in part and denied in part; (iv) Plaintiff JBI Electrical Systems' Motion for Judgment on the Pleadings, filed September 17, 2020 (Doc. 65), is denied; and (v) the Plaintiff's Cross-Motion for Partial Summary Judgment, filed January 11, 2021 (Doc. 80), is granted in part and denied in part; (vi) Count IV, Unjust Enrichment, of the Amended Complaint, filed August 16, 2019 (Doc. 15), is dismissed; (vii) KW AQE is dismissed from this action as a Defendant, but remains in this action as a Counter-Plaintiff; and (viii) Count I, Counterclaim for Violation of the CILA, of the Defendant KW AQE, LLC's Response to Plaintiff's First Amended Complaint and Counterclaim for Violation of Construction Industries Licensing Act and Negligent Construction, filed April 1, 2020 (Doc. 34), is dismissed.

_____
UNITED STATES DISTRICT JUDGE

*Counsel*:

Leah Stevens-Block
Sarah K. Downey
Jackson Loman Stanford & Downey, P.C.
Albuquerque, New Mexico

     *Attorneys for the Plaintiff*

Sean R. Calvert
Calvert Menicucci, P.C.
Albuquerque, New Mexico

     *Attorneys for the Defendant KW AQE, LLC*

Charles Davidson
David L. Gershner
Davidson Law Firm
Little Rock, Arkansas

*Attorneys for the Defendant JMD Construction Services, LLC*